James Earl SLAUGHTER, Petitioner,

v.

Phillip PARKER, Warden, Respondent.

No. 3:00CV–P227–C.

United States District Court,
W.D. Kentucky,
at Louisville.

Sept. 27, 2001.

formalized commercial transactions.

Kathleen K. Schmidt, Pike & Schmidt, Shepherdsville, KY, Marguerite Neill Thomas, Kentucky Capital Litigation Resource, Frankfort, KY, Rodney McDaniel, Frankfort, KY, for Petitioner.

Kent T. Young, Nancy Susan Roncarti, Atty. Gens. Office, Stephen P. Durham, Office of General Counsel, Frankfort, KY, for Respondent.

## MEMORANDUM OPINION AND ORDER

COFFMAN, District Judge.

### INTRODUCTION

This matter is before the District Court to consider the motion for summary judgment filed by the Respondent Warden. The Warden has moved to dismiss the federal habeas petition filed by Petitioner, James Earl Slaughter.[1] Slaughter is a state prisoner currently on death row in Kentucky for his role in the robbery and murder of a Louisville consignment-store owner, Esther Stewart, on January 28, 1983.

A jury convicted Slaughter on both charges in 1983. The trial court sentenced him to twenty years' imprisonment for first-degree robbery and to death for murder.

The Supreme Court of Kentucky affirmed the conviction and sentence on direct appeal. *Slaughter v. Commonwealth*, 744 S.W.2d 407 (Ky.1987), *cert. denied*, 490 U.S. 1113, 109 S.Ct. 3174, 104 L.Ed.2d 1036 (1989). Slaughter filed a post-conviction motion to vacate, set aside or correct the judgment. *See* RCr 11.42. Following an extended evidentiary hearing in 1994, the trial court overruled the motion. The Supreme Court of Kentucky affirmed the decision to deny post-conviction relief. *Slaughter v. Commonwealth*, Appeal No. 96–SC–0049–MR (Ky., rendered April 27, 1999) (unpublished disposition). Petitioner then filed the present federal habeas corpus petition which raises forty-seven grounds for relief.

### Proof at Trial

Events that led to the conviction and death sentence of Petitioner occurred on Oakdale Street in Louisville, Kentucky. At the time of the robbery and murder, Petitioner lived at 3115 Oakdale Street in the apartment of Keith Edwards (TE VIII, 27–28). Edwards lived there with his sister, Laura, and his girlfriend, Paula Gibson (*Id.*). Near the apartment on the same street was a consignment store, The Clothes Rack. The victim, Esther Stewart, owned and operated The Clothes Rack (TE III, 305).

Paula Gibson recalled that on the morning of the crime, on January 28, 1983, Petitioner asked if she remembered him telling her about "that place on the corner." (TE VIII, 1032). A week earlier, Petitioner had told Gibson that he was going to rob the store on the corner (*Id.*, 1088–1089). Another prosecution witness, Terrence Preston, told police initially that Petitioner had said he planned to rob The Clothes Rack, and was not going to leave anyone behind (*Id.*, 1140). At trial, however, Preston denied telling the police that Petitioner had said this (*Id.*, 1129). Ac-

---

1. Petitioner's true name is not James Earl Slaughter. His legal name is Jeffrey Devane Leonard. Because the state court decisions repeatedly refer to Petitioner by his alias, this Opinion will also use the alias.

cording to Preston, he had heard this information from other people (*Id.*, 1130).

Laura Edwards testified that Petitioner left the apartment that afternoon at around 12:30 (TE VIII, 1029–1030). He left wearing a blue jacket and jogging pants and took with him a brown briefcase, which had a gun in it (*Id.*, 1031, 1033). He also took a butcher knife from a kitchen drawer (*Id.*). Both Laura and Paula watched him leave at about 1:00 p.m. in Keith Edwards' station wagon. Laura left the apartment soon thereafter and saw Petitioner driving in the direction of The Clothes Rack (*Id.*, 1034). She did not see him again until 1:00 a.m. the next morning, on January 29, 1983, when he returned home wearing a brown jacket and tan pants (*Id.*, 1035–1037).

At approximately 2:00 p.m. that day, Louisville police received a call about a stabbing at The Clothes Rack on Oakdale. Police discovered Esther Stewart lying dead on the front porch of the store with her arms outstretched (TE II, 294). Detective Wilson observed five stab wounds to Stewart's chest (*Id.*). There was blood on the floor inside the store, and a stool had been overturned (TE III, 404). Detective Clark discovered a .22 long-rifle bullet lying inside the front door (*Id.*, 398).

The cash drawer to the store register was jammed shut. Several police officers were required to force the drawer open (*Id.*, 410). On opening the register, police discovered that the drawer contained cash (*Id.*). A money bag containing cash and Stewart's purse were found under the cash register (*Id.*, 410–411). The purse, which was found behind a sliding drawer, was open and contained no money (*Id.*, 421). The corner of Stewart's empty wallet was sticking out of the top of the purse.

Several witnesses in the area at the time of the crime testified at trial. Two black females approached Officer VanMeter when he arrived at the scene and gave him the description of a thin, white male they saw running north on Oakdale with a knife in his hand (TE III, 385–387). Both woman, Jacelyn Davis and Scoshia Spence, were interviewed by police (TE IV, 430).

Davis described the suspect as being a white male in his early twenties, approximately 5'7" tall, with a thin build and light blond, shaggy hair, cut collar-length (*Id.*, 431–432). She described the young man as being very pale with bushy eyebrows and wearing Levis, a dark blue jacket and a dark blue skull cap (Id.). The jacket appeared to be dirty, and the man's nose looked red as if he had a cold (*Id.*, 432–433). Davis later identified a dark blue, down coat and dark blue toboggan seized from Slaughter as looking the like the clothes worn by the man she had seen running from the store (*Id.*, 439–440). Davis was certain that the man she saw was white and testified that she had a good look at his face and would never forget what he looked like (*Id.*, 450).

Scoshia Spence advised Detective Sherrard that she did not see the face of the man who was running near the store, but she thought that he was a white male in his late teens or early twenties, approximately 5'6" tall, thin, wearing a blue toboggan, a blue ski jacket and blue jeans, with blond hair which hung over his collar (TE IV, 482–483). Spence described the man's jacket as being medium blue with dirt or stains on the front of it. She described the jacket as being a waist-length jacket that was very puffy. The jacket had a seam that ran vertically down the outside of the arm (TE IV, 483). She saw this individual one-half block from The Clothes Rack (*Id.*, 484).

Officer Carlin testified that when he and his partner, Officer VanMeter, arrived on the scene that day, a man approached him and told him that he had seen several white persons acting suspiciously around

an automobile across the street from The Clothes Rack (TE III, 347–349). The man told Officer Carlin that one of the white suspects had a knife and appeared to be wiping blood off of it (*Id.*, 353).

Ronald Vittle was the owner of the Zippy Food Mart, located across the street from The Clothes Rack (TE V, 586–587). Vittle and another local business man were standing on the street immediately after the victim was stabbed (*Id.*, 588). Vittle testified that he saw a 25–year–old, white male, who said something suspicious (*Id.*). The man got into a car with two other people. It looked to Vittle like he was wiping something off on the front seat of the car (*Id.*). The car was parked in a lot directly across the street from the store (*Id.*, 588–589).

During the trial, defense counsel advised the court that a woman, Irene Schuble, contacted him claiming that her neighbor, Ann Fowler, had told her that she saw a white man running from The Clothes Rack on the day of the murder (TE VI, 829, 833–837). Her neighbor, however, refused to go to the police and did not wish to become involved. Schuble testified to these events at Petitioner's trial. Her neighbor, Ann Fowler, however, testified that she knew nothing about the incident at The Clothes Rack, was not at the scene that day, and had never told Schuble or anyone else that she had witnessed any portion of the events that took place at The Clothes Rack (*Id.*, 812–814, 817, 821). Schuble's boyfriend, John Cockrel, testified in rebuttal that he had overheard conversations between Fowler and Schuble about the murder at The Clothes Rack. Fowler allegedly said she had seen the man when she was in the area of the beauty shop; and, that if it was a black man who ran from the building, it was the whitest black man she had ever seen (*Id.*, 846–849).

Still another witness, Preston Siler, testified that he was riding his bicycle in the area of the store between 1:30 p.m. and 2:00 p.m. that day (TE VII, 874–876). Siler saw a black male running from The Clothes Rack. The man looked as if he were attempting to hide something (*Id.*, 881–882). He appeared to have blood on him. Siler did not see the man's face (*Id.*, 913). He told the police that the man he saw that day could have been Puerto Rican (*Id.*).

Ann Ditsch worked three doors down from The Clothes Rack (TE VII, 1009–1010). Periodically, she would shop at The Clothes Rack during her lunch hour (*Id.*). Ditsch testified that about three days before Stewart was murdered, she saw Slaughter in The Clothes Rack (*Id.*, 10100–1015).

When Petitioner returned home, Paula Gibson noticed that he changed his clothes before going out (TE VIII, 1090). Gibson later discovered a broken gun under some dirty clothes in the bathroom of the apartment (*Id.*, 1100). After Keith Edwards learned about the broken gun, he told his sister to throw the gun into the back yard (*Id.*). Laura Edwards testified that when she again saw Petitioner at 1:00 a.m., the following morning, on January 29th, she took the car keys from Petitioner as her brother had told her to do (*Id.*, 1036–1037). She also noticed a spot of blood on Petitioner's pants (*Id.*, 1037). That same morning, Paula noticed a shirt soaking in the bathroom sink of the apartment. She also noticed some blood on Petitioner's pants (*Id.*, 1093). In the kitchen sink, she noticed a knife, which none of them had used the day before (*Id.*, 1096, 1098).

Keith Edwards did not return to the apartment until 5:30 a.m., in the morning of the day after the crime (TE VIII, 1093). Edwards also noticed blood on Petitioner's jogging pants in the bathroom and saw the

pieces of the broken gun. On Saturday, January 29, 1983, Petitioner left the apartment around 4:30 p.m., saying that he was going to visit his father (*Id.*, 1044). Instead, Petitioner went to visit Keith Edwards at his workplace (*Id.*, 1177). Petitioner had earlier told Edwards, the day before, that he knew nothing about the woman getting killed at The Clothes Rack (*Id.*, 1175). However, when Petitioner met Edwards on the 29th, Edwards again asked him about the murder (*Id.*, 1178).

Edwards testified that in response to this question, Petitioner told Edwards that he went down the street and robbed the woman at The Clothes Rack (TE VIII, 1178). According to Petitioner, he walked up behind the owner, and after talking to her briefly, grabbed her while demanding to know where the money was (*Id.*) She began to scream and told him she had no money (*Id.*). Edwards testified that Petitioner then told him that he then hit the victim with the gun, but the blow had no effect on her. He next put the knife to her throat, and again, demanded to know where the money was located (*Id.*, 1179). She begged Petitioner not to hurt her and began to scream again. Petitioner then stabbed her several times and ran out of the store (*Id.*). According to Edwards, Petitioner told him that he stabbed Stewart once in the back and several times in other places (*Id.*, 1191).

As soon as Petitioner left, Keith Edwards called the police to advise them what he had learned (TE VIII, 1183). Sgt. Robert Barker took the call from Edwards (Vol.V, 641). Edwards advised Sgt. Barker that Petitioner had Edwards's automobile and was involved in the robbery-murder at The Clothes Rack (*Id.*, 611–612). Lt. Wolfe and Sgt. Barker then went to Edwards's apartment (*Id.*, 613–614). They arrived at the same time that Petitioner arrived there. Lt. Wolfe advised Laura Edwards that the police were looking for a white male involved in a murder at The Clothes Rack (*Id.*, 614). Edwards said that she did not know anything about a white male, but Petitioner had left the apartment around noon the preceding day and was wearing the same kind of clothes that the killer was wearing (*Id.*, 615). Lt. Wolfe noticed that one of Petitioner's shoes appeared to have a small bloodstain on it (*Id.*, 616).

Lt. Wolfe asked Petitioner to get the jacket he had been wearing before. Petitioner returned with a nylon jacket from the closet. Officer Pike took him into another room to talk with him (TE V, 616–617). Laura Edwards then advised Lt. Wolfe that the nylon jacket that Petitioner had brought out was not the one that he had worn the day before (*Id.*). Edwards went to the closet and got the medium blue jacket that she saw Petitioner wearing (*Id.*, 617). The jacket appeared to have bloodstains on it (*Id.*). Petitioner was then formally arrested for robbery and murder (*Id.*). Edwards directed Lt. Wolfe to the other clothes that Petitioner had been wearing. She advised Lt. Wolfe that Petitioner had soaked the shirt overnight to get the blood out of it (*Id.*, 618). Some of the other clothes appeared to have bloodstains on them.

Petitioner made several different statements to police about the details of his involvement in the events at The Clothes Rack on January 28, 1993. While in the holding room at the police station, Petitioner told Lt. Wolfe one version of events. He said that he was driving Keith Edwards's automobile that day, looking for a purse to snatch (TE V, 619). Petitioner picked up a white male. As the two men rode around, the white male talked about robbing The Clothes Rack (*Id.*, 619–620). Petitioner told Lt. Wolfe that he changed clothes and shoes with this individual and got out of the automobile at Edwards's

apartment (*Id.*, 620). The white male then drove off in Edwards's car, only to return later and switch clothes again with Petitioner (*Id.*).

Lt. Wolfe delivered Petitioner to the homicide office at the police department. Petitioner was interviewed by Detectives Sherrard and Duff. Detective Sherrard testified that he interviewed Petitioner and told him that Keith Edwards had already said that Petitioner admitted killing the store owner, and that Petitioner was the only one involved in the robbery-murder (TE IV, 514). Petitioner denied any involvement in the crime during the interview (*Id.*, 515). He told Detective Sherrard that he did not know who the white male was (*Id.*). Petitioner also denied lending his clothes or Keith Edwards's car to this individual and accused the police officers of lying when they said he made such statements (*Id.*, 515–516).

Detective Duff took Petitioner into his office to interview him alone (TE IV, 516). Duff returned at approximately 9:40 p.m. and advised that Petitioner had changed his story (*Id.*). Petitioner told Detective Sherrard that he was a look-out during the robbery, and that the white male had entered the store to commit the offense (*Id.*). Petitioner denied that he told Detective Duff that he had gone into the store with the white male (*Id.*).

Petitioner told Detective Sherrard that he was driving Keith Edwards's station wagon at 11:30 a.m. that morning when he picked up a white male at the corner of Third and Winkler Streets (TE IV, 517). The two drove around for awhile and decided to rob The Clothes Rack (*Id.*). The two men exchanged clothing and went to the store between 1:30 and 2:00 p.m. Petitioner told Detective Sherrard that the white male had entered the store alone, and that he had remained standing outside on the front porch (*Id.*). Shortly thereafter, Petitioner heard screaming from inside the store (*Id.*). The white male ran from the front door of the store, and the two men ran side by side northward down Oakdale Street and through an alley to where the car was located (*Id.*). Upon arriving at the automobile, they traded clothing and then drove around for awhile. Petitioner then let the white male out at a game room in the Cardinal Shopping Center (*Id.*).

Petitioner told Detective Sherrard that he did not know who this individual was, but described him as being a white male in his early 20s, very thin, with dark-blond hair (TE IV, 519). Petitioner advised the detective that he thought that this man was called "Red." Detectives Sherrard and Hale later went to the game room on January 31, 1983, to look for "Red," but were unable to find anyone matching that description (TE IV, 520–521).

Detective Duff also testified concerning the statements made by Petitioner, following his arrest. Detective Duff testified that Petitioner told him that he had picked up a white male hitchhiking, and that they had discussed ripping people off (TE IV, 536). According to Duff, Petitioner told him that the white male had asked Petitioner if he wanted to pull a job. Petitioner allegedly responded that he did not, but would help (*Id.*). Petitioner told Duff that he had parked in front of Edwards' apartment and had exchanged clothes with the white male. He also had provided him with a pistol or a rifle (*Id.*). Afterwards, Petitioner went into the apartment, and the white male left (*Id.*, 536–537). A short time later, the white male returned, and the two men exchanged clothes in the automobile again (*Id.*, 537). The white male also returned the gun, which was broken (*Id.*). That was the last time that Petitioner saw the white male. He told Detective Duff that he did not know that a murder had been committed at The Clothes Rack

until the following day when he saw the news on television (*Id.*). Subsequently, however, Petitioner told the detective that he was in the store when the robbery happened, but no one was supposed to get killed (*Id.*, 538). Detective Dossett, who took a taped statement from Petitioner on January 29th, testified that Petitioner had never told him that he was in the store when the killing occurred, but that no one was supposed to be hurt (*Id.*, 550).

While Petitioner was awaiting trial in the Jefferson County Jail, he spoke with a fellow inmate, William Keller, about the crime. Keller testified at trial that he asked Petitioner why he had stabbed the victim. According to Keller, in testimony that he would later recant, Petitioner supposedly said that he stabbed the victim because he thought she was going to scream out (TE VIII, 1142–1146). Petitioner had only intended to rob her, but had become scared and stabbed her (*Id.*).

Serologist, William Durbin, testified concerning the blood found on the jogging pants, black pants, tan pants, jogging shoes and rifle barrel (TE VI, 781–783). Durbin testified that with the exception of the right jogging shoe, the blood found on all of these items was the same blood-type as that of Esther Stewart (*Id.*, 782–783). Further, the toboggan and the shirt contained head hairs of a black person that matched Petitioner's hair characteristics (*Id.*, 784). A left-hand, black glove seized by the police also contain the same blood type as the victim's, and the right-hand glove was found to contain clothing fibers similar to the fibers on a smock that the victim was wearing at the time of her death. Durbin, however, did not find any fibers on Petitioner's clothing that matched the victim's clothing (*Id.*, 801).

Dr. Weakly–Jones performed an autopsy on the victim the day after the murder (TE III, 363). The doctor testified that the victim had multiple stab wounds and two incise wounds to the chest, back, hand and shoulder areas (*Id.*, 364). The victim also had a laceration in her scalp above her right ear (*Id.*, 366). One of the stab wounds penetrated the victim's heart and caused her death (*Id.*, 368–369).

At the close of the prosecution's case, Petitioner moved for a directed verdict of acquittal on both the robbery and murder charges (TE IX, 1215–1218, 1241–1242). His motion was overruled by the trial court. Petitioner did not testify during the guilt phase of the proceedings, nor did he put on any other proof. Instead, his attorney noted that Petitioner's version of what happened was contained in the taped statement given to Detective Dossett (*Id.*, 1233). Both sides then gave closing argument (*Id.*, 1279, 1299–1301, 1323). Following deliberation, the jury found Petitioner guilty of intentional murder and robbery in the first degree (Transcript of Record ("TR") 109, 114). The jury fixed a 20–year term of imprisonment on the first-degree robbery count. The penalty phase on the capital murder charge then began.

Petitioner testified during the penalty phase that he quit school in the seventh grade when he was twelve years old (TE IX, 1134). His father died in 1972, while serving a prison sentence for bank robbery and other crimes (*Id.*, 1346). Petitioner's mother physically abused him with numerous beatings. Consequently, he ran away from home for three years at age twelve (*Id.*, 1347). He testified, incorrectly, that his mother had died of cancer in 1980 (*Id.*, 1347–1348). He then supported himself by working in restaurants and truck stops and by stealing cars (*Id.*, 1348).

Petitioner testified that he was involved in an incident where another car thief was murdered for being a snitch (TE IX, 1348–1350). He told the jury that he had a three-year-old daughter who lived in Houston, and that he had used illegal drugs for

a long period of time, including the day before the crime was committed (*Id.*, 1351).

As for the events on January 28, 1983, Petitioner testified that "Red" wanted to see if he could "make some money at that place on the corner." (TE IX, 1351–1352). Petitioner told him there was no money in the store on the corner, and suggested that they hit the Zippy Mart (*Id.*, 1352). "Red" asked again about the store, and Petitioner again replied that there was no money there (*Id.*). When "Red" insisted on robbing the store, Petitioner agreed but said he would stay right there (*Id.*). While Petitioner was waiting outside, he heard someone screaming inside the store and took off running (*Id.*, 1353). "Red" later told Petitioner that the victim had started arguing, and he "just started cutting." (*Id.*). Petitioner explained that no one was supposed to get hurt in the robbery (*Id.*). Petitioner testified that he did not kill the victim, and that it should not have happened, and that he was sorry that it did (*Id.*, 1355). Petitioner admitted on cross-examination that he snatched purses every day when he did not have a stolen car to sell (*Id.*, 1367). He also testified that he and "Red" had stolen batteries from Keith Edwards (*Id.*, 1368).

Dr. Philip W. Johnson, a clinical psychologist employed by the Kentucky Corrections Cabinet, testified that he had examined Petitioner in May of 1983 and again in August of that year (TE X, 1380). As a result of his examination, the doctor had diagnosed Petitioner with borderline personality disorder with antisocial traits (*Id.*, 1388). He also diagnosed Petitioner with alcohol and drug abuse (*Id.*, 1387–1388). The doctor explained to the jury that individuals with borderline personality traits experience a multitude of problems in life that include problems with their families, peers, occupation and academic achievement (*Id.*, 1389). Dr. Johnson then went on

to describe Petitioner as a "marginally functioning individual." (*Id.*, 1393).

Dr. Johnson testified on examination by the defense that without treatment, Petitioner would probably continue in the same lifestyle he had lived for the past fifteen years (TE IX, 1395). The doctor added that Petitioner may have some pre-disposition for violent activities (*Id.*). He may not consistently view cause-and-effect in a realistic manner, resulting in gross errors in judgment (*Id.*, 1408). The doctor explained to the jury that the prospect for rehabilitation with people who have borderline personality disorders is relatively poor as a group, although the doctor could not apply that statement to any one specific individual (*Id.*, 1412–1413).

Following closing arguments, the jury fixed Petitioner's sentence at death for murder (TR 135). Petitioner's motion for a new trial was overruled. The trial court entered its final judgment on December 2, 1983 (TR 162–164). Petitioner then took a direct appeal to the Supreme Court of Kentucky. The Kentucky Supreme Court rejected all of Petitioner's twenty-nine arguments and affirmed his conviction and death sentence in *Slaughter v. Commonwealth*, 744 S.W.2d 407 (Ky.1987).

## POST–CONVICTION PROCEEDINGS

On October 13, 1989, Petitioner filed a motion pursuant to RCr 11.42 to vacate, set aside or correct the judgment of conviction (TR II, 247–266). Following briefing, the trial court held a three-day evidentiary hearing in September of 1994. The first witness to testify was Petitioner's trial counsel, Ferdinand "Fred" Radolovich (Videotape Hearing Record ("VHR"), 9/7/94, 09:30:32). Radolovich testified that he had been practicing as an attorney since 1974 (*Id.*, 09:42:30). He became involved in Petitioner's case *pro bono* when his law partner withdrew from the case

prior to trial (*Id.*, 09:31:16). Radolovich was the sole attorney to represent Petitioner during the trial (*Id.*, 09:33:20).

Radolovich testified that prior to representing Petitioner, he had worked as a state prosecutor in New York, during which time he had handled four capital cases (VHR, 9/7/94, 09:33:00). He also supposedly had handled two capital cases as a defense attorney in Kentucky (*Id.*). This testimony proved to be materially incorrect, however. An affidavit from the Executive Assistant District Attorney in New York County revealed that Radolovich had worked for the office only for less than a year beginning in 1977. During that time, he did not try *any* capital cases (*Id.*). In fact, "[g]iven Radolovich's time with the office, it was unlikely that he tried any homicide cases." (*Id.*).

Radolovich testified that his primary focus in Petitioner's case was the guilt phase of the trial (VHR, 9/7/94, 09:33:40). According to Radolovich, 99% of his trial preparation was devoted to the guilt phase (*Id.*, 09:34:30). It was his belief that if the defense was unsuccessful in the first phase of the trial, the second half of the trial, the penalty phase, would be a "blood bath." (*Id.*, 09:35:50). Radolovich testified that his plan was for Petitioner to testify during the guilt phase of the trial, and accordingly, any preparation for his testimony would have been directed at issues of guilt or innocence (*Id.*). No pretrial preparation was made for Petitioner to testify during the penalty phase of the trial (*Id.*, 09:36:49).

Concerning the penalty phase of the trial, Radolovich testified that he really didn't get a chance to prepare for the penalty phase except for the brief time after the jury returned its verdict of guilty on the robbery and murder charges (VHR, 9/7/94, 09:37:00). At most, Radolovich spoke to only one family member of Petitioner, an elderly aunt, who lived in Georgia or Alabama, and could not attend the trial (*Id.*, 09:38:15). Radolovich did not believe that she had any helpful testimony to offer at trial, given her limited and remote contact with Petitioner. Radolovich admitted, however, that he did not think to ask the elderly aunt about any other family members who might be willing to testify for the appellant (*Id.*, 10:10:13). He admitted that it might have been helpful if he had called Petitioner's mother and brothers to testify on his behalf to show the jury that Petitioner's family still cared about him and stood by him (*Id.*, 10:11:30).

Radolovich also admitted during the hearing that he made no meaningful effort to locate any birth, school or other records of Petitioner for use in the penalty phase (VHR, 9/7/94, 09:39:00). When asked if he made any effort to locate such records, Radolovich testified, "[n]ot really, when we made our determination to focus on guilt phase, that's basically where I put my energies." (*Id.*, 09:39:00). Finally, Radolovich acknowledged that the sole expert he called during the penalty phase, Dr. Philip Johnson, gave testimony that was, in part, harmful to Petitioner (*Id.*, 10:07:50). Radolovich acknowledged that Dr. Johnson testified that Petitioner supported himself by stealing cars, and had antisocial traits, including a borderline personality that limited his potential for rehabilitation (*Id.*, 10:06:00–07:50).

Radolovich also testified concerning his preparations for the guilt phase of the trial (VHR I, 9/7/94, 09:44:10–10:01:27). Radolovich testified that he filed a motion for a competency and sanity evaluation which resulted in Dr. Johnson's report (*Id.*). He additionally filed a motion for a Bill of Particulars and a motion for production of the grand jury transcript in order to obtain information (*Id.*). He requested a hearing to determine the existence of a proper aggravating circumstance after the

Commonwealth gave notice that it would prosecute the murder as a capital offense (*Id.*). He filed a motion for individual voir dire and to sequester the jury. Further, he filed a motion for a witness list and witness statements from the prosecution (*Id.*).

Radolovich also filed a subpoena *duces tecum* to Lt. Mason to obtain mug shots of other suspects and a crank call file. He filed a motion to determine the admissibility of jailhouse informant Keller's statements. He subpoenaed the manager of Keith Edwards's place of employment, along with taped statements from the police department of every individual who gave such a statement relating to the case. He filed a written objection to the court reviewing the victim impact statement of a close relative of the victim. These motions were all filed in order to help him prepare for the trial.

Radolovich testified that Petitioner did not want to draw his friends into a criminal trial. His friends, the ones that Radolovich was able to contact, did not have any positive statements to make that would have helped the defense. Had he been able to locate anyone who would have helped by their testimony in the penalty phase, Radolovich would have called such individuals to testify (VHR I, 9/7/94).

Petitioner's mother, Mary Moon, also testified at the RCr 11.42 post-conviction hearing (VHR I, 9/7/94, 10:22:30). Moon testified that her son's name was not James Earl Slaughter. His real name, in fact, was Jeffrey Devan Leonard (*Id.*, 10:22:45).[2] According to Moon, Petitioner was born in Alexander City, Alabama, in 1964, when she was fifteen years old and unmarried (*Id.*, 10:23:25). Petitioner's father spent only approximately one month

with Petitioner before the father was killed in 1972, while serving a prison sentence (*Id.*, 10:23:40–24:10). Moon gave birth to two other sons by different fathers (*Id.*, 10:27:00). One of her husbands, Thomas Moon, to whom she was married for seven-and-a-half years, was an abusive alcoholic. She left him when Petitioner was eight years old (*Id.*, 10:31:48). Mary left when Moon fired a shotgun at Petitioner as the eight-year-old boy ran out of their home carrying his four-year-old brother (*Id.*, 10:30:18).

Mary Moon testified that Petitioner was extremely close to her mother, Susan Gibbs, and would call her once a week while she was living prior to her death in October of 1991 (VHR I, 9/7/94, 10:34:20–35:00).

Mary received little financial support from the fathers of her children. She routinely worked two jobs to support the family (VHR I, 9/7/94, 10:37:20). As a result, she was gone working from 7:30 a.m. until 10:00 p.m., many days (*Id.*, 10:37:50). Consequently, she taught the children how to cook their own meals (*Id.*, 10:37:25). When she could not leave the children with her mother, they stayed by themselves while she worked, since she could not afford a babysitter (*Id.*, 10:45:30–46:00).

Mary admitted that she "whipped the devil out of my children." (VHR I, 9/7/94, 10:48:00). She testified that if Petitioner were to pull up his shirt, you could see the scars to prove it (*Id.*, 10:48:15). She admitted that she would whip Petitioner with anything that she could lay her hands on (*Id.*, 10:48:40). When he was five, Petitioner suffered a serious head injury when he struck his head on the corner of the

---

**2.** Apparently, neither attorney Radolovich, nor the prosecution, knew of Petitioner's actual identity until his case had been affirmed on appeal, even though the police records contained mention of Petitioner's true name in the statements of a witness, who testified at trial concerning Petitioner's actual name.

refrigerator (*Id.*, 10:38:45). The wound required ten stitches to close, and Petitioner began to have severe headaches when he was nine years old (*Id.*, 10:40:00). Mary, however, lacked the money to pay for follow-up medical treatment and had no medical insurance (*Id.*, 10:40:10). According to her, Petitioner left home when he was seventeen. She had no idea where he stayed after that (*Id.*, 10:59:40).

Mary testified that she had family in Louisville, Kentucky, during the time of the trial (VHR I, 9/7/94, 10:49:30). Her father, stepmother, stepbrother, four aunts and two uncles lived in Louisville at that time (*Id.*, 10:49:35). No one, however, contacted her about testifying on her son's behalf at his trial (*Id.*, 10:50:00). Had she been contacted, Mary would have been willing to testify in support of her son, whom she loves and does not wish to see die in the electric chair (*Id.*, 10:51:30–52:15).

Bobby Moon, Petitioner's younger brother, testified that he and his two brothers grew up together in Alabama (VHR I, 9/7/94, 11:05:40). He confirmed that his mother had two full-time jobs (*Id.*, 11:06:30). While she was working, Petitioner took care of Bobby and his little brother, making sure they were fed (*Id.*, 11:07:00). When a live bullet exploded and injured Bobby's little brother, Vincent, Petitioner got Vincent to the hospital for treatment (*Id.*, 11:07:40).

Bobby testified that the boys grew up in the housing projects and had a hard life (VHR I, 9/7/94, 11:08:35). He confirmed that their mother physically punished them with belts, switches, extension cords and brooms (*Id.*, 11:09:40). Bobby, like his mother, testified that had he known about Petitioner's trial, he is sure that he would have attended to support Petitioner (*Id.*, 11:12:00). Like his mother, Bobby loved his older brother and did not want to see him die (*Id.*, 11:18:40). Bobby and Peti-

tioner were very close, and Petitioner had tried to help Bobby in whatever he did (*Id.*, 11:19:19).

Vincent Moon, the youngest brother, also testified at the RCr 11.42 hearing. He confirmed his mother worked two and three jobs when the boys were growing up (VHR I, 9/7/94, 11:23:25). He also confirmed that Petitioner took care of him and his older brother, Bobby, while his mother was working (*Id.*, 11:23:35). Petitioner would cook for his two younger brothers and would try to get them what they needed (*Id.*, 11:24:15). Vincent testified that when a bullet exploded in his face, Petitioner rushed him to the hospital for treatment (*Id.*, 11:25:00).

Vincent testified that he had seen his mother discipline Petitioner with extension cords (VHR I, 9/7/94, 11:27:20). She occasionally would confine the boys to their room with nothing to eat, but Petitioner would slip them food (*Id.*, 11:28:30). Vincent agreed that if he had known about Petitioner's capital trial, he would have testified for him (*Id.*, 11:30:00). Vincent, like Bobby, testified that he loves his brother and did not want to see him die (*Id.*, 11:29:40–30:10).

Charles Leonard, Petitioner's grandfather, and his grandmother, Clare Leonard, testified at the RCr 11.42 hearing (VHR I, 9/7/94, 12:59:00–13:04:41; 13:06:46–13:11:15). Charles Leonard testified that his grandson would come to visit him at his home in Louisville, and that he had stayed there on occasion, but left and did not return (*Id.*, 13:00:00, 13:00:45). When Petitioner was at the home, Charles observed that he suffered from headaches (*Id.*, 13:03:00).

Charles testified that he was never contacted about giving testimony at Petitioner's trial (VHR I, 9/7/94, 13:02:00). Likewise, Clare Leonard testified that she was never contacted by anyone about Petition-

er's impending trial (*Id.*, 13:11:04–15). She was not aware that Petitioner was using the name "James Slaughter" until she saw his picture on the television (*Id.*, 13:10:40–11:01).

Dr. Eric Engum, a clinical psychologist from Knoxville, Tennessee, testified at the RCr 11.42 hearing (VHR I, 9/7/94, 13:15:00). In 1994, Dr. Engum performed a neuropsychological evaluation of Petitioner to explore the possibility of a brain injury (*Id.*, 13:24:18). Based on his examination, Dr. Engum diagnosed attention deficit disorder, along with difficulties in learning and acquiring new information, particularly, verbally (*Id.*, 13:35:00; 13:35:38). The doctor's specific diagnosis in this regard was "cognitive disorder, not otherwise specified." (*Id.*, 13:37:30).

According to Dr. Engum, an individual with Petitioner's disability cannot sit still and concentrate. He or she would have difficulty understanding legal concepts such as mitigation, aggravation and *Miranda* warnings (VHR I, 9/7/94, 13:42:00). The doctor agreed that Dr. Johnson's report reflected very poor vocabulary, thus giving reason to believe that Petitioner would not have the vocabulary skills to understand the legal terms, unless the words were expressed in a fourth- or fifth-grade vocabulary (*Id.*, 13:42:15).

Dr. Engum also administered the Minnesota Multiphasic Personality Inventory ("MMPI") to Petitioner. The doctor testified that to conduct a competent forensic evaluation, it was absolutely necessary to administer the MMPI (VHR I, 9/7/94, 13:53:00). The doctor noted, however, that Dr. Johnson had not been able to perform the MMPI due to Petitioner's reading disability. He instead relied upon the Ink Blot Test as a substitute (*Id.*, 13:54:00–54:20). Dr. Engum testified that the Ink Blot Test is not a valid substitute for the MMPI, and it would not have permitted Dr. Johnson to conclude that Peti-

tioner has a borderline personality disorder (*Id.*, 14:01:15). In fact, Dr. Engum testified that Dr. Johnson did not perform *any* test that would have permitted him to reach that critical conclusion (*Id.*, 14:03:50).

Dr. Engum also challenged Dr. Johnson's conclusions concerning the potential for rehabilitation. Dr. Engum testified that with proper psychotherapy, Petitioner could begin tearing down the barriers that he had developed. The doctor believed that Petitioner had sufficient intellectual development to respond to psychotherapy. Because Dr. Johnson did not obtain a valid MMPI, his diagnostic impressions were inaccurate and led him to present Petitioner to the jury in a way that was not a fair representation of Petitioner's personality (VHR I, 9/7/94, 14:51:30).

On cross-examination, Dr. Engum conceded that had he been called to testify in 1983, he would have had to tell the jury that Petitioner is impulsive, bitter and unempathetic (VHR I, 9/7/94, 14:45:39–47:38). His personal inter-relationships were short-lived and characterized by conflict due to Petitioner's significant suspiciousness and hostility (*Id.*). Further, Dr. Engum would have had to advise the jury that Petitioner's elevated antisocial skills revealed impulsive and self-destructive behaviors with little forethought to the potential consequences of the behaviors (*Id.*). Further, under unusual circumstances, Petitioner could be expected to accept risks potentially dangerous to himself or those around him (*Id.*). He might vacillate from being very cooperative to being unable to control his anger (*Id.*). All of these items would have been in Dr. Engum's report had he participated in 1983. Finally, Dr. Engum testified that Petitioner was an extremely bright individual with a full-scale IQ of 107, which the doctor characterized as being "remarkable," given his

limited academic and cultural background (*Id.*, 13:44:02–44:25). Dr. Engum concluded that Petitioner was competent, and that he acquired information at an average rate but had a better-than-average ability to retain information once acquired (*Id.*, 13:47:30–48:06).

Dr. Jerry Kearl, a Lexington physician, testified at the hearing. Dr. Kearl found no evidence of organic brain damage (VHR I, 9/7/94, 15:55:20–55:48). Dr. Kearl attributed Petitioner's insomnia to excessive caffeine and his headaches to vascular tension (*Id.*, 15:57:43–58:58). The doctor found it unlikely to believe that Petitioner's headaches were the result of a childhood injury. Physical examination by Dr. Kearl confirmed that Petitioner did have a scar at the hairline on the right side of his head, and the cranium of his skill was depressed underneath that scar (*Id.*, 15:33:20). The doctor testified that the medical attention that Petitioner received did not appear adequate for the type of injury (*Id.*, 15:36:00–39:00).

Dr. Kearl observed a large laceration on the forearm of Petitioner that appeared to be a medically neglected injury (VHR I, 9/7/94, 15:39:20). Petitioner exhibited many scars that appeared to be the result of corporal punishment he received as a child (*Id.*, 15:41:25–42:00). The doctor testified that this evidence suggested physical abuse, followed by medical neglect (*Id.*, 15:45:00). Finally, Dr. Kearl testified that many children with attention deficit disorder or learning disabilities are abused by their parents as a result of the frustrations of trying to deal with them (*Id.*, 15:46:30).

Dr. Gayle Spears, a psychologist, testified at the RCr 11.42 hearing based on a review of Petitioner's grade records for school years 1976 through 1978, and attendance records for school years 1976 through 1979 (VHR II, 9/8/94, 09:50:27; 10:18:32–10:19:30; 10:22:34–23:06). Based on her review, Dr. Spears testified that certain patterns emerged consistent with learning-disabled students. These patterns included deterioration of academic performance, a drop in school attendance and deterioration of behavior (*Id.*, 09:50:40). According to Dr. Spears, individuals with learning disabilities are able to perform fairly well in the earlier grades, but as the requirements become increasingly difficult, they begin to encounter educational performance problems. Such students lose interest, and their attentiveness and behavior begin to deteriorate (*Id.*, 09:51:00).

Dr. Spears added that even a person with an IQ higher than 107 could have poor academic performance in a specific area, such as reading, due to a learning disability (VHR II, 9/8/94, 09:53:55). Dr. Spears reviewed a videotape of a school official from Alexander City, Alabama, discussing the state of the public schools during the time that Petitioner attended them (*Id.*, 10:00:35). Alexander City was located in the poorest county in Alabama, and had a complete lack of educational resources, materials and supplies (*Id.*, 10:01:00–10). The school system had no special resources or any training or expertise for students with learning disabilities, and there was no effort to identify such students (*Id.*, 10:01:45). Further, even had such students been identified as special-needs students, they would not have received any additional learning resources (*Id.*, 10:02:15). Such students were more likely to be viewed as uninterested, unmotivated students with limited capability and behavior problems (*Id.*, 10:03:00). Dr. Spears agreed that patterns of attention deficit disorder were reflected in Petitioner's school records, and that without proper intervention, such problems can have a devastating effect on a child's education (*Id.*, 10:05:30). Finally, she testified that persons with attention deficit disorder re-

spond well to structure, such as the structure available in prison (*Id.*, 10:11:00).

Lane Veltkamp, a licensed clinical social worker, performed a psychosocial evaluation of Petitioner (VHR II, 9/8/94, 10:35:50). Veltkamp described Petitioner's relationship with his father as being one of abandonment and neglect (*Id.*, 10:44:40). Due to her work schedule, Petitioner's mother simply was not available to her children (*Id.*, 10:48:10). As a result, Petitioner was forced to take responsibility for raising his brothers when he was far too young (*Id.*, 10:49:25). To complicate matters, his mother was physically abusive (*Id.*, 10:48:58). As a result of the neglect and abuse, Petitioner was distrustful and experienced difficulty in becoming close to people. Petitioner would be expected to have a great deal of anger and rage, although with therapy, his problems could be overcome over time (*Id.*, 10:52:25–53:26). Veltkamp added that Petitioner was basically a follower with little esteem and self-confidence (*Id.*, 11:00:00).

Dr. Eric Drogin, a licensed clinical psychologist, also testified (VHR II, 9/8/94, 13:17:20). Dr. Drogin reviewed both the evaluation report prepared by Dr. Johnson and Dr. Johnson's trial testimony (*Id.*). Dr. Drogin was not able to endorse the conclusions reached in Dr. Johnson's trial testimony (*Id.*, 14:03:30). However, Dr. Drogin did not know whether Dr. Johnson's ultimate diagnosis in 1983 was correct (*Id.*, 14:12:26–13:10).

Following Petitioner's conviction in 1983, William Keller provided the defense with two affidavits. In the affidavits, he admitted that the testimony he provided for the prosecution concerning Petitioner's alleged admission that he stabbed the victim was not entirely true. Keller was called by Petitioner to be a witness at the RCr 11.42 evidentiary hearing (VHR II, 9/8/94, 14:20:30). Prosecutors, however, threatened to prosecute Keller for perjury and

for being a persistent felony offender if he testified inconsistently with his trial testimony (TR VIII, 819). The court advised Keller that he could be prosecuted for perjury if he testified at the RCr 11.42 hearing, contrary to his trial testimony (*Id.*, 14:20:40). Keller subsequently invoked his Fifth Amendment rights (*Id.*, 14:33:00).

In an affidavit prepared after the RCr 11.42 hearing, Keller admitted that he had lied during Petitioner's trial, that Petitioner had not admitted stabbing the victim, but stated that he was too nervous to testify at the evidentiary hearing after being told that he could be prosecuted for perjury. Although Keller felt bad about his false trial testimony, he was not willing to subject himself to the possibility of additional prison time due to that testimony.

Attorney, Betty Niemi, testified on the question of ineffective assistance of counsel (VHR II, 9/8/94, 14:49:04). Niemi, a Kentucky criminal defense attorney who has defended several capital murder cases, testified that she had reviewed the entire criminal trial record, the defense counsel's entire trial, and the materials submitted with the RCr 11.42 motion (*Id.*, 14:49:50). In her opinion, Petitioner did not receive effective assistance of counsel during the guilt phase or the penalty phase of the trial (*Id.*, 14:52:23; 15:26:55). In her view, defense counsel was deficient during jury selection, failed to do an adequate voir dire, failed to obtain an independent mental health expert and failed to make adequate preparation for the penalty phase of the trial (*Id.*, 14:53:30–15:12:30).

Niemi testified that a defense attorney in a death penalty case must begin preparing for the penalty phase on the day the case is received (VHR II, 9/8/94, 15:12:30). In her words, "you have to anticipate making it to the penalty phase because if you don't you're gonna be caught totally inade-

quate." (*Id.*, 15:12:40). The types of preparation she gave examples of included: considering the social history of your client from the day he was born until he walks into the courtroom; obtaining birth, school, medical and employment records; and talking to family members, school teachers, ministers and neighbors (*Id.*, 15:12:50–15:13:00). Gathering such information, according to Niemi, is essential in developing a strategy (*Id.*, 15:13:30). Niemi noted that information was available in the record to defense counsel at the time which would have revealed his client's true name as being Jeffrey Leonard (*Id.*, 15:13:40–15:16:25).

Niemi testified that it is a questionable defense practice to have a client evaluated at Kentucky Correctional Psychiatric Center, because the information obtained is not confidential, and KCPC does not act as a defense expert (VHR II, 9/8/94, 15:13:55). Niemi agreed, based on the post-conviction affidavit of defense counsel, that the entire focus appeared to have been on the guilt phase (*Id.*, 15:27:10). After the guilty verdict was returned, the penalty phase became something of a sudden afterthought (*Id.*, 15:27:30). Niemi charactered Dr. Johnson's testimony as being "devastating" to Petitioner, who was not prepared adequately to testify in the penalty phase and was not aware of either his role in the process or the nature of mitigating evidence (*Id.*, 15:28:10).

On June 22, 1995, the trial court entered an opinion overruling Petitioner's RCr 11.42 motion (TR VI, 859–865). In its opinion, the trial court noted that the hearing had revealed an impressive display of mitigating evidence (*Id.*, 861). In fact, the court wrote that it had never been presented at trial with such an accumulation of mitigating evidence during a penalty phase (*Id.*, 863). The court, however, concluded that it was unpersuaded that in 1983, the now-mitigating evidence would have changed the jury's verdict (*Id.*, 863–864).

Petitioner took an appeal to the Supreme Court of Kentucky. On post-conviction appeal, the Supreme Court affirmed the decision of the trial court. *Slaughter v. Commonwealth* (Ky.1998). Petitioner then filed his present federal habeas petition in which he raises forty-seven claims of error. Respondent has filed a motion for summary judgment that requests the dismissal of the petition. Petitioner has responded. Accordingly, the matter is ripe for consideration.

### LEGAL ANALYSIS

Legal analysis of Slaughter's claims presents a substantial challenge. Slaughter raises forty-seven separate claims of error in his 281–page memorandum. Virtually every aspect of the trial proceedings has been challenged. For example, Slaughter raises three arguments involving pretrial hearings,[3] four arguments involving the jury selection and questioning process,[4] three arguments involving testimony during the guilt phase,[5] six arguments involving prosecutorial misconduct,[6] three arguments involving the sufficiency of the evidence,[7] nine arguments involving jury instruction during the guilt or penalty phases of trial,[8] five arguments involving the constitutionality of the death penalty,[9] eleven arguments alleging ineffective as-

---

3. Arguments no. 1, 8, 25.

4. Arguments, 2, 3, 4, 9.

5. Arguments 5, 6, 7.

6. Arguments 10, 11, 12, 18, 35, 36.

7. Arguments 13, 24, 26.

8. Arguments 14, 15, 16, 19, 20, 21, 22, 23, 27.

9. Arguments 28, 29, 30, 31, 32.

sistance of counsel,[10] as well as a double jeopardy argument,[11] and two arguments involving the death penalty report prepared by the trial court.[12]

Before the merits of any of these claims may be addressed, several important matters must be discussed. First, the standard of review to be applied pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") must be established. *See* 28 U.S.C. § 2254(d). Second, the law relating to habeas corpus review must also be set forth. Habeas corpus review comes with an exacting set of requirements that must be satisfied *before* the federal courts will address the substance of a prisoner's claim. Claims that do not involve federal constitutional issues, that are not timely and adequately presented or preserved in the state courts, or that depend upon a "new rule" of law will not ordinarily receive habeas corpus review, absent extraordinary circumstances. Accordingly, the first duty of the Court is to discuss the standard of review and the exacting requirements of habeas corpus law. After an overview of the law, the Court will address each claim that is properly before the Court to determine whether it is subject to habeas corpus review on the merits. If so, then the Court will decide whether Petitioner is entitled to relief under clearly established precedent of the United States Supreme Court.

### THE STANDARD OF HABEAS CORPUS REVIEW

Petitioner filed a notice of his intention to file a habeas corpus petition on March 7, 2000 (Dkt. No. 1). He filed his petition for a writ of habeas corpus on April 20, 2000 (Dkt. No. 13). The petition, therefore, was filed almost four years after the date that the AEDPA became effective on April 24, 1996. The provisions of the AEDPA clearly are applicable.

Under the AEDPA, a writ of habeas corpus may not be granted by a federal court to a person in custody pursuant to a state court judgment unless the adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as defined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d).

■ Recently, the Supreme Court in *Williams v. Taylor*, 529 U.S. 362, 405–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) elaborated on the meaning of this statutory language. In explaining § 2254(d), the Court noted that the statute "places a new constraint on the power of the federal courts to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." *Williams*, 529 U.S. at 412, 120 S.Ct. 1495. A state court decision will be "contrary to" the precedent of the Supreme Court if either the "state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law," or "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at [the opposite] result." *Id.* at 405, 120 S.Ct. 1495.

■ A state court opinion will violate the "unreasonable application" clause of the statute when "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unrea-

---

**10.** Arguments 33, 34, 37, 38, 39, 40, 41, 42, 43, 44, 45.

**11.** Argument 17.

**12.** Arguments 46, 47.

sonably applies that principle to the facts." *Williams,* 529 U.S. at 413, 120 S.Ct. 1495. Certain panels of the Sixth Circuit also hold that a state court opinion will be an "unreasonable application" of the Supreme Court precedent if it "either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context." *See Seymour v. Walker,* 224 F.3d 542, 549 (6th Cir.2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 1643, 149 L.Ed.2d 502 (2001).

The Supreme Court in *Williams* explained that "a federal court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Williams,* 529 U.S. at 409, 120 S.Ct. 1495. The Court explained that the term "objectively unreasonable" means that "[a] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411, 120 S.Ct. 1495.

■ When determining the "clearly established federal law," the courts may look only to the decisions of the Supreme Court of the United States. *Barnes v. Elo,* 231 F.3d 1025, 1028 (6th Cir.2000). It is error for the federal courts to rely on authority other than the Supreme Court of the United States in their analysis under § 2254(d). *Harris v. Stovall,* 212 F.3d 940, 944 (6th Cir.2000) (*cert. denied,* 532 U.S. 947, 121 S.Ct. 1415, 149 L.Ed.2d 356 (2001)). Further, it is the holding of the Supreme Court decision, not its *dicta,* which is controlling in the analysis. *Id.*

■ The AEDPA also gives deferential treatment to the findings of fact made by a state court during the direct appeal and on state collateral review. The applicable statute provides that "[a] determination of a factual issue made by a state court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). Further, "[t]he applicant [for § 2254 relief] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.* Accordingly, the factual findings are reversed only if Petitioner establishes that they are clearly erroneous. *Campbell v. Coyle,* 260 F.3d 531 (6th Cir., rendered August 1, 2001) (available on WestLaw at 260 F.3d at 539).

## OVERVIEW OF HABEAS CORPUS LAW

[5, 6] In essence, the "Great Writ" exists to provide a limited opportunity for extraordinary relief when a state prisoner demonstrates that he or she is being held in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Application for a writ of habeas corpus is an original civil proceeding that exists independently of the normal channels of criminal review to test the gravest allegations that a state prisoner's detention violates the fundamental liberties safeguarded by the Constitution. *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). The "Great Writ" is not an instrument the federal courts may employ at will to reverse a state criminal conviction. It is instead a truly extraordinary means to undo a restraint contrary to fundamental constitutional law. *Roddy v. Black,* 516 F.2d 1380 (6th Cir.), *cert. denied,* 423 U.S. 917, 96 S.Ct. 226, 46 L.Ed.2d 147 (1975); *Eberhardt v. Bordenkircher,* 605 F.2d 275 (6th Cir.1979) (habeas corpus review is not a broad exercise of supervisory power, but is limited to constitutional error). The federal courts, therefore, will not use habeas corpus review to sit as an additional state appellate court. *Gemmel v. Buchkoe,* 358 F.2d 338 (6th Cir.1966), *cert. denied,* 385

U.S. 962, 87 S.Ct. 402, 17 L.Ed.2d 306 (1967).

■■ A state prisoner who seeks this extraordinary relief first must fully and fairly present his or her claim, as a matter of federal law, to the state courts. *See Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971) (exhaustion of state remedies requires that a petitioner fairly present federal claims to the state courts so that the state may have the opportunity to correct any alleged violation of federal rights). Merely raising an issue as a matter of state law will not satisfy the exhaustion requirement. *Riggins v. McMackin*, 935 F.2d 790, 792–93 (6th Cir. 1991). A federal claim will be fairly and fully presented only if the petitioner cites to a provision of the United States Constitution, federal decisions relying upon constitutional analysis, or state decisions employing constitutional analysis in similar fact patterns, when presenting a claim to the state's highest court. *Levine v. Torvik*, 986 F.2d 1506, 1516 (6th Cir.), *cert. denied*, 509 U.S. 907, 113 S.Ct. 3001, 125 L.Ed.2d 694 (1993). Further, the same federal claim under the same theory must be presented to the state courts before a petitioner will satisfy the exhaustion requirement. *Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir.1987); *Franklin v. Rose*, 811 F.2d 322, 325–26 (1987).

■ So long as the petitioner has fully and fairly presented his federal claim to the state's highest court, the claim will be totally exhausted even if the state courts do not consider the claim on its merits. *Harris v. Rees*, 794 F.2d 1168, 1173–74 (6th Cir.1986). If the petitioner has not fully and fairly presented his federal claim, however, then the petition must be dismissed without prejudice for lack of exhaustion so long as a remedy remains available to pursue in the state courts and the claim is not frivolous. *Rose v. Lundy*, 455 U.S. 509, 518–20, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982); *Boggs v. Evitts*, 818 F.2d 534, 536 (6th Cir.1987).

■ A different situation exists when no state remedies remain available for the petitioner to pursue and petitioner has failed to fully and fairly present his federal claim; or, the state courts have held that consideration of the claim is barred due to the petitioner's procedural default in state court. In such situations, when the petitioner has no remaining state remedy available, the petition is not dismissed for lack of exhaustion, since no remedies remain available in state court to exhaust. *Hannah v. Conley*, 49 F.3d 1193, 1195–96 (6th Cir.1995) (*per curiam*). When this situation occurs, the federal courts ordinarily will not consider the claim unless the petitioner can show cause to excuse his failure to present the claims appropriately in the state courts, and actual prejudice as a result. *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Teague v. Lane*, 489 U.S. 288, 298–99, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).

■ To show cause sufficient to satisfy the cause-and-prejudice requirement, a petitioner must ordinarily establish the existence of some objective factor external to the defense that prevented counsel from complying with the state procedural rule that was violated, and which the state courts invoked to decline review of the claim. *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). If cause is shown, then the petitioner must establish prejudice that was actual and substantial, infecting the entire trial with error of constitutional dimension. *United States v. Frady*, 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). Absent a showing of cause and prejudice, the federal courts ordinarily will not reach the merits of procedurally defaulted claims. *Reed v. Farley*, 512 U.S. 339, 114 S.Ct. 2291, 129 L.Ed.2d 277 (1994). Only when

a petitioner submits new and reliable evidence that a constitutional violation has probably resulted in the conviction of an actually innocent individual will the courts otherwise address the merits of the defaulted claim to avoid a fundamental miscarriage of justice. *Schlup v. Delo,* 513 U.S. 298, 317–23, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).

 Certainly, the federal courts may sometimes have difficulty in determining whether a state court has relied upon a procedural default as an adequate and independent ground to deny relief. The traditional test is to examine the last state court decision to determine whether the state court invoked a procedural bar to decline review of the petitioner's claim. *Coleman,* 501 U.S. at 729–30, 111 S.Ct. 2546. If the state decision appears to rest upon federal law, then the federal courts will presume that the state court did **not** rely on a procedural default unless so stated in the decision. *Harris v. Reed,* 489 U.S. 255, 262–63, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989). If the state court invokes the procedural bar, while discussing the merits of the claim, the federal courts will presume that the procedural default has been invoked and petitioner must show cause and prejudice to obtain review. *McBee v. Grant,* 763 F.2d 811, 813 (6th Cir.1985). Finally, if the last state court judgment does not include an explanation for its basis, the federal courts will "look through" the last order to the preceding one. If that prior order relies on federal law, then the habeas court will presume that the state court did not rely on the default. *Ylst v. Nunnemaker,* 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991). If the preceding order does rely on the procedural default, the habeas court will presume that the last state court judgment likewise relied on the adequate and independent state law ground. *Id.*

 Still, a final challenge remains ahead of a state prisoner who seeks to obtain habeas corpus relief in the federal courts. A prisoner who has fully and fairly presented a federal claim, which the state courts have not declined to review on its merits due to a procedural default, must still confront the retroactivity analysis of *Teague v. Lane,* 489 U.S. at 305–10, 109 S.Ct. 1060. Under *Teague,* a new rule of constitutional criminal procedure will **not** be applied retroactively to convictions that have become final before the rule was announced. *Caspari v. Bohlen,* 510 U.S. 383, 390, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994); *Graham v. Collins,* 506 U.S. 461, 466, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993). A rule will be considered "new" if it imposes new obligations on the states, breaks new ground, or was not *dictated* by existing precedent at the time the petitioner's conviction became final. *Teague,* 489 U.S. at 301, 109 S.Ct. 1060; *Gilmore v. Taylor,* 508 U.S. 333, 340, 113 S.Ct. 2112, 124 L.Ed.2d 306 (1993). A new rule will not be applied retroactively to afford relief, unless the rule places certain kinds of primary private conduct beyond the power of the criminal-lawmaking authority to prohibit; prohibits the imposition of certain types of punishment to a class of defendants due to their status or the offense; or, announces a "watershed" rule of criminal procedure that implicates the fundamental fairness and accuracy of the criminal process. *Sawyer v. Smith,* 497 U.S. 227, 241–43, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990). For the purpose of the *Teague* analysis, a conviction and sentence will be final when the availability of direct appeal in the state courts is exhausted, and the time for filing a petition for a writ of certiorari has lapsed, or a timely petition has been finally denied. *Caspari,* 510 U.S. at 390, 114 S.Ct. 948.

The above discussion, although an overview, clearly shows the type of procedural thicket that awaits a habeas corpus petitioner. Slaughter's claims must be federal ones that have been fully and fairly presented throughout the state court proceedings. If the state courts have declined to consider such claims on their merits due to a procedural default, then he must show cause and prejudice for the default, or alternatively, that manifest injustice will result if the claim is not considered on its merits. Finally, the federal courts will not consider a claim that involves a "new rule" of constitutional criminal procedure, absent very limited circumstances. Only when all of the above conditions are satisfied will the federal courts address the merits of Slaughter's constitutional claims under the new standard of the AEDPA.

## LEGAL ANALYSIS OF SLAUGHTER'S CLAIMS

Respondent has filed a motion for summary judgment (Dkt. No. 28). Petitioner has filed, in response, a motion to bar summary judgment, or in the alternative, a response to the motion (Dkt. No. 40). The gravamen of Petitioner's request to bar summary judgment is that such a procedure is inappropriate in the context of this habeas corpus proceeding.

Summary judgment motions pursuant to Rule 56 may properly be filed in habeas corpus cases. The Supreme Court has recognized the appropriateness of such motions in *Blackledge v. Allison*, 431 U.S. 63, 80, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977). The acceptance of such motions in habeas corpus cases has been expressly affirmed by the federal courts. *See Clark v. Johnson*, 202 F.3d 760, 764–65 (5th Cir.), *cert. denied*, 531 U.S. 831, 121 S.Ct. 84, 148 L.Ed.2d 46 (2000) ("As a general principle, Rule 56 of the Federal Rules of Civil Procedure, applies with equal force in the

context of habeas corpus cases.") (citing Rule 11 of the Rules Governing § 2254 Cases; Fed.R.Civ.P. 81(a)(2)); *Randle v. Scott*, 43 F.3d 221 (5th Cir.1995), *cert. denied*, 515 U.S. 1108, 115 S.Ct. 2259, 132 L.Ed.2d 265 (1995) ("We recognize summary judgment proceedings as an appropriate mode used by the district courts of this Circuit in habeas corpus proceedings."). Our own Circuit has reviewed habeas corpus cases disposed of on motion for summary judgment. *See Sanders v. Freeman*, 221 F.3d 846 (6th Cir.), *cert. denied*, 531 U.S. 1014, 121 S.Ct. 571, 148 L.Ed.2d 489 (2000); *Workman v. Bell*, 178 F.3d 759 (6th Cir.1998), *cert. denied*, 528 U.S. 913, 120 S.Ct. 264, 145 L.Ed.2d 221 (1999). Accordingly, no prohibition exists against the use of motions for summary judgment merely because of the nature of the proceeding as being a habeas corpus proceeding. The only question is whether the requirements for a grant of summary judgment have been satisfied.

Summary judgment will be proper only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *See Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In reviewing a motion for summary judgment, the court is required to view the evidence and draw all inferences in the favor of the non-moving party. *Id.* The court should not weigh the evidence and determine the truth of the matter, but is to determine only whether there is a genuine issue for trial. *Id.* The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for

summary judgment. *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505; *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1245 (6th Cir.1995). Only disputes over facts that may affect the outcome of the suit under governing law will prevent the entry of a summary judgment. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *Nernberg v. Pearce,* 35 F.3d 247, 249 (6th Cir.1994). Factual disputes that are irrelevant or unnecessary will not do so. *Id.* If the facts of a case are undisputed, then one of the parties will be entitled to judgment as a matter of law. *Atlantic Richfield Co. v. Monarch Leasing Co.,* 84 F.3d 204, 206 (6th Cir.1996). Indeed, the appellate court may even direct entry of summary judgment when a case on review presents no genuine issue of material fact and proper disposition is clear under the controlling law. *Nazay v. Miller,* 949 F.2d 1323, 1328 (3d Cir.1991). *See also Teague v. Scott,* 60 F.3d 1167, 1170 (5th Cir.1995) (in reviewing a grant of summary judgment in a habeas case where there are no state court findings on a specific issue, the appellate court will review the grant of summary judgment *de novo* employing the traditional standard for summary judgment to grant summary judgment only when there is no dispute as to the material facts).

## PRETRIAL CLAIMS

Three of Petitioner's claims are considered in this section. These claims include Petitioner's claim that he was denied due process by the failure of the trial court to conduct an evidentiary pretrial hearing on his competency to stand trial (Memorandum of Law in Support of Habeas Petition ("Memo"), pp. 58–62); his claim that the trial court denied him due process by failing to hold a pretrial hearing on the existence of aggravating factors (Memo, 159–161); and his claim that the seizure of various body samples from him was a violation of the Fourth and Fourteenth Amendments (Memo, 78–79). The Court will address each of these arguments in the order in which it appears in Petitioner's Memo.

### Competency Hearing

■ Prior to Petitioner's trial, his attorney requested a psychiatric examination pursuant to RCr 8.06, "to determine both ... sanity and competency to stand trial." (Transcript of Record ("TR"), Vol. I, p. 27). Attached to the motion was counsel's brief affidavit (*Id.,* 28). The affidavit stated, in relevant part, that counsel "believes the defendant is not competent to stand trial due to his lack of his understanding of the seriousness of the crime, and his inability to comprehend the judicial repercussions should he be found guilty." (*Id.*).

The trial court entered an Order on March 21, 1983, that directed Petitioner to be admitted to the Kentucky Correctional Psychiatric Center ("KCPC") for examination and psychiatric evaluation (TR I, 29). Petitioner was transferred to KCPC where he was evaluated by a licensed psychologist, Philip W. Johnson, Ph.D. (Appendix, Vol.I, pp. A80–85).

Based on his examination, Dr. Johnson found Petitioner to be operating in the low-normal level of intellectual functioning (Appendix, Vol.I, A84). Dr. Johnson found that Slaughter's psychological condition did not prohibit him from actively and constructively participating in the legal process. *Id.* In support of this conclusion, the doctor found no deficits in Petitioner's ability to: appraise legal defenses, manage behavior, plan a legal strategy, appraise the role of various individuals in the judicial process, understand courtroom procedure, appreciate the nature of the charges and penalties, disclose pertinent facts to his attorney, realistically challenge prosecution witnesses and testify relevantly. (*Id.,* A84–85). Based on the doctor's report, Petitioner's attorney appeared in open court on October 5, 1983, and with-

drew his prior motion for a competency hearing (TR I, 61).

Petitioner raised the competency issue on direct appeal. His argument may be found at pages 68 through 72 of his brief to the Supreme Court of Kentucky in *Slaughter v. Commonwealth*, Appeal No. 84–SC–272–MR. In his brief, Petitioner raised the competency hearing issue as a matter of federal law, arguing that an evidentiary pretrial hearing was constitutionally required as a matter of due process under *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966) and *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960).

■■■ The Opinion of the Kentucky Supreme Court in *Slaughter v. Commonwealth*, 744 S.W.2d 407 (Ky.1988), *cert. denied*, 490 U.S. 1113, 109 S.Ct. 3174, 104 L.Ed.2d 1036 (1989) does not speak directly to the competency issue, but includes it by general reference to other issues that are "without merit." *Slaughter*, 744 S.W.2d at 409. Because the Supreme Court of Kentucky did not discuss this issue, and cites to no controlling Supreme Court precedent, the Court cannot determine, based only on the limited language of the Opinion, whether the decision was contrary to clearly established precedent of the Supreme Court, or was an unreasonable application of such precedent. The State Supreme Court did characterize the issues as being "without merit." Accordingly, the Court does presume that it was considered and rejected on its merits. The Court, therefore, considers the question to be whether the decision of the Supreme Court of Kentucky to deny relief on this issue was contrary to clearly established precedent of the Supreme Court, or if not directly contrary, whether it would be an unreasonable application of such precedent.

Petitioner has cited the controlling precedent of the Supreme Court which was in existence at the time that his conviction became final upon direct appeal, when the United States Supreme Court denied his motion for certiorari in 1988. Review of *Pate, Dusky*, and *Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975) reveals that the decision of the Kentucky Supreme Court was not contrary to nor an unreasonable application of any of the three decisions. Petitioner was not constitutionally entitled to a pretrial competency hearing based upon the report of Dr. Johnson, the affidavit of his trial attorney or any other facts of record at the time his trial was held. Unlike defendant Robinson in the *Pate* decision, the present Petitioner had no lengthy history of "pronounced irrational behavior" such as would put the court on notice that his competency to stand trial was in doubt. *Pate v. Robinson*, 383 U.S. at 386, 86 S.Ct. 836. In fact, the facts of *Pate* stand in stark contrast to the facts of this case. Robinson had a long history of paranoid, delusional behavior that include psychiatric hospitalization, suicide attempts and bizarre, irrational behavior. *Id.*

The same is true of the defendant in the *Drope* decision. Drope was noted to have led a "marginal existence" with a "history of anti-social conduct" and "strange behavior" noted by his wife. *Drope*, 420 U.S. at 165, 95 S.Ct. 896 n1. Drope also had a history of suicidal behavior. *Id.*, at 169, 95 S.Ct. 2040. Accordingly, in both *Drope* and *Pate*, the trial courts had more than sufficient information to raise grave doubts concerning the defendant's ability to comprehend the nature of the charges and actively participate in his defense.

Such facts are not present here. Petitioner had no documented history of psychiatric hospitalization, suicidal behavior, delusions or other aberrant behaviors. (App.I, A 80). Dr. Johnson found in his report that Petitioner "exhibited no symp-

tomatology consistent with a thought disorder or effective disorder of psychotic proportion. No delusional ideation or hallucinatory behavior were observed in, or reported by, the patient." (*Id.*, A–38). Dr. Johnson also found that Petitioner was competent to understand the nature of the charges and assist in all aspects of his defense.

Dr. Engum, one of the experts for Petitioner during the RCr 11.42 hearing, testified that Petitioner has "always been extremely calm, extremely bright." (VHR I, 9/7/94, 13:43:30). Dr. Engum found Slaughter to be in the average range of intellectual functioning. (*Id.*, 13:43:51). His full skill IQ was determined to be 107, "which is truly remarkable." (*Id.*, 13:44:02—44:25). Like Dr. Johnson, Dr. Engum found Slaughter to be competent (*Id.*, 13:46:28).

No mental health professional has ever determined that Petitioner was incompetent. At most, he was diagnosed with attention deficit disorder accompanied by difficulties in acquiring new information. (VHR I, 9/7/94,13:35:00). The trial court simply had no information before it that would have called into question Petitioner's competency. The pretrial affidavit filed by his attorney was merely a three-paragraph "boiler plate" affidavit with no specific facts whatsoever. Contrary to the affidavit, Petitioner was able to participate in his defense and testified during the penalty phase of the trial in a responsive fashion. His few, unrestrained comments during the trial were made in response to adverse testimony from prosecution witnesses and merely indicated that he was aware of the damaging nature of such testimony, rather than suggesting, even remotely, the prospect of incompetency.

In sum, the Supreme Court of Kentucky properly declined to grant Petitioner relief upon this issue, and its decision to do so was not contrary to, nor an unreasonable application of, any clearly established precedent of the United States Supreme Court at the time. This is so because there were simply no facts in the record which would have caused the trial court to have a serious question about the competency of Petitioner.

### Seizure of Body Samples

■ The second pretrial issue involves a question concerning the seizure of certain body samples from Petitioner following his arrest. Petitioner was arrested on February 21, 1983 (TE V, 617). Several days later, he was taken to Humana Hospital University where samples of his hair, blood and saliva were taken (TE III, 413). Petitioner claims that no warrant authorized such seizures, nor were such warrantless seizures justified by exigent circumstances. Accordingly, he maintains that the seizure of these items, and their introduction into evidence at trial, violated his Fourth and Fourteenth Amendment rights. In support of this argument, he relies on *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

Petitioner did raise this issue on direct appeal to the Supreme Court of Kentucky (Brief for Appellant, 79–82). The Supreme Court of Kentucky did not consider the issue separately, but merely found it to be "without merit." *Slaughter*, 744 S.W.2d at 409.

■ Here, the Court need not attempt to determine whether the decision of the Supreme Court of Kentucky was contrary to, or an unreasonable application of, controlling Supreme Court precedent. Such an analytical exercise is not required, because Petitioner may not seek habeas corpus relief on this claim, given *Stone v. Powell*, 428 U.S. 465, 494–495, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). The *Stone* decision holds that the federal courts will not consider a claim of illegal search and seizure if the state prisoner seeking

§ 2254 relief had a full and fair opportunity to raise such claim in the state courts. *Id.; Gilbert v. Parke*, 763 F.2d 821, 823–24 (6th Cir.1985). This rule applies even in the context of those habeas corpus petitions involving death-penalty convictions. *See McQueen v. Scroggy*, 99 F.3d 1302, 1332 (6th Cir.1996), *cert. denied*, 520 U.S. 1257, 117 S.Ct. 2422, 138 L.Ed.2d 185 (1997). So long as the state has provided, in the abstract, a mechanism by which Petitioner could have raised this claim, a full and fair opportunity to raise the claim exists. *Gilbert*, 763 F.2d at 823.

Petitioner does not claim that he was denied a full and fair opportunity to raise this claim. Had he chosen, he could have filed a pretrial motion to suppress. He did not, and now, may not revive this issue contrary to *Stone v. Powell.*

### Hearing on Aggravating Factors

Petitioner claims in his third argument on pretrial matters that he was denied due process when the trial court failed to hold a pretrial hearing on the existence of aggravating factors sufficient to support a capital charge. On July 25, 1983, the Commonwealth filed written notice of its intent to proceed with a capital charge. (TR I, 48). The notice provided that the Commonwealth would proceed with the indictment as a capital murder based on the "pertinent aggravating factor being that the murder was committed during the commission of a robbery in the first degree pursuant to KRS 515.020." (*Id.*) In response to this notice, Petitioner's attorney filed a request for a pretrial hearing "to review the merits of the Commonwealth's claim as to the existence of *any* aggravating factor which would merit capital punishment herein." (TR I, 50). The motion added that the defense had yet to receive the minutes of the grand jury proceedings, and the hearing was intended to be a "pragmatic approach to the longer protractive method of litigation which the

denial of [sic] hearing would necessitate." (*Id.*) The request for a hearing was overruled *sub silentio*, and no hearing was held.

Petitioner raised this issue on direct appeal to the Supreme Court of Kentucky. The argument may be found at pages 82 through 85 of his brief on direct appeal. (Brief for Appellant, Appeal No. 84–SC–272–MR, 82–85). The Supreme Court of Kentucky did not specifically address this argument. As with the two earlier-mentioned arguments, the State Supreme Court simply held that it was one of the twenty-nine arguments raised on direct appeal that was "without merit." Petitioner now maintains that the decision of the State Supreme Court was contrary to, or an unreasonable application of, *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

The argument of Petitioner is essentially based on the claim that the prosecution failed to produce sufficient evidence at trial that the murder of the store owner occurred during the course of a robbery. Robbery was the only aggravating factor alleged in the notice of the Commonwealth. Petitioner claims that had the trial court held a pretrial hearing, it would have discovered prior to trial that the aggravating factor of robbery was unsupported by the evidence. Accordingly, Petitioner concludes that "both fundamental fairness and judicial economy would have been served had the court ruled that aggravating factor insufficient prior to trial."

The problem with Petitioner's argument is that nowhere in *Gregg* is there held to be a constitutional requirement that the existence of an aggravating factor must be determined prior to trial by way of a pretrial hearing. The *Gregg* decision concerns itself primarily with the constitutionality of the death penalty and the adequacy of the capital punishment scheme

under the Georgia statutory system. *Gregg*, 428 U.S. at 196–207, 96 S.Ct. 2909.

As Respondent correctly points out, the Supreme Court has subsequently held in *Lewis v. Jeffers*, 497 U.S. 764, 782–784, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990) that the adequacy of the proof of an aggravating circumstance is to be determined under the standard of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), with "a sentencer to 'resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id.*, 782, 110 S.Ct. 3092. A state court's finding of an aggravating circumstance in a particular case will be deemed arbitrary and capricious if and only if no reasonable sentencer could have so concluded. *Id.*, 783, 110 S.Ct. 3092. Accordingly, the Supreme Court has indicated in *Lewis* that the finder of fact is to determine the existence or non-existence of an aggravating circumstance during the penalty phase of a capital trial. There is no constitutional requirement that the existence of an aggravating factor be determined prior to the start of trial. Accordingly, the Supreme Court of Kentucky did not act contrary to, or unreasonably apply, clearly established Supreme Court precedent, in rejecting this argument without extended discussion.[13]

### JURY SELECTION AND QUESTIONING

Petitioner raises three arguments that involve selection and questioning of the jury. The first argument involves the failure of the trial court to excuse juror Graf for cause (Memorandum of Law in Support of Petition, 62–67). The second argument relates to Petitioner's claims that the trial court erred when it excluded prospective jurors whose views on the death penalty allegedly would not have prevented or impaired them from performing their duty as jurors. (*Id.*, 67–71). Finally, Petitioner argues that he was denied a jury representing a fair cross-section of the community, and due process of law, when the trial court excluded for cause those jurors who were not "death-qualified." (*Id.*, 72–73). The Court again shall address these arguments in the order in which they are presented.

#### *Juror Graf*

During the voir dire, Petitioner's attorney challenged Juror Graf for cause. (TR I, 101). Graf volunteered during voir dire that she had previously, on two occasions, been the victim of a break-in robbery at her home. (TE I, 98–99). In her words, "my home was robbed twice, and I saw the party and I don't think I could be very impartial ..." (*Id.*, 99). Graf went on to add, after the prosecutor explained the circumstances of the case, that she "was badly frightened by the one that broke in, that's why I wanted to know. I know I couldn't be impartial on that. On this I assume I probably wouldn't have any ..." (TE I, 100). At that point, defense counsel interrupted. However, when she was asked concerning the difference between the two crimes, Graf made the following statement, "Well, I was frightened so badly because I found them in my home and I just—I just wouldn't want to be involved in anything like that. But the break-in, I could make that general and I could probably be impartial." (TE I, 101). Based on her response, the trial court declined to strike Juror Graf for cause from the jury. Instead, Petitioner exercised a peremptory challenge to remove Graf prior to trial.

On appeal, Petitioner argued that the trial court had denied his Sixth and Four-

---

13. The court will separately consider Petitioner's related argument that the evidence offered at trial was insufficient to establish the existence of robbery as an aggravating factor.

teenth Amendment rights by refusing to excuse Juror Graf for cause. The argument may be found on pages 31 through 36 of his brief on appeal in *Slaughter v. Commonwealth,* Appeal No. 84–SC–272–MR. The Supreme Court of Kentucky did address this argument specifically on its merits. *Slaughter,* 744 S.W.2d at 411. The State Supreme Court held that the trial court did not abuse its discretion in refusing to remove Graf for cause. According to the court, her subsequent answers rehabilitated her to the extent that the trial court properly exercised its discretion in declining to strike her from the jury for cause. *Id.*

Petitioner maintains that the decision of the Kentucky Supreme Court is contrary to, or an unreasonable application of, the decision announced in *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). In essence, he claims that, contrary to *Irvin,* the state court permitted mere form to rule over substance and relied upon a talismanic approach to the question of impartiality that ignored the fact that the juror had twice been the victim of a similar crime, had expressed an emotional response and had equivocated that she could only "probably" be impartial. (Brief, 64–65).

The decision of the Kentucky Supreme Court was not contrary to, nor an unreasonable application of, *Irvin* or any other precedent of the Supreme Court on this question. The Supreme Court held in *Ross v. Oklahoma,* 487 U.S. 81, 88, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988) that a defendant's right to challenge for failure to remove a juror for cause is dependent upon whether the juror actually sat on the jury, and if petitioner properly preserved his claim. Subsequently, in *United States v. Martinez–Salazar,* 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792, the Supreme Court held that when a defendant objects to a trial court's denial of a for-cause chal-

lenge to a potential juror, the defendant may choose either to remove the challenged juror peremptorily and forgo a later Sixth Amendment challenge, or to allow the juror to sit, thereby preserving the Sixth Amendment claim for appeal. *Id.*

Here, Petitioner's attorney chose to exercise a peremptory challenge to remove Graf from the jury. She did not sit on his jury and was not a member of the panel that convicted him and subsequently fixed a punishment of death. Accordingly, Petitioner has no Sixth Amendment challenge based on the failure of the trial court to remove Graf for cause. *See, Wolfe v. Brigano,* 232 F.3d 499, 501–503 (6th Cir.2000) (discussing *Ross* and *Martinez–Salazar* in a decision that granted habeas corpus relief on this issue).

*Jurors Abrams and Douglas*

 Petitioner maintains in his second jury argument that the trial court improperly excluded for cause two jurors, Mary Abrams and Juanita Douglas, based on their opposition to the death penalty. (TE I, 68–71; 131–132). Petitioner argues that the comments of Abrams and Douglas were not of such nature to demonstrate that their views would "prevent or substantially impair the performance of [their] ... duties as a juror in accordance with [the] ... instructions and ... oath." *See Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).

In raising this argument, Petitioner relies upon *Wainwright,* along with *Gray v. Mississippi,* 481 U.S. 648, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987); *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980); *Jaggers v. Kentucky,* 403 U.S. 946, 91 S.Ct. 2282, 29 L.Ed.2d 856 (1971); and *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Petitioner properly raised the argument in his brief on direct appeal to the Supreme Court of Kentucky at pages 101 through

104. The Supreme Court of Kentucky did not specifically address the argument, but merely included it among those of the twenty-nine arguments that were "without merit."

During individual voir dire, Juror Abrams advised that she had conscientious scruples against imposing the death penalty. The prosecutor then asked her whether she could return a verdict of death in this or any other case regardless of the facts. (TE I, 132). Abrams reiterated that, "I do not believe in the death penalty." (*Id.*) The court then excused Abrams for cause. (*Id.*)

In *Adams v. Texas*, 448 U.S. 38, 43–45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980) the Supreme Court applied the standard of *Witherspoon* in the context of a bifurcated trial in a capital case. *Id.* The Court held that the *Witherspoon* line of cases established the general proposition that a juror may not be challenged for cause based upon his or her views about capital punishment unless those views would prevent or substantially impair the performance of the juror's duties as a juror in accordance with his or her instructions and oath. *Adams,* 448 U.S. at 45, 100 S.Ct. 2521. Five years later, in 1985, the Supreme Court reiterated the *Adams* holding in *Wainwright v. Witt,* 469 U.S. 412, 418–426, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). To quote from *Wainwright:*

> We therefore take this opportunity to clarify our decision in *Witherspoon,* and to reaffirm the above-quoted standard from *Adams* as the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment. That standard is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." We note that, in addition to dispensing with *Wither-*

*spoon's* reference to "automatic" decisionmaking, this standard likewise does not require that a juror's bias be proved with "unmistakable clarity." This is so because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism.

*Id.,* at 424, 105 S.Ct. 844. The Court then concluded that when the trial judge is left with the definite impression that a prospective juror would be unable to apply faithfully and impartially the law, the prospective juror may be excluded for cause and "deference must be paid to the trial judge who sees and hears the juror." *Id.,* at 426, 105 S.Ct. 844.

Here, the Supreme Court of Kentucky was not contrary to, nor unreasonable in, its decision to deny relief as to the exclusion of Juror Abrams. Abrams was steadfast in her view that she did not believe in the death penalty. The trial judge had the opportunity, which obviously this court does not have, to observe her demeanor and determined that her views would substantially impair her performance as a juror. The federal courts must show substantial deference to such factual determinations. *See* 28 U.S.C. § 2254(e).

The same conclusion applies with equal force to prospective Juror Douglas. Her responses also reveal that she would have been substantially impaired in her ability to perform her duties as a juror in a capital case. Douglas expressed conscientious scruples against the death penalty. (TE I, 68–71). She candidly acknowledged that due to those scruples, she did not know if she could vote for the death penalty under any circumstances, adding, "I am religiously against the death penalty." Based on her comments, the trial court excluded Douglas without objection by defense counsel. Again, substantial defer-

ence must be afforded the decision of the trial court. Based upon the record, the Supreme Court of Kentucky did not act contrary to clearly established precedent of the United States Supreme Court, nor unreasonably apply such precedent, in refusing to grant relief given the standard of *Adams* as applied in *Wainwright.*

### Death–Qualified Jury

■ Petitioner argues next that the exclusion of those jurors who were not "death-qualified" violated his rights to a representative, impartial jury from a cross-section of the community. (Brief, 54–55). He maintains that the use of a "death-qualified" jury resulted in a jury that was biased in favor of imposing the death penalty. While Petitioner acknowledges that the United States Supreme Court rejected a similar argument in *Witherspoon v. Illinois,* 391 U.S. 510, 517–518, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), this decision, according to Petitioner, was due to the inadequacy of the factual basis set forth in that particular case. Petitioner maintains that certain, undescribed "current scientific research" now establishes that such death-qualified juries are conviction-prone and tend to give harsher sentences.

Petitioner's attorney did not raise this issue by objection at trial. Petitioner did present the argument in his Brief on direct appeal at pages 104 through 107. The Supreme Court of Kentucky, in keeping with its treatment of the earlier arguments, did not separately address this claim, but instead simply chose to dismiss it generally as one of the claims "without merit."

This resolution was not contrary to, nor an unreasonable application of, the controlling Supreme Court precedent. Petitioner candidly acknowledges that the *Witherspoon* decision is contrary to his position on this issue. (Brief, 73). Further, in *Lockhart v. McCree,* 476 U.S. 162, 173–183, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), the Supreme Court of the United States once again held that the Constitution does not prohibit the removal for cause of prospective jurors whose opposition to the death penalty is so strong that it will prevent or substantially impair the performance of their duties as jurors at the sentencing phase of a capital trial. *Id.* The Court reached this same conclusion even though social science studies introduced in the lower courts were adequate to establish that death-qualified juries tended to be somewhat more conviction-prone than non-death-qualified juries. *Id.*

Thus, the Supreme Court has twice rejected the argument of Petitioner on this issue. On the second occasion, the Supreme Court rejected Petitioner's argument regardless of more recent social science studies. The Kentucky Supreme Court decision, therefore, was not contrary to, nor an unreasonable application of, any controlling precedent of the federal Supreme Court.

### TESTIMONY–RELATED ISSUES

The next portion of this memorandum addresses those arguments of Petitioner that relate to constitutional issues based on the nature, or the adequacy, of the testimony at trial. These testimony-related issues may be found at arguments five through seven. Claims that relate to the adequacy of the trial testimony may be found at arguments XIII, XXIV and XVI. The final two arguments considered in this section involve the alleged use of perjured testimony and the destruction of the taped statement of jailhouse informant Keller (Arguments XXXV and XXXVI). Again, the arguments are discussed in the order in which they are raised.

### Testimony of Officer Pike

■ Arguments V and VI of Petitioner's memorandum center upon the trial

testimony of Officer Pike. On cross-examination by Petitioner's attorney, Officer Pike was asked what made him think, when he took Slaughter into the bedroom of the apartment on January 29, that Slaughter was going to talk to him. (TE V, 720). Officer Pike responded as follows:

> A. Because I knew at that time that as a police officer our suspicions as long as I have been on it he had something to do with this case, and I took him in there to see if he would tell me, you know, what was going on, who was involved with him or what have you, which he didn't. I thought he might, but he didn't.

(*Id.*) Petitioner maintains that this comment was "totally impermissible" and, in essence, advised the jury that Petitioner was guilty in Officer Pike's view. Petitioner maintains that he was denied his Fourteenth Amendment right to a fair trial by this testimony.

This issue was raised on direct appeal by Petitioner at pages 49 through 52 of his Brief in *Slaughter v. Commonwealth*, Appeal No. 84–SC–272–MR. The Supreme Court of Kentucky, once again, merely characterized this issue as being without merit.

In this Court, Petitioner relies upon *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), as being the precedent of the Supreme Court that was unreasonably applied by the state courts in rejecting him relief on this issue. Petitioner's reliance upon the *Berger* decision is somewhat curious. He did not cite the decision at any time in the state courts in support of this issue. More importantly, the *Berger* decision, while frequently cited, runs to two separate issues that do not relate to the current argument.

The first issue that *Berger* addresses is the question of materiality in a variance between the proof at trial and the charges of an indictment. *Berger*, 295 U.S. at 81–82, 55 S.Ct. 629. The second issue that *Berger* resolves is prosecutorial misconduct in cross-examination. *Id.*, at 84–88, 55 S.Ct. 629. This second issue led to the now-famous quotation concerning the United States Attorney being a representative, not of an ordinary party, but of a sovereignty, whose obligation in a criminal prosecution "is not that it shall win a case, but that justice shall be done." *Id.*, at 88, 55 S.Ct. 629.

While this quotation has found its way into many a legal brief in both state and federal courts, it has little to do with the question of improper opinion testimony by a lay witness in a criminal trial. Accordingly, the Court would be well within its bounds in stopping its analysis at this point, in simply concluding that Petitioner had failed to show the unreasonable application of the single United States Supreme Court precedent that he cited.

■■■ The actual precedent of the Supreme Court that applies on the question of admissibility of evidence in a state trial is more appropriately found in *Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), which relies on the decisions of *Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990), and *Pulley v. Harris*, 465 U.S. 37, 41, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). In *Estelle*, the United States Supreme Court ruled that the defendant's due process rights were not violated by the admission of evidence in a state criminal trial as "federal habeas corpus relief does not lie for errors of state law." *Id.*, at 67, 112 S.Ct. 475. The Court held "[t]oday, we reemphasize that it is not the province of the federal courts to re-examine state-court determination on state-law questions." Accordingly, an issue involving the admissibility of evidence will not raise a question of federal constitutional magnitude unless the alleged error was so egregious that

Petitioner was denied a fundamentally fair state trial as a result. *See Romano v. Oklahoma*, 512 U.S. 1, 11–12, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994) (discussing the admission of evidence during the penalty phase of a capital state trial).

■ In deciding whether the admission of evidence denied a state defendant his or her fundamental right to due process, the Court will consider whether the evidence was critical to the case and whether it tended to exculpate the accused. *See Chambers v.Mississippi*, 410 U.S. 284, 297–302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). *See Clemmons v. Sowders*, 34 F.3d 352, 357–358 (6th Cir.1994); *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir.), *cert. denied*, 513 U.S. 1061, 115 S.Ct. 674, 130 L.Ed.2d 607 (1994); *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir.1988).

Here, the Supreme Court of Kentucky reasonably concluded, albeit implicitly, that Petitioner was not denied a fundamentally fair trial by Officer Pike's brief comment that Petitioner "had something to do with this case." It must be remembered that Officer Pike came to the apartment based on information provided by Keith Edwards that Slaughter had confessed to robbing and murdering Esther Stewart (TE V, 646). When Pike arrived at the apartment, Slaughter advised the officers that he was suspected of being the murderer by Keith and Laura Edwards (TE V, 649). Thus, it was hardly surprising that Pike concluded that Slaughter had something to do with the case.

Further, Officer Pike's general comment was so vague and non-specific that it could hardly have had a substantially and injurious effect on the verdict of the jury. Many witnesses testified during the trial concerning Slaughter's admissions about his involvement in the robbery/murder. (TE III, 320; IV, 516, 538, 549; V, 619; 649). The jury, therefore, had ample unobjectionable evidence before it, some-

times in graphic terms, that Slaughter did indeed have "something to do with this case." (TE VIII, 1032, 1088, 1140, 1145, 1178–1179). Officer Pike's fleeting reference to his personal suspicion was unlikely to have had any impact upon the jury, much less an impact so substantial and injurious as to render the trial fundamentally unfair.

■ In his second argument involving Officer Pike's testimony, Petitioner maintains that Officer Pike improperly commented on his post-arrest silence in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). Specifically, Petitioner refers to the following testimony:

A. And Officer Clabfleish advised him of his rights at that time. I took Mr. Slaughter in one of the back bedrooms and talked with him and was trying to get him to tell me who was with him, if there was a white person involved with him and . . .

Q. Did he tell you?

A. He did not give me—I thought he was going to tell me something, but he didn't. He didn't give me no names, no nothing. So about that it wasn't—we wasn't there but just a minute or so.

(TE V, 712). Again, on cross-examination, Officer Pike testified:

A . . . I took him in there to see he would tell me, you know, what was going on or who was involved with him or what have you, which he didn't. I thought he might but he didn't

(TE V, 720).

Petitioner did not raise this issue in the trial court but did raise the issue on direct appeal at pages 52 and 53 of his brief to the Supreme Court of Kentucky in *Slaughter v. Commonwealth*, Appeal No. 84–SC–272–MR. The Supreme Court of Ken-

tucky did not specifically address this claim, but in keeping with its practice, simply made a passing reference to claims "without merit." *Slaughter,* 744 S.W.2d at 409.

In *Doyle,* two criminal defendants testified at trial, making exculpatory statements that they had not offered previously following their arrest. Over objection, the prosecutor cross-examined each defendant about why he had not so advised the arresting officers if the exculpatory statements were true. The defendants had exercised their right to silence and had not made any post-arrest statements to the officers. Based on those facts, the Supreme Court held that total silence in the face of *Miranda* warnings is completely ambiguous and may be nothing more than the exercise of one's *Miranda* rights. *Doyle,* 426 U.S. at 617, 96 S.Ct. 2240. The court then continued to hold that the use of such post-arrest silence in cross-examination violated due process because it was contrary to the implicit assurance that *Miranda* warnings would not be used against an arrestee. *Id.,* at 618, 96 S.Ct. 2240.

█ When, however, a defendant chooses to speak after receiving *Miranda* warnings an entirely different situation occurs. In such situations, the controlling precedent of the Supreme Court is *Anderson v. Charles,* 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980). When a defendant does choose to offer a statement following arrest and *Miranda* warnings, he has not been induced to remain silent. Accordingly, testimony concerning his post-arrest conduct and statements is not a violation of *Doyle. See United States v. Crowder,* 719 F.2d 166, 171–172 (6th Cir. 1983), *cert. denied,* 466 U.S. 974, 104 S.Ct. 2352, 80 L.Ed.2d 825 (1984); *Hockenbury v. Sowders,* 718 F.2d 155, 156–159 (6th Cir.1984), *cert. denied,* 466 U.S. 975, 104 S.Ct. 2354, 80 L.Ed.2d 826 (1984) (discuss-

ing *Anderson* in the context of habeas corpus proceedings).

Here, the facts are those of the *Anderson* scenario. Petitioner did not choose to remain silent in the face of his *Miranda* warnings. To the contrary, Petitioner made repeated, often contradictory, statements to at least three police officers following his arrest. Given his repeated post-arrest statements, the holding of *Doyle* has little impact in this case. Rather, it is *Anderson* that controls and convinces the Court that the Supreme Court of Kentucky was not acting contrary to, nor making an unreasonable application of, controlling Supreme Court precedent when it denied Petitioner relief on this question. Petitioner chose to make a host of post-arrest statements, and his silence was not impermissibly used against him at trial in violation of *Doyle.*

### Uncharged Misconduct

█ Petitioner next argues that the admission of evidence concerning uncharged crimes denied him a fundamentally fair trial. During his trial, on repeated occasions, witnesses testified concerning various theft-related crimes that Petitioner had earlier committed. This testimony was elicited both by the prosecutor and by defense counsel (TE II, 281; V, 654; VIII, 1131, 1202, 1208; IX, 1256, 1279, 1299–1300). Admission of such evidence resulted in Petitioner's attorney unsuccessfully moving for a mistrial (TE IV, 489–492; VIII, 1052–1053, 1099).

On direct appeal, Petitioner raised this issue at pages 53–59 of his Brief in *Slaughter v. Commonwealth,* Appeal No. 84SC272–MR. The Supreme Court of Kentucky, as before, merely made a general reference to this issue as being "without merit." *Slaughter,* 744 S.W.2d at 409.

Petitioner again relies only on the decision of *Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935) as the controlling precedent of the United

States Supreme Court that supposedly was not reasonably applied by the state courts. The Court already has discussed the inapplicability of the *Berger* decision on a question concerning the admissibility of evidence in a state trial. Once again, the more appropriate authority is that discussed in the *Estelle* decision, which holds that the admission of evidence in a state criminal trial ordinarily does not raise a federal constitutional question, unless the improper admission of evidence was so egregious, and had such a substantial and injurious effect, as to render the trial proceedings fundamentally unfair.

Petitioner's trial simply was not rendered unfair by the repeated testimony concerning his prior acts of thievery. Indeed, the focus of the defense during the guilt phase was to portray to the jury the Petitioner as being merely a thief, not a murderer. It must be remembered that Petitioner's attorney had anticipated that Petitioner would testify at trial and was well aware that Petitioner had a prior felony conviction involving theft.[14] Accordingly, the strategy of defense counsel from the outset of the guilt phase of trial was to acknowledge Petitioner's prior criminal history but to use the non-violent nature of that criminal history in an attempt to show the jury that Petitioner was simply not the type of criminal who was a killer.

For example, in opening statement, Petitioner's attorney told the jury, "[t]he evidence will show you—Mr. Slaughter will admit to you he's got a prior conviction. He is a thief. A thief is not a robber, nor is it a murderer." (TE II, 281). In his taped statement to the police, Petitioner made repeated references to other theft-

related crimes that he had previously committed (TE IV, 549). In closing argument, his attorney again acknowledged that Petitioner "makes his living stealing," (TE IX, 1256), and re-emphasized, "James Slaughter is a thief." (*Id.*, 1279). Accordingly, the fact that other witnesses during the trial made brief references to certain uncharged thefts could hardly have rendered the trial fundamentally unfair. Indeed, their testimony simply played into the defense strategy to portray Petitioner as being a frequent criminal, but a decidedly non-violent one. The decision of the Supreme Court of Kentucky to deny Petitioner relief on this argument was not contrary to, nor an unreasonable application of, any clearly established precedent of the United States Supreme Court.

### Insufficiency of the Evidence

■ Petitioner maintains in argument XIII that he was deprived of due process in violation of the Fourteenth Amendment because his conviction for first-degree robbery was not supported by any evidence other than his out-of-court confession (Memo., 95–99). He claims that the prosecution could not rely solely on his confession to prove robbery, given the requirement under Kentucky Criminal Rule, RCr 9.60, that "a confession of defendant, unless made in open court, will not warrant a conviction unless accompanied by other proof that such an offense was committed." In support of this argument, he cites *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

Petitioner did move for a directed verdict of acquittal during his trial (TE IX, 1215–1218, 1241–1242). He also raises this issue on direct appeal to the Supreme Court of Kentucky at pages 24–43 of his

---

**14.** In fact, Petitioner had a prior felony conviction for theft by unlawful taking, which had resulted in a 5–year sentence. *Commonwealth v. Slaughter,* Case No. 82–CR–1635 (Jefferson Circuit Court 1983). In addition,

he had a series of theft charges that were disposed of in the Jefferson District Court as misdemeanor offenses in 1981 and 1982 (*see* App., Vol. I, pp. 42–44).

Brief in *Slaughter v. Commonwealth,* Appeal No. 84–SC–272–MR. The Supreme Court of Kentucky reviewed the issue in some depth, and after a careful review of the evidence, held that there was an abundance of evidence to show a clear intent to commit a theft that day. *Slaughter,* 744 S.W.2d at 410–11.

On this point, the Supreme Court of Kentucky wrote:

> We believe that there is an abundance of evidence to show that James Earl Slaughter had the requisite intent to commit theft. A witness testified that Slaughter had been in the store several days before the crime and was loitering and acting suspiciously. He was, in effect, "casing" the store. It was also shown that the cash register in the store was open, slightly, when an investigating officer entered the store and took a photograph of it. Also, it was testified to that the same cash register was broken. The clear implication is that the cash register was attempted to be opened by the killer, and in so doing, it was broken. A drawer, under the cabinet on which the cash register was located, was wide open when the police came into the store. It was reasonable to assume that the killer was rummaging about near the cash register, looking for money.
>
> Also, the decedent's purse was empty of money when the police found it behind the drawer underneath the cabinet holding the cash register. The purse, moreover, was open, and the wallet inside the purse was partially out of the purse. It is further indication that the killer was searching for money.
>
> The killer of Mrs. Stewart was in the store, armed with a gun and a knife.

The purpose of such presence was clearly to rob her. His previous scouting of the store, the attempt to open the cash register, the opening of the drawer, and the opening of the purse clearly are evidence of such nature as to show a clear intent to commit a theft. A jury would be totally justified in so believing. *Slaughter,* 744 S.W.2d at 410–11.

Clearly, the Supreme Court of Kentucky did not resolve this issue in a fashion that was contrary to, or an unreasonable application of, the clearly established precedent of the United States Supreme Court. In fact, Petitioner relied almost exclusively on state court precedent to argue the independent corroboration requirement of a state rule of criminal procedure, RCr 9.60, as creating a *corpus delicti* requirement. It has been held in the context of a federal habeas corpus proceedings that such state *corpus delicti* requirements are not constitutionally mandated. *See Lucas v. Johnson,* 132 F.3d 1069, 1078 (5th Cir.), *cert. dismissed,* 524 U.S. 965, 119 S.Ct. 4, 141 L.Ed.2d 765 (1998). *See also Autry v. Estelle,* 706 F.2d 1394, 1407 (5th Cir.1983) (stating that "[s]uch a state rule of *corpus delicti* has no independent constitutional footing.").

The correct constitutional standard is merely whether, upon the "record evidence adduced at trial, no rational trier-of-fact could have found proof of guilt beyond a reasonable doubt." *See Jackson v. Virginia,* 443 U.S. at 324, 99 S.Ct. 2781. As the above-quoted passage from the decision of the Supreme Court of Kentucky reveals convincingly, ample proof was to be found in the trial record to support a conviction for robbery in the first degree pursuant to KRS 515.020.[15] Because Petitioner's argu-

---

**15.** Under KRS 515.020, a person is guilty of robbery in the first degree when in the course of committing a theft, he uses or threatens to use physical force on another person with the intent to accomplish the theft, and he either causes physical injury to any person who is not a participant in the crime, or is armed with a deadly weapon, or uses or threatens the immediate use of a dangerous instrument

ment regarding independent corroboration of the *corpus delicti* raises merely an issue of state law, and because the proof adduced at trial was more than adequate to satisfy the standard of *Jackson v. Virginia*, the Supreme Court of Kentucky did not rule contrary to, nor unreasonably apply, the precedent of the United States Supreme Court in rejecting this argument.

Petitioner has raised a related argument that involves the use of the robbery conviction as an aggravating factor to support the death sentence imposed by the jury. He maintains that because the evidence at trial was insufficient to prove the only aggravating factor, the first-degree robbery, his sentence of death was a violation of the Due Process Clause. Petitioner raised this issue on direct appeal to the Supreme Court of Kentucky at pages 24–31 of his Brief in *Slaughter v. Commonwealth*, Appeal No. 84–SC–272–MR. The State Supreme Court did not separately discuss the issue, but merely disposed of it as being "without merit."

The clearly established constitutional standard is discussed in *Lewis v. Jeffers*, 497 U.S. 764, 781, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990). In *Lewis*, the Supreme Court explained that the rational fact-finder standard established in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) applies when a habeas petitioner alleges that an aggravating circumstance was not established to support a sentence of death. As discussed above, the evidence of first-degree robbery introduced at trial was more than sufficient to meet the *Jackson* standard. Accordingly, Petitioner is not entitled to habeas corpus relief on this related evidentiary argument.

■ The final argument that deals with a question of the sufficiency of the evidence presents the proverbial "other side of the coin." Petitioner maintains at

argument XXVI of his Memorandum that he was entitled to a directed verdict during the penalty phase, given the uncontroverted nature of certain mitigation evidence (Memo., 160–161). Specifically, he claims that the evidence established, without contradiction, that he did not have a criminal history of violent felonies, that he did not flee or resist arrest, that he had a difficult childhood that included neglect and abuse by his mother, and that he was an insecure man (TE V, 617; IX, 1347, 1388–1389, 1393). Although Petitioner's attorney did not request a directed verdict on these matters, Petitioner did raise the issue on direct appeal at pages 132–133 of his Brief in *Slaughter v. Commonwealth*, Case No. 84–SC–272–MR. The Supreme Court of Kentucky determined, without analysis, that the issue was "without merit."

The Court agrees. The sole precedent of the Supreme Court cited by Petitioner in support of his argument is *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Nowhere in the *Jackson* decision is there any requirement for a directed verdict on mitigating factors in the penalty phase of a capital case. Further, the Sixth Circuit has held in *McQueen v. Scroggy*, 99 F.3d 1302, 1331–32 (6th Cir.1996), *cert. denied*, 520 U.S. 1257, 117 S.Ct. 2422, 138 L.Ed.2d 185 (1997) that no constitutional right to a directed verdict on mitigating circumstances exists. Accordingly, the decision of the Supreme Court of Kentucky was neither contrary to, nor an unreasonable application of, any clearly established Supreme Court precedent on this question, there being none.

### False or Destroyed Trial Evidence

■ Petitioner maintains in argument XXXV of his Memorandum in Support of his Petition that he was denied due pro-

upon any person who is not a participant in the crime. *See* KRS 515.020(1)(a)-(c).

cess of law in violation of the Fourteenth Amendment because his conviction was obtained by the use of perjured testimony (Memo., 245–248). His argument focuses on the trial testimony of jailhouse informant, William H. Keller. Keller testified that while the two men were in jail together, Petitioner confessed to stabbing the victim after she began to scream. Following Petitioner's conviction, Keller signed two affidavits in which he acknowledged that he lied when he testified that Petitioner confessed to stabbing the victim. Keller stated in both post-conviction affidavits that in all other respects, his testimony was true. He received no inducement to testify, and he initiated the contact with the prosecution prior to trial.

Petitioner raised this issue in his post-conviction RCr 11.42 motion. When he called upon Keller to testify during the post-conviction evidentiary hearing, Keller declined to testify after being advised that his testimony might result in his prosecution on charges of perjury and being a persistent felony offender. Following denial of the motion to vacate in state court, Petitioner raised the issue of Keller's recantation on direct appeal at page 45 of his Brief in *Slaughter v. Commonwealth*, Appeal No. 96–SC–49. On post-conviction appeal, the Supreme Court of Kentucky ruled that Petitioner had failed to show that the prosecution was aware of the perjury (Appendix, A–220). Accordingly, the state court concluded that Petitioner's allegation of perjury was not supported by sufficient particulars to be raised pursuant to a motion to vacate under RCr 11.42 (*Id.*, A–219).

Petitioner now argues that the 1999 decision of the Supreme Court of Kentucky was contrary to, or an unreasonable application of, *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935); *Pyle v. Kansas*, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942), and *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

In *Mooney*, 294 U.S. at 112, 55 S.Ct. 340, the Supreme Court held that a criminal conviction obtained by a state prosecutor solely by the use of perjured testimony known to be false is a violation of the due process of law. Likewise, in *Pyle*, 317 U.S. at 216, 63 S.Ct. 177, the Supreme Court reiterated that an allegation by a habeas petitioner that state authorities obtained his conviction by the knowing use of perjured testimony and the deliberate suppression of favorable evidence was sufficient to state a cognizable claim of a due process violation.

In conjunction with the prohibition against the knowing use of false testimony, the Supreme Court held in *Napue*, 360 U.S. at 265–72, 79 S.Ct. 1173, that the failure of a prosecutor to correct the testimony of a key witness that he knew to be false denied a defendant due process of law. Later, in *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the Supreme Court found a similar due process violation where one prosecutor had promised favorable treatment to a key prosecution witness, who later testified falsely at trial that he received no promises of favorable treatment in return for his cooperation. This knowledge was attributed to a second prosecutor, who was actually unaware of the existence of the promise, or the falsity of the testimony, but nonetheless relied on the perjured testimony to convict the defendant.

Here, Petitioner failed to present any evidence during the state post-conviction proceedings that would suggest, even momentarily, that the prosecutor or any law enforcement officers were aware of the alleged falsity of Keller's testimony. In fact, Keller did not recant that he contacted the police on his own initiative to provide them with Petitioner's alleged confes-

sion. Keller also repeatedly testified at trial, without contradiction, that he initiated the contact with the police, that he was offered no inducement to provide the statement, and that no promises were made to him concerning the disposition of the theft charges then pending in state court against him (TE IV, 558; XIII, 1146, 1156). Keller also denied that he had ever "turned state's evidence" before (TE IV, 558). Detective Barrett, who took Keller's statement, testified that Keller did not ask for anything in return for giving his statement or testimony (TE IV, 572–573). Accordingly, the state courts had no evidence before them that would suggest that the prosecution knowingly used perjured testimony or failed to correct testimony that it knew was perjured. For this reason, the disposition of this issue was not contrary to, nor an unreasonable application of, any of the three clearly established Supreme Court decisions relied on by Petitioner.

■ Petitioner maintains in a related argument that the police acted in bad faith when the tape-recorded statement of Keller concerning Petitioner's alleged confession was "inadvertently" erased prior to trial. According to the detective who took the statement, a secretary at the police department accidentally erased the tape after she transcribed it (TE VIII, 1126). Petitioner argues that this allegedly accidental destruction of a key piece of evidence in a capital murder trial denied him his sole opportunity to cross-examine Keller effectively at trial (Memo., 248–249).

Petitioner raised this issue during the post-conviction proceedings. It was argued at pages 45 through 50 of his post-conviction Brief on appeal in *Slaughter v. Commonwealth*, Case No. 96–SC–49–MR. The Supreme Court of Kentucky rejected this argument, relying upon *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988).

In *Youngblood*, the Supreme Court held that the negligent destruction of evidence that might have been helpful to a criminal defendant does not violate due process. *Id.* Only when law enforcement officials act in bad faith to destroy evidence is the failure to preserve potentially useful evidence a possible due process violation. *See also California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984) (Due Process Clause does not require the preservation of defendant's breath sample).

Petitioner was afforded a lengthy evidentiary hearing during the state post-conviction phase of the criminal proceedings. Yet, the only evidence that was developed was that the tape was accidentally erased by a transcriptionist. Petitioner presented no facts to suggest that law enforcement officials or the prosecutor had any involvement in the accidental erasure of the tape, much less acted in bad faith. Accordingly, the Supreme Court of Kentucky did not act contrary to, nor unreasonably apply, the *Youngblood* decision when it rejected this argument.

### *PROSECUTORIAL MISCONDUCT*

■ Petitioner raises three arguments in which he makes claims of prosecutorial misconduct. In argument X, he maintains that the prosecutor denied him due process when examining Detective Wilson (Memo., 86–89). Petitioner maintains in argument XXII that the prosecutor engaged in misconduct by making improper and prejudicial comments during closing argument of the guilt phase (*Id.*, 91–95). Finally, Petitioner, in similar fashion, maintains that the closing argument of the prosecutor during the penalty phase, and his cross-examination of Petitioner during the penalty phase, likewise denied him due process of law (*Id.*, 121–123).

Petitioner raised the first argument regarding prosecutorial misconduct during cross-examination in his Brief on direct appeal at pages 43–49 in *Slaughter v. Commonwealth*, Appeal No. 84–SC–272–MR. He raised the second argument at pages 36–43 of his Brief on direct appeal in the same appeal. His third claim of prosecutorial misconduct was raised at pages 95–101 of his Brief in the same direct appeal. The Supreme Court of Kentucky considered each of these arguments in depth in two separate sections of its Opinion. *Slaughter*, 744 S.W.2d at 411–412, 414–415.

In considering the claims of prosecutorial misconduct in closing argument, the Supreme Court of Kentucky relied on *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) and *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). The Supreme Court explained that *Donnelly* and *Phillips* require the court to determine whether the prosecutor's conduct was of such an egregious nature as to deny the accused his constitutional right of due process. *Id.* The Kentucky Supreme Court noted that the analysis must focus on the overall fairness of the trial, and not the culpability of the prosecutor. *Id.*, at 411–412. After carefully reviewing all of the challenged conduct of the prosecutor, the Court found nothing improper in the prosecutor's cross-examination of any witness, or in closing argument, with the exception of certain unidentified quotations from the Bible, which the Kentucky Supreme Court found to be improper but not prejudicial. *Slaughter*, 744 S.W.2d at 415.

 The Supreme Court of Kentucky correctly cited the controlling precedent of *Donnelly* and *Phillips*. These cases teach that prosecutorial misconduct will not justify habeas corpus relief unless so egregious as to deny a petitioner a fundamentally fair trial. *Donnelly*, 416 U.S. at 643–45, 94 S.Ct. 1868. The touchstone is the fairness of the trial, not the culpability of the prosecutor. *Phillips*, 455 U.S. at 219, 102 S.Ct. 940. Thus, when analyzing such questions, the federal courts will consider the degree to which the remarks had a tendency to mislead the jury and to prejudice the accused, whether they were isolated or extensive, whether they were deliberate or accidental, and the strength of the competent proof to establish the guilt of the accused. *Serra v. Michigan Dept. of Corr.*, 4 F.3d 1348, 1355 (6th Cir.1993), *cert. denied*, 510 U.S. 1201, 114 S.Ct. 1317, 127 L.Ed.2d 666 (1994) (discussing *Phillips* ).

When the examples of prosecutorial misconduct relied on by Petitioner are examined in light of the above factors, it becomes clear that the Supreme Court of Kentucky reasonably applied the controlling *Donnelly* and *Phillips* precedent to reject Petitioner's arguments. For example, in argument X, Petitioner maintains that the prosecutor in questioning Detective Wilson induced him to speculate that Petitioner seized upon the description of a white male suspect in order to create an alibi (TE III, 341–342).

What actually occurred is that Petitioner's *own* attorney, during cross-examination of Detective Wilson, asked him, hypothetically, if the white male suspect, "Red," would not have left the area soon after his description was published (TE III, 339). In response to this hypothetical question, the prosecutor countered with his own hypothetical to Detective Wilson in which he asked the detective if he would not reasonably expect a defendant, who was aware of such a description, to capitalize on that description. When Petitioner's attorney objected, the trial court overruled the objection, noting that, "You were asking for the same conjecture...." (*Id.*, 331–342). Thus, Petitioner's own attorney opened the

door for this line of questioning by his hypothetical to Detective Wilson. The prosecutor was merely responding to the situation with his own hypothetical. Petitioner has failed to show how this brief exchange, occasioned by his own attorney, resulted in a fundamentally unfair trial.

■ During closing argument of the guilt phase, the prosecutor made several challenged statements. He referred to the defense as a "great octopus" or "soldier" defense that was raised to create confusion (TE IX, 1289–1290, 1329). He stated that the defense had tried to "pull a scam," which resulted in an objection that was sustained by the trial court (*Id.*, 1295). The prosecutor also questioned "how sharp" defense counsel was and referred to him as being "snide." (*Id.*, 1315). Further, he asked the jury to "deal with justice in this particular case" after telling them he had done all he could do, the police had done all they can, and the judge had been fair and impartial (*Id.*, 1329). The prosecutor then suggested to the jury that "the Commonwealth has given you a guilty man, and please don't let him go." (*Id.*, 1323). Finally, the prosecutor referred to Petitioner as being "a bit of evil" that walked up to the victim's door (*Id.*, 315).

Although the Kentucky Supreme Court determined otherwise and found the closing argument comments to be within the realm of proper commentary, the real question is whether such comments work to render Petitioner's trial fundamentally unfair. In this regard, it must be kept in mind that the testimony during the guilt phase showed that soon after the crime, Petitioner confessed his involvement in the robbery/murder to Keith Edwards. On the morning of the crime, he was seen by

Laura Edwards and her roommate, Paula Gibson, departing the house with a briefcase containing a knife and gun. Further, Gibson recalled that Petitioner had asked her if she remembered the store on the corner that he had expressed an interest in robbing. Later, when Petitioner returned to the apartment, both women noticed blood spots on various items of his clothing. Police later retrieved clothing that contained a blood type matching the blood type of the victim. Subsequent to his arrest, Petitioner gave several different, albeit incriminating, versions of the events which had him involved to varying degrees in the robbery of the store. The alleged murder weapon, a butcher knife, was recovered at the apartment where Petitioner resided, as was a broken gun. Although the police, and a private investigator retained by Petitioner, searched diligently for the white male known as "Red," who allegedly committed the murder, they were never able to locate this individual.

In light of all of the above evidence, the remarks of the prosecutor in closing argument during both the guilt and the penalty phases, could not be considered to be so egregious as to render the entire trial, or the sentence, fundamentally unfair. On this point, the decision of the Supreme Court of Kentucky was neither clearly contrary to *Donnelly* or *Phillips*, nor did it unreasonably apply either decision.

### ADEQUACY OF JURY INSTRUCTIONS

Petitioner raises nine arguments that relate to the constitutional adequacy of the jury instructions during his trial.[16]

---

16. Arguments 14, 15, 16, 19, 20, 21, 22, 23, 27. Arguments 14, 15 and 16 relate to jury instructions given during the guilt phase of the trial. Arguments 19–23 and 27 focus on instructions during the penalty phase of the trial. The Court shall consider these two groups of arguments separately, beginning with jury instructions during the guilt phase.

## Guilt Phase Instructions

■ In argument 14, Petitioner maintains that the trial court deprived him of due process in violation of the Eighth and Fourteenth Amendments when it failed to instruct the jury on the offenses of wanton murder and second-degree manslaughter (Memo., 99–109). While the trial court did give wanton murder and second-degree manslaughter instructions based on the participation of Petitioner in an alleged conspiracy to commit first-degree robbery (TR 96–99), the trial court declined to give the requested instructions based on a theory of Petitioner's actual participation in the robbery, even though such instructions were tendered by his attorney (TR 86–87).

■ Petitioner maintains that the failure to give these tendered instructions was contrary to the holding of *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). In other words, he maintains that the jury was not permitted to consider the option of imposing a lesser-included non-capital offense, where the evidence at trial, including Petitioner's own taped statement to the police, would have supported such a verdict. *See Keeble v. United States*, 412 U.S. 205, 208, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973). Petitioner maintains that the evidence was of such a nature to permit a jury rationally to find him guilty of these lesser-included offenses and to acquit him of the greater. Petitioner maintains that a reasonable juror could have concluded that Petitioner intended

only to rob the victim, not to kill her, and stabbed her only to stop her screaming, after he panicked (Memo., 104). Thus, the evidence could have persuaded a reasonable jury that Petitioner stabbed the victim not intending to kill her, but rather disregarded the substantial and unjustifiable risk that she would die, thereby justifying a wanton murder instruction.[17]

Petitioner properly raised this issue on direct appeal at pages 59–62 of his Brief in Appeal No. 84–SC–272–MR. The Supreme Court of Kentucky specifically addressed this issue. *Slaughter*, 744 S.W.2d at 412–13. In rejecting the argument, the Supreme Court held that the jury must be instructed in accordance with the evidence. The Court held there was no evidence that Petitioner acted wantonly, "and no reasonable juror could conclude that appellant consciously disregarded an unjustifiable risk he denied ever taking." *Id.*, at 413. Petitioner maintains that the Kentucky Supreme Court unreasonably rejected his argument contrary to the *Beck* and *Keeble* decision cited earlier.

In *Beck*, the defendant and an accomplice participated in the robbery of an 80-year-old victim. *Beck*, 447 U.S. at 629, 100 S.Ct. 2382. Defendant testified repeatedly that he neither killed the victim nor intended his death. According to the defendant, he and an accomplice entered the victim's home, and while the defendant was preparing to tie up the victim, his accomplice unexpectedly struck and killed

---

17. Wanton murder is defined in Kentucky at KRS 507.020(1)(b) as occurring when, under circumstances manifesting extreme indifference to human life, a person wantonly engages in conduct that creates a grave risk of death and thereby causes death. Second-degree manslaughter is defined at KRS 507.040 as being committed when a defendant wantonly causes the death of another.

Under Kentucky law, a person acts wantonly when he is aware of and consciously disregards a substantial and unjustifiable risk

that the result will occur or that the circumstance exists. KRS 501.020(3). The risk must be of such a nature and degree that to disregard it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. Wanton murder and second-degree manslaughter are distinguished by the former occurring under circumstances that manifest extreme indifference to the value of human life.

the elderly man. *Id.*, at 630–31, 100 S.Ct. 2382. Under Alabama law at the time, the trial court was precluded from instructing the jury on the lesser-included offense of felony murder due to the status of the prosecution as a capital case. *Id.*, at 630, n. 5, 100 S.Ct. 2382.

Beck challenged the constitutionality of the prohibition on lesser-included offense instructions in capital cases. He was convicted of intentional murder and sentenced to death. On certiorari, the Supreme Court reversed his conviction, holding that when the evidence establishes that the defendant is guilty of a serious, violent offense, but leaves some doubt as to an element justifying conviction of a capital offense, the failure to give the jury a "third option" of returning a verdict on a lesser-included offense is a violation of due process in the context of a capital prosecution. *Beck*, 447 U.S. at 636–39, 100 S.Ct. 2382.

Subsequently, in *Schad v. Arizona*, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991), the United States Supreme Court returned to discuss the rationale of *Beck*. In *Schad*, the defendant was found in possession of the murder victim's vehicle and belongings. The state chose to prosecute the defendant on theories of premeditated and felony-murder. Defendant argued at trial, like Petitioner, that at most, he was a thief, but not a murderer. *Schad*, 501 U.S. at 629, 111 S.Ct. 2491. The trial court declined to render an instruction on theft as a lesser-included offense, but did instruct the jury on second-degree murder as well as first-degree murder. The jury subsequently sentenced Schad to death. The state courts rejected Schad's argument that *Beck* required the trial court to give an instruction on the lesser-included offense of robbery.

On certiorari, the Supreme Court distinguished *Beck*, noting that the jury in this case was given the option of finding the defendant guilty of the lesser-included non-capital offense, second-degree murder. The Court rejected the defendant's argument that *Beck* required that a jury in a capital case be instructed on every lesser-included non-capital offense supported by the evidence. *Beck*, according to the Supreme Court, was an "all or nothing" situation, where the jury was placed in the dilemma of convicting the defendant of a capital offense, when the proof suggested the reasonable possibility of less culpable conduct, but the only other option offered was to set the defendant free. *Schad*, 501 U.S. at 646–47, 111 S.Ct. 2491. Accordingly, the Court explained, "[t]he goal of the *Beck* rule, in other words, is to eliminate the distortion of the fact-finding process that is created when the jury is forced into all-or-nothing choice between a capital murder and innocence." *Id.* (citing *Spaziano v. Florida*, 468 U.S. 447, 455, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984)). Because the jury in *Schad* was given the "third option" of a second-degree murder conviction, the dilemma of *Beck* did not exist. The second-degree murder instruction was sufficient to protect the reliability of the jury's verdict under the circumstances. *Id.* at 647–48, 100 S.Ct. 2382.

Upon reviewing *Beck* and *Schad*, the Court is left with the firm conviction that the Supreme Court of Kentucky did not act contrary to, nor unreasonably apply, any of these clearly established Supreme Court precedents. The evidence at trial plainly established that the victim was bludgeoned in the head and stabbed five times in the chest, including a stab wound that penetrated five inches into her chest and pierced her heart. Such facts negate any claim that a reasonable juror could have found that Petitioner acted wantonly, rather than with intent, when he repeatedly stabbed the victim in the chest.

The Sixth Circuit reached exactly this conclusion in *Campbell v. Coyle*, 260 F.3d

531 (6th Cir., rendered August 1, 2001) (available on Westlaw at 260 F.3d 531, 2001 WL 863560), a case that is virtually on all fours with the present one. In *Campbell*, an Ohio defendant was convicted of aggravated murder for the stabbing death of a 78–year–old apartment dweller. The victim was stabbed to death during the course of a break-in, in which certain items of personal property were taken from the victim's apartment. At trial, the defendant argued that he was entitled to a lesser-included manslaughter instruction, given the allegedly disputed evidence of his intent at the time he stabbed the victim. The Ohio state court disagreed and held that given the number and location of the wounds, a reasonable juror would have been compelled to find that the defendant possessed the intent to kill. *Campbell*, 260 F.3d 531, 541–43.

After thoroughly analyzing the *Beck* and *Hopper* decisions, the Sixth Circuit held that the decision of the Ohio Supreme Court was not objectively unreasonable. On this point, the Sixth Circuit wrote:

> A decision as to whether a *Beck* instruction is required is a fact-specific inquiry in which a court must determine whether there were sufficient facts for a reasonable jury to conclude that such an intent did not exist. That was precisely the inquiry made by the Ohio court. Indeed, the conclusion reached by the Ohio Supreme Court was that "the number and location of his victim's wounds would compel any reasonable trier-of-fact to find intent to kill."

*Id.*, at 545 (citing *State v. Campbell*, 69 Ohio St.3d 38, 630 N.E.2d 339, 350 (1994)).

The decision of the Kentucky Supreme Court applied exactly the same type of fact-specific inquiry and reached exactly the same conclusion—that the evidence of record did not support merely a wanton mental state. This conclusion was neither objectively unreasonable nor contrary to

the holdings of *Beck* or *Schad.* To the contrary, it was imminently reasonable to believe that a defendant who stabs a 56–year–old female victim in the chest five times clearly intends to bring about her death, and a reasonable juror could not have concluded otherwise under the circumstances.

### Criminal Facilitation Instruction

 Petitioner made no request during the guilt phase for an instruction on criminal facilitation under Kentucky law. Criminal facilitation is defined at KRS 506.080(1) as occurring when a person, who acts with the knowledge that another person is committing or intends to commit a crime, engages in conduct that knowingly provides such other person with the means or the opportunity for the commission of the crime, and which, in fact, aids that other person to commit the crime. Petitioner maintains that criminal facilitation to murder is a Class D felony, to which the evidence at trial entitled him to an instruction. He maintains, as before, that the *Beck* and *Keeble* decisions entitled him to such an instruction, and that the failure of the trial court to so instruct *sua sponte* violated his right to due process.

Petitioner raised this issue at pages 62–65 of his Brief on direct appeal in *Slaughter v. Commonwealth,* Appeal No. 84–SC–272–MR. The Supreme Court of Kentucky did not specifically address this argument, but merely generally dismissed it as being "without merit."

 Unfortunately, the nature of the Kentucky Supreme Court Opinion makes it impossible to determine whether the state court considered the claim to be "without merit" because no request for such an instruction was made or because, if requested, the trial court would have been justified in refusing to give such an instruction based on the evidence at trial. Certainly, the former proposition seems

more reasonable—that the Kentucky Supreme Court simply found the argument meritless, because Petitioner's attorney had never requested a criminal facilitation instruction. The failure to request an instruction in a criminal trial ordinarily will bar habeas corpus review. *See Campbell v. Coyle*, 260 F.3d 531 (6th Cir., rendered August 1, 2001) (available on Westlaw at 260 F.3d 531, 556–57).

It is undisputed that Petitioner's attorney never requested an instruction on criminal facilitation. Therefore, it is hard to conclude that the failure to grant him relief based on an instruction he never requested was objectively unreasonable or contrary to any Supreme Court precedent. Certainly, neither *Beck, Hopper*, nor *Schad* stands for the proposition that a trial court is compelled to provide the jury, on its own motion, with an instruction on a lesser-included offense, where the court independently determines that the evidence would justify such an instruction. Such a proposition, in fact, is not to be found in the *dicta* of any of those three decisions. Accordingly, the decision of the Kentucky Supreme Court is neither contrary to, nor an unreasonable application of, any clearly established Supreme Court precedent, regardless of the basis of that decision.

### Absence of Extreme Emotional Disturbance

Petitioner maintains in argument 16 of his Memorandum of Law in support of his petition that his right to due process was violated when the trial court omitted the absence of extreme emotional disturbance from the murder instruction and failed to instruct on first-degree manslaughter (Memo., 118–119). Petitioner maintains that at the time of his trial, the absence of extreme emotional disturbance was an essential element of murder under Kentucky law. In support of this proposition, he cites *Bartrug v. Commonwealth*, 568 S.W.2d 925, 926 (Ky.1978), *overruled by Wellman v. Commonwealth*, 694 S.W.2d 696 (Ky.1985), and *Edmonds v. Commonwealth*, 586 S.W.2d 24, 27 (Ky.1979), *overruled by Wellman v. Commonwealth*, 694 S.W.2d 696 (Ky.1985). Petitioner concludes that the omission of this essential element from the murder instruction and the failure to instruct on first-degree manslaughter violated his rights under *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980).

Petitioner raised this argument in his Brief on direct appeal at pages 66–68 in *Slaughter v. Commonwealth*, Appeal No. 84–SC–272–MR. The Supreme Court of Kentucky did not specifically address this issue, instead finding it merely to be "without merit." *Slaughter*, 744 S.W.2d at 409.

The Supreme Court of Kentucky did not act contrary to, nor unreasonably apply, any clearly established precedent of the United States Supreme Court in rejecting this argument out of hand. Petitioner cites no Supreme Court case which would have entitled him to relief. In *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), the United States Supreme Court discussed extreme emotional disturbance in the context of a Maine statute that required a criminal defendant to prove by a fair preponderance of the evidence that he or she acted in the heat of passion to reduce a murder charge to manslaughter. 421 U.S. at 692–704, 95 S.Ct. 1881. The Supreme Court found that such a requirement violated the due process requirement announced in *In Re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) that the prosecution must prove beyond a reasonable doubt every fact necessary to constitute the crime charged. The United States Supreme Court, however, later went on to write in *Hankerson v. North Carolina*, 432 U.S. 233, 237 n. 3, 97 S.Ct. 2339, 53 L.Ed.2d 306 (1977) that

*Mullaney* "does not forbid States from requiring the criminal defendant to present *at least some evidence* to raise a factual issue with respect to heat of passion or self-defense." *id.* *See Gall v. Parker,* 231 F.3d 265, 287–305 (6th Cir.2000).

Here, the question of extreme emotional disturbance was never raised even by the "some evidence" standard of *Hankerson, supra.* Petitioner maintained throughout that he was, at most, merely present near the crime scene, but not involved in the stabbing. Even the prosecution testimony of inmate Keller indicated that petitioner simply panicked during the robbery when he stabbed the victim. Thus, whether the jury chose to credit either version of events, no question of extreme emotional disturbance was ever put into proof *in any fashion.* In other words, there was simply nothing for the prosecution to negate. Thus, while the trial court did not instruct the jury on the absence of extreme emotional distress, which was at that time apparently an element of murder in Kentucky, *Gall v. Parker,* 231 F.3d at 288–90, no harmful error occurred.

This conclusion is not contrary the decision of the Sixth Circuit in *Gall v. Parker,* 231 F.3d 265, 287–305 (6th Cir.2000). The Sixth Circuit addressed the absence of extreme emotional disturbance as an element of murder in *Gall* 231 F.3d at 287–305 (6th Cir.2000). The Sixth Circuit granted habeas corpus relief in *Gall,* in part, based on exactly the same type of argument that Petitioner now makes. The Sixth Circuit *rejected* the Commonwealth's reliance on the *Wellman* decision as retroactively amending the state law involving the absence of extreme emotional disturbance as an element of murder in Kentucky.

The key distinguishing feature of *Gall,* however, lies in its facts. Gall had a lengthy history of severe mental illness that included severe schizophrenia, accompanied by bouts of uncontrollable rage.

Nowhere in the facts established at trial in the present case is there any such evidence of any severe mental illness or any emotional disturbance. At most, the proof would simply suggest that Petitioner panicked during a robbery and stabbed the victim after she began to scream. These facts do not give rise to a basis for an instruction on the absence of extreme emotional disturbance. Accordingly, the *Gall* decision by the Sixth Circuit, which is not, in any event, clearly established precedent of the United States Supreme Court, is materially distinguishable given the dramatically different nature of the facts proved at Petitioner's trial. Once again, the decision of the Supreme Court was not contrary to, nor an unreasonable application of, any clearly established Supreme Court precedent.

### Penalty Phase Jury Instructions

Petitioner raises a host of arguments involving the adequacy of the penalty phase jury instructions. First, he maintains that the penalty phase instructions were contrary to the controlling precedent of *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) and *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), to the extent that they used the term "recommend," rather than "fix," when referring to the jury verdict. Although KRS 532.025(1)(b) specifically states that in death penalty cases, the jury may "recommend" a sentence, Petitioner maintains that the use of the term improperly misled the jury to believe that the responsibility for determining the appropriateness of Petitioner's death sentence rested elsewhere, contrary to *Caldwell,* 472 U.S. at 328–29, 105 S.Ct. 2633.

Petitioner raised this issue on direct appeal in his Brief at pages 137–142 in *Slaughter v. Commonwealth,* Appeal No. 84–SC–272–MR. The Supreme Court of

Kentucky did not specifically address this question on the merits. The State Supreme Court simply included the issue among those "without merit."

The Sixth Circuit addressed this exact issue and the *Caldwell* decision in *Kordenbrock v. Scroggy*, 919 F.2d 1091, 1101 (6th Cir.1990), *cert. denied*, 499 U.S. 970, 111 S.Ct. 1608, 113 L.Ed.2d 669 (1991). In *Kordenbrock*, the prosecutor advised the jurors during voir dire that their recommendation of death would not be binding on the court, but that the court would accord it great weight. Thereafter, the trial court used the term "recommend" in its instructions when referring to the sentence. Kordenbrock was found guilty and sentenced to death. At the Sixth Circuit, he argued that the prosecutor's conduct violated *Caldwell*. The Sixth Circuit disagreed, noting that the judge had instructed the jury in accordance with Kentucky law as set forth in KRS 532.025(1)(b). The prosecutor's conduct did not misstate or improperly describe the jury's role under state law. *Kordenbrock*, 919 F.2d at 1101. In the absence of any affirmative misstatement or misconduct, the Sixth Circuit found no *Caldwell* violation.

Further, the Sixth Circuit rejected the retroactive application of the decision of *Tamme v. Commonwealth*, 759 S.W.2d 51 (Ky.1988), *cert. denied*, 525 U.S. 1153, 119 S.Ct. 1056, 143 L.Ed.2d 61 (1999), wherein the Supreme Court held that in the future, juries should be instructed to "fix," not to "recommend," death sentences. The *Tamme* decision was specifically held to be prospective in its application. Although the Sixth Circuit found the issue to be worthy of "serious consideration," it concluded that the argument did not rise to the level of a *Caldwell* violation. The same is true here for exactly the same reasons. Accordingly, the decision of the Kentucky Supreme Court was not contrary to, nor an unreasonable application

of, *Caldwell v. Mississippi*, 472 U.S. at 328–29, 105 S.Ct. 2633.

In argument XX, Petitioner maintains that the penalty phase jury instructions denied him due process and a reliable sentencing. Petitioner challenges the instructions in fourteen different respects as being contrary to *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) and *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (Memo., 133–149).

Petitioner raised this argument, along with its many subparts, on direct appeal to the Supreme Court of Kentucky at pages 114–132 of his Brief in *Slaughter v. Commonwealth*, Appeal No. 84–SC–272–MR. The Supreme Court of Kentucky did not specifically address this argument or any of its subparts. As before, the argument was simply dismissed as being "without merit."

The first subpart involves Petitioner's claim that he was constitutionally entitled to an instruction that defined the term "mitigation." The Court can find nothing objectively unreasonable in the decision of the Kentucky Supreme Court on this issue. Petitioner cites no clearly established precedent of the United States Supreme Court which would have required the trial court in 1983 to give an instruction to explain or define the term "mitigation." As Respondent points out, in fact, the United States Supreme Court has upheld jury instructions in capital cases that do not define this term. *See Buchanan v. Angelone*, 522 U.S. 269, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998); *Boyde v. California*, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990); *Johnson v. Texas*, 509 U.S. 350, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993).

The jury, in Petitioner's case, was instructed on eight specific mitigating circumstances that it could consider and was advised that "you shall consider such mitigating or extenuating circumstances as have been presented to you in the evidence and you believe to be true, including but not limited to, such of the following as you believe from evidence to be true." (TR I, 131). This language, and the instruction containing it, were clearly sufficient to satisfy the requirement under *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) that the jury be given the opportunity to consider as a mitigating factor any aspect of the defendant's character, background, personality, record or other circumstance as a basis for a sentence less than death.

■ Likewise, Petitioner cites no clearly established precedent of the United States Supreme Court, which would have required the jury to be informed concerning the way that the aggravating and mitigating circumstances are to be weighed against one another. Respondent correctly points out that Kentucky is not a "weighing" state. Kentucky law does not require that the aggravating circumstances outweigh the mitigating circumstances beyond reasonable doubt. *See Skaggs v. Commonwealth,* 694 S.W.2d 672 (1985), *cert. denied,* 476 U.S. 1130, 106 S.Ct. 1998, 90 L.Ed.2d 678 (1986); *Smith v. Kentucky,* 599 S.W.2d 900 (Ky.1980). Accordingly, no clearly established precedent of the United States Supreme Court was violated or unreasonably applied in an objective fashion. *See Tuilaepa v. California,* 512 U.S. 967, 979–80, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994) (sentencer has broad discretion in determining whether the death penalty should be imposed in a capital case, once the defendant is determined to be a member of the death-eligible case).

■ Petitioner also argues that the instructions should have advised that the prosecutor bore the burden of proving the existence of the aggravating circumstance beyond reasonable doubt, and that such circumstance outweighed any mitigation. Petitioner, however, cites no clearly established precedent of the United States Supreme Court to support this argument on page 141 of his Memorandum of Law. Further, the jury was instructed during the penalty phase that it could consider the aggravating circumstance in recommending a penalty if it believed the circumstance to be true beyond a reasonable doubt (TR I, 132). The jury also was instructed that it could not recommend a death sentence unless it was satisfied from evidence beyond a reasonable doubt that the aggravating circumstance was true in its entirety (*Id.,* 133). Finally, the jury was instructed that if it had a reasonable doubt about the aggravating circumstance, no finding should be made on that circumstance (*Id.,* 134). These instructions show that the proper burden of proof was amply set forth to the jury.

Next, Petitioner maintains that *Woodson* and *Proffitt* required that the jury make specific mitigation findings. Neither of those decisions, however, so holds. In fact, the Sixth Circuit considered this exact issue in *McQueen v. Scroggy,* 99 F.3d 1302, 1332 (6th Cir.1996), *cert. denied,* 520 U.S. 1257, 117 S.Ct. 2422, 138 L.Ed.2d 185 (1997), and held, "McQueen claims that the Constitution requires a judge and a jury to prepare written findings regarding the mitigating circumstances presented at the penalty phase of the trial. There is no case from any federal court that supports this proposition." *Id. See also Kordenbrock v. Scroggy,* 680 F.Supp. 867, 892–93 (E.D.Ky.1988), *aff'd. in part and rev'd. in part,* 919 F.2d 1091, 1120–21 (6th Cir.1990) (*en banc*), *cert. denied,* 499 U.S. 970, 111 S.Ct. 1608, 113 L.Ed.2d 669 (1991).

■ Petitioner also maintains that he was constitutionally entitled to an instruction that specifically limited the jury's consideration of the aggravating circumstance to the sole circumstance enumerated in the instruction. Petitioner speculates that absent such an instruction, the jury may have relied on an impermissible aggravating circumstance—the failure of Petitioner to divulge the home address of the white male suspect, known only as "Red."

Petitioner, however, cites no clearly established precedent of the United States Supreme Court that requires the type of instruction he now maintains he was entitled to receive. As the Supreme Court has noted, "once the jury finds that the defendant falls within the legislatively-defined category of persons eligible for the death penalty, ... the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment." *Tuilaepa*, 512 U.S. at 979, 114 S.Ct. 2630. *See also Buchanan v. Angelone*, 522 U.S. 269, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998).

■ Petitioner maintains that the trial court also constitutionally erred when it failed to instruct the jury not to be influenced by considerations of passion or prejudice (Memo., 143). Such an instruction, according to Petitioner, was not only required by KRS 532.075(3)(a) but also by *California v. Brown*, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987), wherein the court indicated that such an instruction serves a useful purpose in limiting the jury's reliance on extraneous emotional factors in a death penalty situation. *Id.*, at 543, 107 S.Ct. 837.

A review of the *Brown* decision does not support the proposition that such an instruction is constitutionally compelled. The *Brown* decision focused on the issue of whether a California state court violated the Eighth and Fourteenth Amendments by giving an instruction in the penalty phase that the jury not be swayed by

sympathy, passion or prejudice. The Supreme Court held that the instruction did not violate the Constitution, but served a useful purpose. *Id.* at 543, 107 S.Ct. 837. The fact that such an instruction serves a useful purpose does not mean that it is constitutionally mandated. Subsequent decisions of the Supreme Court to discuss *Brown* do not give such an indication. *See generally Johnson v. Texas*, 509 U.S. 350, 371–72, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993); *Saffle v. Parks*, 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990). Accordingly, the decision of the Kentucky Supreme Court to deny relief was not contrary to, nor an unreasonable application of, *California v. Brown*, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987).

■ Petitioner also argues that the jury should have been instructed during the penalty phase that it must presume that a life sentence means life without parole (Memo., 143). Petitioner cites state court cases in support of this argument. *See Pennington v. State*, 364 S.W.2d 376, 380 (Tex.Cr.App.1962); *Farris v. State*, 535 S.W.2d 608, 614 (Tenn.1976). He fails to cite, however, any clearly established precedent of the United States Supreme Court that would support such a proposition. Accordingly, he is not entitled to relief on this argument.

■ Next, Petitioner argues that he was constitutionally entitled to a penalty phase jury instruction that defined reasonable doubt (Memo., 144). He maintains that such an instruction was required to ensure that the jury properly understood the concepts of the burden of proof and reasonable doubt. In support of his argument, Petitioner cites three decisions of the United States Supreme Court. First, he points out that in *Taylor v. Kentucky*, 436 U.S. 478, 486, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978), the Supreme Court criticized the reasonable doubt definition

previously used in the Kentucky courts as being "truncated." In *Taylor*, the defendant had been convicted of robbery in state court where the only prosecution witness was the victim, and the defendant was the sole defense witness. In closing argument, the state prosecutor made statements suggesting that the status of the defendant as a defendant tended to establish his guilt. *Id.*, at 487, 98 S.Ct. 1930. The defendant requested an instruction on the presumption of innocence, which was denied by the trial court. *Id.*, at 480, n. 5, 98 S.Ct. 1930. The trial court, however, did give an instruction on reasonable doubt that defined a reasonable doubt as being "a substantial doubt, a real doubt." *Id.*, at 488, 98 S.Ct. 1930.

Although this definition was held not to be reversible error, the Supreme Court noted that several federal circuit courts had criticized the definition as being "confusing." *Taylor, supra,* (citing *United States v. Muckenstrum,* 515 F.2d 568, 571 (5th Cir.), *cert. denied,* 423 U.S. 1032, 96 S.Ct. 564, 46 L.Ed.2d 406 (1975); *United States v. Christy,* 444 F.2d 448, 450 (6th Cir.), *cert. denied,* 404 U.S. 949, 92 S.Ct. 293, 30 L.Ed.2d 266 (1971)). Accordingly, the Supreme Court held that on the facts of the case, the refusal to give the requested instruction on the presumption of innocence denied the defendant his right to a fair trial under the Due Process Clause. *Id.*, at 483–90, 98 S.Ct. 1930. The Supreme Court did not hold, however, that a defendant in a capital trial is entitled to an instruction on reasonable doubt during the penalty phase of the trial. *Taylor* was not a capital case, and did not address the question of whether a reasonable doubt instruction was mandated in such situations.

■ The same can be said of the other two cases cited by Petitioner. Petitioner cites *In re Winship,* 397 U.S. 358, 363–64, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), apparently for the general proposition that proof beyond reasonable doubt, which is required by the Due Process Clause in criminal trials, is an essential aspect of due process and fair treatment. *Id.*, at 363–64, 90 S.Ct. 1068. While this statement certainly is beyond dispute, the case itself does not hold that a defendant in a capital trial is constitutionally entitled, as a matter of due process, to a jury instruction defining reasonable doubt. In fact, *In re Winship* involved a juvenile convicted in the New York Family Court by a preponderance of the evidence of an act that, if done by an adult, would have constituted larceny. The Supreme Court held that proof beyond a reasonable doubt was constitutionally required when a juvenile is charged with an act that would constitute a crime if committed by an adult. *Id.*, at 365, 90 S.Ct. 1068.

The remaining decision cited by Petitioner, *Estelle v. Williams,* 425 U.S. 501, 503, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976), also is not on point. At most, the *dicta* of *Estelle* urges the courts to be diligent to guard against the dilution of the fundamental principle that guilt must be established by proof beyond reasonable doubt. The *Estelle* decision, however, involved the question of whether the State could constitutionally compel a criminal defendant to appear before a jury while dressed in prison attire. Although the State could not compel the accused to stand trial in prison clothes, the accused in *Estelle* had failed to make a timely objection and therefore was not entitled to relief. *Id.*, at 503–513, 96 S.Ct. 1691. This holding of *Estelle* does not entitle the present Petitioner to any relief in this case where the issue centers on the adequacy of jury instructions, not prison garb. Accordingly, the Kentucky Supreme Court did not act contrary to, nor unreasonably apply, any of three above decisions, none of which are on point.

■ At page 144 of his Memorandum of Law in support of his petition, Petitioner argues that the nature of the instructions unconstitutionally misled the jurors to believe that they must find any mitigating factors unanimously in order to give them effect. In raising this argument, Petitioner focuses on instruction no. 5 (TR I, 134) of the jury instructions in the penalty phase. This instruction states that, "The verdict of the jury must be unanimous and must be signed by one of you as a foreman." Petitioner insists that such an instruction runs afoul of clearly established precedent announced in *Mills v. Maryland,* 486 U.S. 367, 384, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988).

In *Mills,* the Supreme Court reversed the capital sentence of a defendant, where the trial court had distributed a verdict form that included individual questions concerning aggravating and mitigating circumstances. The form indicated that the jurors were to answer "Yes" or "No" to each question. *Id.,* at 378, 108 S.Ct. 1860. On the portion of the form that related to aggravating circumstances, the instructions stated that if the jury unanimously concluded that an aggravating circumstance had been proved, the question should be answered "Yes," but if the jury was not so satisfied, then the question must be answered "No." *Id.* The remaining portion of the form contained the same instructions for mitigating circumstances. *Id.* The final portion of the form instructed the jury to weigh only those mitigating circumstances marked "Yes." *Id.*

In examining the instructions, the Supreme Court concluded that the instructions, as written, may well have precluded the jury from considering specific mitigating factors contrary to *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). On this point, the Supreme Court concluded:

[T]here is a substantial probability that reasonable jurors, upon receiving the judge's instructions in this case, and in attempting to complete the verdict form as instructed, well may have thought that they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance. Under our cases, the sentencer must be permitted to consider all mitigating evidence. The possibility that single juror could block such consideration, and consequently require the jury to impose the death penalty, is one we dare not risk.

*Mills,* 486 U.S. at 384, 108 S.Ct. 1860. *See also McKoy v. North Carolina,* 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990) (applying *Mills* to grant habeas corpus relief).

The Sixth Circuit considered a similar *Mills* argument in depth in *Gall v. Parker,* 231 F.3d 265, 320–30 (6th Cir.2000), *cert. denied,* 533 U.S. 941, 121 S.Ct. 2577, 150 L.Ed.2d 739 (2001). In *Gall,* the Sixth Circuit found that an instruction which read, "Your *findings* and verdict must be *unanimous* and must be signed by the Foreman," (*Id.,* at 320–21) created a reasonable likelihood that the jury applied the challenged instructions so as to prevent them from considering constitutionally relevant evidence in rendering a death sentence. *Id.,* at 329. To quote the Sixth Circuit,

Because we must ensure that juries carry out their roles properly in death penalty cases, because it is reasonably likely that the jury was confused on the necessity of unanimity for mitigation, and because "the verdict of death may not have been imposed had they understood that one juror could block the death sentence if he or she believed that there were sufficient mitigating circumstances, *Kibbe,* 431 U.S. at 154, 97 S.Ct.

1730," we conclude that this error so infected the sentencing phase that the resulting death sentence violated due process.

*Gall,* 231 F.3d at 329–330 (partial citation omitted).

The present case is materially distinguishable from the decision of the Supreme Court in *Mills* and the decision of the Sixth Circuit in *Gall.* In the case of *Mills,* the jury was presented with a form that required the jury to specifically state in writing which of the mitigating factors it chose to accept. In *Gall,* the jury was provided with an instruction which, in material part, read, "Your *findings* . . . must be *unanimous.*" *Gall,* 231 F.3d at 320 (original emphasis). Thus, in both of these decisions, the respective courts concluded that a reasonable likelihood existed that the juries involved could have applied the instructions in a way which prevented them from considering constitutionally relevant mitigation evidence, due to the false assumption that there must be unanimous agreement upon the existence of a mitigating factor before it could be taken into consideration.

Such a problem does not exist in the present case, where the challenged instruction, instruction no. IV, provided only that the *verdict* must be unanimous (TR I, 134). The instruction on mitigating facts and circumstances, instruction no. I, contained no reference to a requirement of unanimity. To the contrary, the instruction advised the jury that it must consider the mitigating facts that have been presented and believed to be true (TR I, 131).

The only other decision of the Sixth Circuit to discuss this issue in any depth is *Kordenbrock v. Scroggy,* 919 F.2d 1091, 1108–10, 1120–21 (6th Cir.1990), *cert. denied,* 499 U.S. 970, 111 S.Ct. 1608, 113 L.Ed.2d 669 (1991). In *Kordenbrock,* the Sixth Circuit, sitting *en banc* in a 13 judge panel, addressed the same question involving instructions that were identical in material part to those given in Petitioner's trial. In that case, the trial court instructed the jury, during the penalty phase, that it could consider the aggravating circumstance if it believed from the evidence beyond a reasonable doubt that it exists. *Id.,* at 1108, n. 7. The trial court then instructed on mitigating circumstances stating that in recommending a sentence for the defendant, "You shall consider such mitigating and extenuating facts and circumstances as have been presented to you in evidence and you believe to be true, including but not limited to each of the following as you believe from the evidence to be true. . . ." *Id.,* at 1109, n. 7. Thus, the challenged instructions in the *Kordenbrock* decision were the same in their key language as those now before the Court.

The Sixth Circuit was widely divided on this issue. Although the circuit court granted Kordenbrock habeas relief and directed a retrial as to both liability and sentence, the Judges could not agree on whether the above language was a violation of the principles announced in *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). Eight of the thirteen Judges, writing on this particular issue, concluded that the language of the instructions did not deprive Kordenbrock of due process or any constitutional right. *Kordenbrock,* 919 F.2d at 1121. To quote from the Opinion of the eight dissenting Judges:

As the district court held, there is nothing in the instructions that would lead the jurors to believe that finding a mitigating factor required unanimity. The instructions carefully stated that finding an *aggravating* factor required such agreement, but it cannot be reasonably inferred that silence as to finding a mitigating factor would likely cause the jury to assume that unanimity was also a requirement. Indeed, it would indi-

cate the opposite. The instructions were not misleading.

*Kordenbrock*, 919 F.2d at 1121 (Kennedy, J., dissenting). Because the Supreme Court of Kentucky could have reasonably reached a similar conclusion, this Court cannot say that the decision of the Kentucky Supreme Court was objectively unreasonable or contrary to the *Mills* decision.

▇ Petitioner next argues that he was entitled to instructions that: (1) "if any juror does not believe the sentence of death is warranted under these instructions, then a sentence of life imprisonment, or a sentence of 20 years or more, must be imposed;" and (2) "the law presumes that the appropriate sentence for murder is punishment other than death." (Memo., 146). Petitioner does not cite any precedent of the United States Supreme Court to support his first argument. Further, the jury was instructed that if it has a reasonable doubt as to whether the defendant should be sentenced to death, it should recommend a sentence of life imprisonment instead (TR I, 134). Accordingly, Petitioner received in substance the instruction that he now claims he was denied. As for the latter presumption-of-life instruction, Petitioner cites only one Supreme Court decision in support of his argument. This decision is *Taylor v. Kentucky*, 436 U.S. 478, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978). The Court has already discussed the facts and holding of this case.

Essentially, the Supreme Court held that in a non-capital, criminal trial where the proof was nothing more than a swearing contest between the victim and the defendant, the refusal of the trial court to give a presumption-of-innocence instruction during the guilt phase of trial denied the defendant due process, given the genuine risk that the jury convicted the defendant on the basis of extraneous consider-

ations. *Taylor*, 436 U.S. at 483–90, 98 S.Ct. 1930. As one can see, the facts and holding of *Taylor* simply do not support the proposition that a defendant in a capital trial is entitled to a presumption-of-life-imprisonment instruction during the penalty phase of the trial.

▇ Petitioner also argues that the jury was entitled to an instruction during the penalty phase that they could consider the facts of other cases to determine whether similar defendants, who have committed similar murders, have been sentenced to death. He also maintains that the jury was entitled to a "life option" instruction that would direct the jury that it could sentence Petitioner to life imprisonment, or a term of twenty years or more, even it found that the statutory aggravating circumstance was proven beyond a reasonable doubt (Memo., 147–148).

In neither situation, however, does Petitioner cite a controlling precedent of the Supreme Court which would have required such jury instructions at the time of his trial. At most, he cites *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) and *Bell v. Ohio*, 438 U.S. 637, 98 S.Ct. 2977, 57 L.Ed.2d 1010 (1978) for their *dicta* that the sentencer must be given the option to consider all of the mitigating circumstances in the evidence that may call for a sentence less than death. Reliance on *dicta* is not sufficient. Nor do the three state court decisions Petitioner cites entitle him to relief. *See State v. Tyner*, 273 S.C. 646, 258 S.E.2d 559, 566 (1979); *State v. Goolsby*, 275 S.C. 110, 268 S.E.2d 31, 40–41 (1980), overruled in part by *State v. Torrence*, 305 S.C. 45, 406 S.E.2d 315 (1991); *Zant v. Gaddis*, 247 Ga. 717, 279 S.E.2d 219, 222 (1981). Such decisions are not adequate grounds in the absence of a controlling Supreme Court precedent.

In argument XXI of his Memorandum in support of his petition, Petitioner argues that he was denied due process during the penalty phase when the instructions failed to include the following mitigating factors for the jury to consider:

1. That James Earl Slawter's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of *intoxication from drugs and alcohol* even though you might have already found the impairment insufficient to constitute a complete defense to the crime.

2. That James Earl Slawter is mentally retarded and/or mentally ill.

3. That James Earl Slawter's capacity to commit the offense of murder was lessened by mental difficulties and/or the intake of alcohol or drugs, and that his ability to maturely and meaningfully deliberate, reflect and intend the death of Esther Stewart was lessened by these mental problems and/or the effects of alcohol or drugs.

(TR I, 118–119) (original emphasis).

Petitioner argues that the evidence presented at trial was more than adequate to support an instruction on the three requested mitigating factors. In this respect, Petitioner points to his statements to psychologist Johnson that he had used drugs for a long time, including acid, speed and marijuana (TE IX, 1351). Petitioner also used drugs on the day before the robbery/murder (*Id.*). He suggests that the timing of the drug use alone would have supported an instruction. He also argues that there was evidence of mental illness, given his diagnosis of borderline personality disorder with anti-social traits (TE X, 1388). Because the trial court declined to grant the instruction as tendered, Petitioner maintains that the trial court failed to permit the jury to make particularized consideration of the relevant aspects of his character before returning the sentence of death in violation of *Woodson v. North Carolina*, 428 U.S. 280, 303, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) and *Roberts v. Louisiana*, 431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 637 (1977). Petitioner further cites *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) and its requirement that the sentencer not be precluded from considering as a mitigating factor any aspect of the defendant's character or record, or any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. *Id.*

Petitioner raised this issue in his Brief on direct appeal at pages 107–114 in Appeal No. 84–CR–272–MR. The Supreme Court of Kentucky dismissed the argument without substantive discussion as being "without merit." *Slaughter*, 744 S.W.2d at 409.

The Supreme Court of Kentucky did not act contrary to, nor unreasonably apply, any of the above-cited Supreme Court precedent in rejecting this argument. While it is true that "a jury must be allowed to consider all of the relevant mitigating evidence," no evidence was introduced at trial that Slaughter's capacity to appreciate the criminality of his conduct, or to conform it to the requirements of law, was impaired as a result of intoxication or alcohol use on the day of the crime. To the contrary, although Petitioner advised Dr. Johnson that he had used a variety of drugs in the past, there was no testimony that Petitioner was acting under the influence of drugs or alcohol at the time of the offense. Indeed, Petitioner told Dr. Johnson that he was not feeling any ill effects from his drug use on the day of the murder and robbery (TE X, 1409). Also, no evidence was offered that Petitioner was mentally retarded. Indeed, his IQ was determined

to be in the low average range by Dr. Johnson (TE IX, 1382). Further, the trial court did instruct on the mitigating factor of low intelligence. Therefore, Petitioner cannot complain that he did not receive an instruction that included below-average intelligence as a mitigating factor. Because the evidence did not support the additional mitigating factors requested by Petitioner, the trial court was not compelled to grant the requested instructions. The decision of the Supreme Court of Kentucky was not contrary to, nor an unreasonable application of, any existing Supreme Court precedent cited by Petitioner. *See generally Buchanan v. Angelone,* 522 U.S. 269, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998).

Petitioner next argues that his right to due process was violated when the trial court failed to grant him an instruction during the penalty phase that the indictment had no evidentiary value. The trial court did instruct the jury during the penalty phase on the presumption of innocence, and instructed the jury to apply the presumption in determining whether aggravating circumstance existed (TR I, 129). Petitioner maintains, however, that such an instruction was not sufficient to satisfy *Taylor v. Kentucky,* 436 U.S. 478, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978) and *Estelle v. Williams,* 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976).

Petitioner raised this issue on direct appeal to the Supreme Court of Kentucky at pages 135–137 of his Brief. The Supreme Court found it to be "without merit." This Court agrees. Neither *Taylor* nor *Estelle* reaches the question of jury instructions in the penalty phase of a capital prosecution. The Supreme Court has held that once a defendant is fairly convicted in the guilt phase of a criminal trial, any presumption of innocence evaporates as to the charged offenses of conviction. *See Delo v. Lashley,* 507 U.S. 272, 278–79, 113 S.Ct. 1222, 122 L.Ed.2d 620 (1993). At the time of the

penalty phase, Petitioner had been convicted of first-degree murder and robbery. He was no longer entitled to the presumption of innocence as to murder or robbery or to an instruction that the indictment was not proof against him. Accordingly, the Supreme Court of Kentucky did not act contrary to, nor unreasonably apply, any existing precedent of the United States Supreme Court in refusing to grant relief on this argument.

### DEATH PENALTY CHALLENGES

Petitioner raises five arguments that directly challenge the nature of the death penalty and the process by which it is imposed in Kentucky. He maintains, for example, in argument XXVIII, that Kentucky's death penalty statute, KRS 532.025, violates the Eighth and Fourteenth Amendments to the Federal Constitution, because it: provides no guidance in the role of mitigating circumstances; does not specify who has the burden of proving aggravating circumstances; does not require any findings by the sentencer regarding mitigating circumstances; and, contains vague, open-ended aggravating and mitigating circumstances (Memo., 163–164).

Petitioner argues in his second death penalty challenge, argument XXIX, that Kentucky's death penalty scheme operates in an arbitrary, discriminatory and freakish manner in violation of the same two Constitutional Amendments (Memo., 165–166). He then maintains in argument XXX that electrocution, as a form of capital punishment, is cruel and unusual punishment in violation of the Eighth Amendment (*Id.,* 166). In his fourth argument, Petitioner maintains that he was denied due process of law and a rational sentencing process, when the Supreme Court of Kentucky allegedly denied him access to data it used to review the proportionality

of his death sentence (*Id.*, 167). Finally, he insists that his sentence of death is arbitrary, cruel and unusual, because it is disproportionate as applied to the crime and to sentences received in similar cases (*Id.*, 168–171).

Respondent does not challenge the exhaustion of state remedies with regard to any of the above arguments. Review of the state record confirms that these arguments were raised on direct appeal in the Brief filed by Petitioner to the Supreme Court of Kentucky in *Slaughter v. Commonwealth*, 84–SC–272–MR (Brief for Appellant, 142–147,147–154, 154–160, 160–162, 162–163). Accordingly, the issues are properly before this Court.

A lengthy discussion of these issues, however, is not necessary. Petitioner has not cited any clearly established authority which would support any of the above arguments. In fact, all of these arguments have previously been rejected by the federal courts in this Circuit. For example, in *McQueen v. Scroggy*, 99 F.3d 1302, 1333 (6th Cir.1996), *cert. denied*, 520 U.S. 1257, 117 S.Ct. 2422, 138 L.Ed.2d 185 (1997), the Sixth Circuit held that Kentucky's death penalty statute is modeled after the Georgia death penalty statute, which consistently has been upheld by the Supreme Court. *Id.* (citing *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987)). The Sixth Circuit also rejected the claim that the death penalty statute in Kentucky operates in an arbitrary, discriminatory and freakish manner. *Id.* In so doing, the Court noted that the type of empirical evidence relied on by Petitioner amounts to the same kind of statistical studies the Supreme Court found to be insufficient in *McCleskey*, 481 U.S. at 297, 107 S.Ct. 1756. The same is true here. Such studies were relied on by

Petitioner in the state courts. Accordingly, Petitioner's argument is no more persuasive in this context that it was in the *McQueen* decision.

The Sixth Circuit also addressed the proportionality argument in *McQueen*, 99 F.3d at 1333. In rejecting the argument, the Court noted that "[t]here is no federal constitutional requirement that a state appellate court conduct a comparative proportionality review." *Id.* (citing *Pulley v. Harris*, 465 U.S. 37, 50–51, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984)). The question is not simply whether any persons have received the death penalty for similar crimes, but also whether the death penalty is proportionate to the crime under review. *Id.* Here, the Supreme Court of Kentucky did perform a proportionality review and determined that Petitioner's sentence was not disproportionate to the crime committed. Petitioner has offered no clearly established Supreme Court precedent which would demonstrate that this determination of the Kentucky Supreme Court was clearly contrary to, or an unreasonable application of, existing Supreme Court precedent. While the members of the Court were obviously divided on this issue, that division itself does not entitle Petitioner to relief.

Petitioner's argument concerning electrocution as cruel and unusual punishment also has been squarely rejected in this Circuit. This claim was directly addressed by the Sixth Circuit in *In re Sapp*, 118 F.3d 460, 464 (6th Cir.1997), *cert. denied*, 521 U.S. 1130, 117 S.Ct. 2536, 138 L.Ed.2d 1035 (1997). The *Sapp* decision involved a civil rights suit filed by a death-sentenced Kentucky inmate who challenged his scheduled execution by electrocution. In setting aside the stay of execution granted by the district court, the Sixth Circuit observed:

Electrocution has never been found to be cruel and unusual punishment by any American court. *See e.g. In re Kemmler,* 136 U.S. at 443–44, 10 S.Ct. 930; *Ingram v. Ault,* 50 F.3d 898 (11th Cir. 1995); *Felker,* 101 F.3d at 97; *Porter,* 805 F.2d at 943, n. 15; *Glass v. Louisiana,* 471 U.S. 1080, 105 S.Ct. 2159, 85 L.Ed.2d 514 (1985) (Brennan, J., dissenting from denial of certiorari) ("such claims have uniformly and summarily been rejected"). No legislatively authorized method of execution in the United States is outlawed in any jurisdiction by any currently-effective court decision. *Gomez v. Fierro,* 117 S.Ct. at 285, *Rupe v. Wood,* 863 F.Supp. 1307 (W.D.Wash. 1994), *vacated as moot,* 93 F.3d 1434 (9th Cir.1996). The very practice of electrocution has been upheld by other courts within the past year, and there is no argument even plausible that there are differences in the level of "evolving decency" among the different circuits or states of the Union, or over the last very few years.

*Id.,* at 464.

Petitioner's argument regarding access to alleged data used by the Supreme Court of Kentucky has previously been reviewed by the District Court in this case. The Court addressed this argument in the context of one of Petitioner's motions for discovery. As the Court noted, the Supreme Court of Kentucky has explained, on more than one occasion, that it does not rely on any non-public data in performing the proportionality review in death sentence cases that is required by KRS 532.075. This fact was explained in *Perdue v. Commonwealth,* 916 S.W.2d 148, 168 (Ky.1995), wherein the Supreme Court of Kentucky explained that the only "data" used by it in performing such a review are the prior published death penalty decisions identified in its opinions. The Supreme Court of Kentucky, prior to *Perdue,* further emphasized in *Harper v. Commonwealth,* 694

S.W.2d 665, 670–71 (1985), *cert. denied,* 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992 (1986) that "[i]n no way are mysterious and secret records or data taken into account in our deliberations." *Id.,* at 670–71. Further, the District Court for the Eastern District of Kentucky in *Bowling v. Parker,* Civil Action No. 99–236 (E.D.Ky. 2000) held that the petitioner in that case had "suggested no basis or belief that other data exists or that the Supreme Court of Kentucky has changed its method since the *Harper* decision." (Dkt. No. 54, Op.18).

■ The same is true here. As the Court has already found in its Order on discovery, Petitioner has not shown any concrete facts that would suggest, even for a moment, that the Supreme Court of Kentucky relies on some secret data base when conducting its statutorily required proportionality review. Further, as noted, such a proportionality review of sentences in state capital murder cases is not a constitutional requirement. *Pulley v. Harris,* 465 U.S. 37, 48–51, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Recently, in *Skaggs v. Parker,* 27 F.Supp.2d 952, 984–85 (W.D.Ky., 1988), *rev'd. on other grounds,* 230 F.3d 876 (6th Cir.), *amended and superceded by,* 235 F.3d 261 (6th Cir.2000), the District Court rejected exactly the same argument. *See also Kordenbrock v. Scroggy,* 680 F.Supp. 867 (E.D.Ky.1988), *rev'd. on other grounds,* 919 F.2d 1091 (6th Cir.1990) (*en banc*). As the District Court directly stated in its discovery Order when discussing this issue:

In sum, the time has come to put this issue to rest. The Supreme Court of Kentucky does not maintain a non-public data base. Its proportionality review, under KRS 532.075, is conducted by a review of the records of the published death penalty decisions it identifies in each of its published death penalty opin-

ions. Discovery requests that seek to obtain such non-existence records are a waste of a petitioner's resources and those of the federal courts. The futility of such request is underscored· by the repeated holdings of numerous federal courts that habeas petitioners have no federal due process rights that would entitle them to any specific procedure when a proportionality review is performed by a state court pursuant to state statute. Slaughter's arguments to the contrary border upon being specious.

(Dkt. No. 57).

Accordingly, the Supreme Court of Kentucky did not act contrary to, nor unreasonably apply, any existing Supreme Court precedent when it denied Petitioner's request to obtain a non-existent secret data base.

### DOUBLE JEOPARDY

■ Petitioner maintains in argument XVII that his constitutional protection against double jeopardy was violated when the prosecution used his first-degree robbery conviction as the sole aggravating circumstance to make his murder conviction a capital offense. Petitioner argues that this use of robbery as an aggravating circumstance to increase the punishment for murder from imprisonment to death constituted multiple punishments for the same offense in violation of his guarantee against double jeopardy. In support of this conclusion, he cites *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).

Petitioner raised this argument on direct appeal at pages 76–78 of his Brief to the Supreme Court of Kentucky in Appeal No. 84–CR–272–MR. The Supreme Court of Kentucky dismissed the argument without discussion as being "without merit." *Slaughter*, 744 S.W.2d at 409.

Examination of the controlling precedent of the United States Supreme Court persuades the Court that the issue is without merit. The Supreme Court of Kentucky did not act contrary to, nor unreasonably apply, the *Benton* decision. The *Benton* decision is inapplicable on its facts.

*Benton* involved a Maryland defendant who was tried in state court for burglary and larceny. He was acquitted of larceny but convicted of burglary and sentenced to ten years of imprisonment. On appeal in state court, his case was remanded to the trial court, and he was re-indicted and retried for both larceny and burglary. Benton protested that retrial on the larceny count violated his double jeopardy protection, given the prior acquittal on that count. On retrial, Benton was found guilty of both offenses and concurrently sentenced to fifteen years for burglary and five years for larceny. On certiorari, the Supreme Court held that his larceny conviction could not stand, given the prior acquittal. *Benton*, 395 U.S. at 797, 89 S.Ct. 2056.

Obviously, Petitioner Slaughter was not acquitted of first-degree robbery during the guilt phase of his capital trial. To the contrary, he was found guilty by proof beyond a reasonable doubt. Therefore, the facts of *Benton* are not those of this case.

The more appropriate authority was rendered by the Supreme Court over forty years ago in *Williams v. Oklahoma*, 358 U.S. 576, 79 S.Ct. 421, 3 L.Ed.2d 516 (1959). In *Williams*, the defendant was charged with a kidnapping/murder committed while he was attempting to escape from police after a robbery. *Id.* Following his arrest, defendant pled guilty to murder and was given a life sentence. He was later convicted of kidnapping, which was then a capital offense in Oklahoma, the state of conviction. The state sentencing

court took into account, in assessing the death penalty, the fact that the kidnapping victim had been murdered. The Supreme Court rejected the argument of the defendant that the use of the prior murder conviction in assessing the death penalty in the kidnapping case was a violation of double jeopardy.

On this point, the Supreme Court held in *Williams* that the trial court was entitled to consider, as one of the aggravating circumstances in the kidnapping, the murder of the kidnapping victim. The Court disposed of the defendant's double jeopardy argument, holding that: "[I]n view of the obvious fact that, under the law of Oklahoma, kidnaping [sic] is a separate crime, entirely distinct from the crime of murder, the court's consideration of the murder as a circumstance involved in the kidnaping [sic] crime cannot be said to have resulted in punishing petitioner a second time for the same offense." *Id.* at 586, 79 S.Ct. 421.

Later, in explaining the *Williams* decision in *Witte v. United States,* 515 U.S. 389, 399, 115 S.Ct. 2199, 132 L.Ed.2d 351 (1995), the Supreme Court stated, "We thus make clear [in *Williams* ] that use of evidence of related criminal conduct to enhance a defendant's sentence for a separate crime within the authorized statutory limits does not constitute punishment for that conduct within the meaning of the Double Jeopardy Clause." *Id.*

Given the holding of *Williams* and the inapplicability of the facts and *dicta* of *Benton,* no clearly established precedent of the Supreme Court was contravened or unreasonably applied by the Supreme Court of Kentucky in rejecting Petitioner's double jeopardy argument. The Double Jeopardy Clause was not violated merely because, during the penalty phase, the jury properly considered Petitioner's first-degree robbery conviction as an aggravating circumstance.

## JUROR QUESTIONING

Another issue raised by Petitioner involves a question asked in open court by a female juror during the penalty phase of the trial. After Petitioner testified, juror #5 asked aloud the following question:

JUROR NO. 5: I have a question. He stated that he knew, he and this, "Red" had been friends for some time. Where did this "Red" live? He would had to visit or something. Where did this "Red" live? Where did he hang out at? Why didn't any of your friends know about you and "Red," and since you . . .

THE COURT: That is about five questions there. I'll allow the questions. But there was about four there.

WITNESS [PETITIONER]: Um, I would say this much. He stays on Hill Street. I won't say what part or what, but he stays on Hill Street.

JUROR NO. 5: You're asking for your life, and nobody can find "Red," and you refuse to tell his address so he can be found to save you probably?

WITNESS: I . . .

MR. RADOLOVICH: May we approach the Bench?

(TE IX, 1374–1375).

Petitioner's attorney moved for a mistrial based on juror no. 5's alleged predisposition. In counsel's words, "The juror stated, which is Ms. McAtee, that unless he fingers this 'Red,' the jury will find him guilty and sentence him to death. Her statement was that was probably what would happen. It shows a predisposition before the close of any evidence." (TE IX, 1376). The prosecutor responded that the question was valid, and that the juror was simply asking why the witness would not reveal the location of a key suspect when his own life was in the balance (*Id.*). The trial court concluded that, "I don't think it showed a predisposition. I took the question particularly in the more than the words than in the manner that the juror asked the question that she was asking a pretty valid question and did not show any

predisposition." (*Id.*, 1377). The trial court overruled the motion without giving an admonition to the jury, nor was one requested by counsel.

Petitioner now argues that this exchange denied him due process and an impartial capital sentencing jury (Memo., 79–86). According to Petitioner, it was apparent by her questions that juror no. 5 had formed an opinion on the penalty before the jury began its deliberations (*Id.*, 80). Because this opinion was expressed in open court, in the presence of the jury, Petitioner concludes that the impartiality of the remaining jurors was compromised. Petitioner relies on the Supreme Court cases of *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); and, *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) in support of his argument.

Petitioner did raise the issue of jury questioning on direct appeal to the Supreme Court of Kentucky at pages 85–91 of his appellate brief in Appeal No. 84–SC–272–MR. The Supreme Court of Kentucky did discuss the substance of this argument as a matter of state law and held that state law permitted jurors to ask questions so long as the questions were pertinent and competent. *Slaughter,* 744 S.W.2d at 413. The Kentucky Supreme Court further held that the question asked by juror no. 5 ran to the credibility of the witness, and therefore was pertinent and legitimate (*Id.*). The Supreme Court of Kentucky did not address this question as a matter of federal constitutional law.

The reason that the Supreme Court of Kentucky did not address the issue on direct appeal as a matter of constitutional law becomes obvious when one examines Petitioner's Brief on direct appeal. Petitioner's Brief is devoted exclusively to state law decisions. At most, his Brief mentions the term "due process" in a sentence that is followed by a citation to the Fourteenth and Sixth Amendments. That is the sole and entire scope of Petitioner's federal constitutional argument in his Brief on direct appeal. The remainder of the Brief is devoted to Kentucky case law. *See Louisville Bridge and Terminal Co. v. Brown,* 211 Ky. 176, 277 S.W. 320, 322–23 (1925); *Miller v. Commonwealth,* 188 Ky. 435, 222 S.W. 96 (1920). Petitioner also extensively cited state court decisions from other states than Kentucky in his Brief on direct appeal (Memo., 88–91). Accordingly, it is questionable whether Petitioner fully and fairly presented this issue to the state courts as a matter of federal constitutional law in the first instance.

Even if Petitioner did satisfy the exhaustion requirement, the Supreme Court decisions he cites do not address the constitutionality of juror questions during the course of a criminal trial. The Sixth Circuit did address, in general terms, the propriety of permitting jurors to ask questions in a criminal proceeding in *United States v. Collins,* 226 F.3d 457, 461–65 (6th Cir.2000). *See also U.S. v. Hernandez,* 176 F.3d 719 (3d Cir.1999). In discussing this issue in the context of a federal prosecution, the Sixth Circuit concluded that "[w]hile allowing jurors to ask questions during criminal trials is permissible and best left to the discretion of the trial judge, the routine practice of juror questioning should be discouraged. Nonetheless, we discern no abuse of discretion in this case." *Collins,* 226 F.3d at 461. Indeed, the Court has found no Supreme Court decision which expressly prohibits the practice of permitting a juror to ask questions during a criminal trial.

The above federal decisions, and others, do repeatedly caution that the practice should be used sparingly and under careful control of the trial judge. Unfortunately, the types of procedural control suggested by the Sixth Circuit were not in place in Petitioner's trial. The jurors did not ask the questions in writing to permit prior review by the trial court and to afford counsel time for objection and argument. That being said, the trial court in this case specifically found that the question of the juror did not indicate a predisposition as to the outcome of the penalty proceedings. This finding is entitled to a presumption of correctness, absent clear and convincing proof to the contrary. Although Petitioner was afforded an extensive post-conviction evidentiary hearing, no such proof was developed during the state post-conviction RCr 11.42 proceedings.

Subsequently, after Petitioner filed his federal habeas corpus petition, the same juror, juror no. 5, Mary L. McAtee, supplied Petitioner's attorneys, on November 3, 2000, with an affidavit. In her affidavit, McAtee states that she became convinced that Petitioner was guilty well before the jury retired to deliberate during the guilt phase (Dkt. No. 41, Memo. of Law, App. 7, Aff. of McAtee). McAtee also stated in her affidavit that she was "for the death penalty in this case" and had decided to vote for imposition of the death penalty when the victim's bloody clothing was introduced into evidence before the jury retired to deliberate. She further advised that during the penalty phase jury deliberations, three of the jurors were considering a life sentence. McAtee states in her affidavit that she talked to one of the three jurors and explained that with a life sentence, he could "get out as early as eight years." (Id.).

The affidavit of juror McAtee is not sufficient for Petitioner to avoid the entry of summary judgment. Contrary to his arguments, the inclusion of this affidavit as an attachment to his Memorandum in Opposition to Respondent's Motion for Summary Judgment does not raise a material issue of fact. First, as a general rule, a party cannot manufacture a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts the party's earlier testimony. *See generally Gagne v. Northwestern Nat'l. Ins. Co.*, 881 F.2d 309, 315 (6th Cir.1989); *Laborers' Pension Trust Fund v. Sidney Weinberger Homes, Inc.*, 872 F.2d 702, 706 (6th Cir.1988) (*per curiam*).

While McAtee is not filing the affidavit in conflict with her earlier testimony, it is entirely contrary to the factual finding of the trial court, which was never factually contradicted during the state post-conviction proceedings. More importantly, any such document that serves as an affidavit must not only be based on personal knowledge, but must set forth facts that would be admissible in evidence. *See Wiley v. United States*, 20 F.3d 222, 225–26 (6th Cir.1994); *Moore v. Holbrook*, 2 F.3d 697, 699 (6th Cir.1993). Juror McAtee's statements in her recent affidavit would not be admissible in evidence. *See United States v. Tines*, 70 F.3d 891, 896 (6th Cir.1995), *cert. denied*, 516 U.S. 1180, 116 S.Ct. 1280, 134 L.Ed.2d 225 (1996) (Fed.R.Evid.606(b) precluded the introduction of juror's affidavit that attempted to explain the effect of an *Allen* charge in a criminal trial, wherein Tennessee prison guards were charged with depriving inmates of their civil rights under state law). *See also In re Beverly Hills Fire Litigation v. Bryant Elec.*, 695 F.2d 207, 213 (6th Cir.1982), *cert. denied*, 461 U.S. 929, 103 S.Ct. 2090, 77 L.Ed.2d 300 (1983); *Womble v. J.C. Penney Co.*, 431 F.2d 985, 988 (6th Cir. 1970). Accordingly, the affidavit of juror McAtee does not raise a genuine issue of material fact as it would not be admissible, even if Petitioner were entitled to an evi-

dentiary hearing, which he has not shown. Further, the Supreme Court precedent cited by Petitioner does not reach the question of the due process impact of juror questioning during a criminal trial. At most, the *dicta* of several of the decisions cited merely refer to the general right to a fundamentally fair trial. Accordingly, the decision of the Supreme Court of Kentucky is not contrary to, nor an unreasonable application of, any then-existing precedent of the United States Supreme Court.

### *REPORT OF THE TRIAL JUDGE*

■ Kentucky law provides that in those criminal cases in which a death penalty is imposed, the trial judge is required to prepare a report pursuant to KRS 532.075(1). A standard form, Administrative Office of the Courts ("AOC") Form 085, is used by the Kentucky courts for this purpose. The form is a 12–page form that, when completed, sets out various biographical information about a defendant, data concerning the trial and charged offenses, information concerning a defendant's counsel, the chronology of the case and general considerations (TR II, 150–161). It is prepared in order to help the Supreme Court of Kentucky in its review of death sentences. KRS 532.075(1).

Petitioner has raised several arguments relating to the preparation and adequacy of the AOC–085 report entered by the trial court on December 2, 1983. Petitioner argues that he was denied a meaningful opportunity to offer mitigating evidence in violation of *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), when the report was completed by the trial court *before* it conducted the sentencing hearing (Memo., 277–278). According to Petitioner, the final sentencing, entry of the final judgment, and preparation of the AOC–085 report all occurred on the same day, December 2, 1983 (TR II, 150–164). Because defense counsel must by statute be provid-

ed a copy of the report and given the opportunity to comment upon it, Petitioner concludes that the trial judge had to have prepared the report prior to the sentencing hearing, thereby allegedly denying him his opportunity to offer mitigating evidence.

Petitioner also argues in argument XXVII that the failure of the trial court to answer one of the questions on the form, in the general consideration section of the form, violated his Eighth and Fourteenth Amendment rights under *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) and *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). The question at issue is question no. 11 on page 5 of the form. This question, which is in the "offense-related data" section, asks, "although the evidence suffices to sustain the verdict, does it foreclose all doubt respecting the defendant's guilt?" (TE II, 154). The trial judge declined to answer question 11. Instead, he merely wrote, "inappropriate question" to the side of the answer blocks. Petitioner maintains that this refusal to answer the question, in effect, was a refusal to consider a potentially compelling mitigating circumstance—any possible doubt as to Petitioner's guilt.

Petitioner raised the issue regarding question 11 at pages 91–95 of his Brief on direct appeal. He did not raise the issues regarding the timing of the report's preparation on direct appeal. Instead, the remaining two issues concerning the timing of the report were raised in the post-conviction setting at page 48 of his Brief on appeal in Appeal No. 95–SC–00049. The Supreme Court did address the question on direct appeal regarding the unanswered question, but declined to address the remaining two arguments in its Opinion on post-conviction appeal, concluding

that "[t]his issue was presented on direct appeal." (Dkt. No. 13, App.223).

On direct appeal, the Supreme Court of Kentucky explained that:

> The purpose of the statutory mandate of this procedure and filing of the written report is set out in the statute. KRS 532.075(3) is as follows:
>
> (a) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factors, and
>
> (b) Whether the evidence supports the jury's or judge's findings of statutory aggravating circumstances as enumerated in KRS 532.025(2), and
>
> (c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
>
> No specific questions are set out in the statute, that is left up to this Court. Certainly, the trial court should have answered *all* the questions. However, it is clear that he did answer all other questions, and that those questions (and answers) provided all the information necessary to respond to the basic questions provided in the statute quoted above. At worst, this failure to answer the question was a technical error and in no way affected the judge's ability to impose the death penalty. Certainly, it does not affect our ability to thoroughly review the conviction.

*Slaughter,* 744 S.W.2d at 414.

This decision of the Supreme Court of Kentucky is neither contrary to, nor an unreasonable application of, *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). In *Eddings,* the trial court specifically declined to consider a mitigating factor that was in evidence. The United States Supreme Court held that this refusal violated the rule in *Lockett* as "the sentencer [may not] refuse to consider, as a matter of law, any relevant mitigating evidence." *Id.*

Here, there is no indication that the trial court, as sentencer, refused to consider any mitigating evidence. Certainly, the decision of the trial court to decline to answer question 11 does not support the proposition that the trial court refused to consider mitigating evidence. To understand this conclusion, one must appreciate the nature of the AOC–085 report.

The report is a statutory requirement that is designed not for the trial court, but to assist the Supreme Court of Kentucky in conducting its statutorily-required proportionality review. *See generally McClellan v. Commonwealth,* 715 S.W.2d 464 (Ky.1986), *cert. denied,* 479 U.S. 1057, 107 S.Ct. 935, 93 L.Ed.2d 986 (1987) (trial judge not required to conduct proportionality review; rather, such review is conducted by a supreme court). The form is merely an administrative tool used by the state supreme court to assist it in its duties under the statute. Indeed, the very language of the statute makes this clear.

Section (1) of the statute provides that when a death penalty is imposed "and upon the judgment becoming final in the circuit court, the sentence shall be reviewed on the record by the supreme court." KRS 532.075(1). Immediately following this sentence in subsection (1) of the statute is a reference to the report prepared by the trial judge, which the statute requires that the circuit clerk forward to the State Supreme Court within ten days after receiving the transcript. *Id.* The report, therefore, is obviously not a tool to be used by the trial court, but is designed solely for the convenience of the State Supreme Court.

Merely because the trial judge, rightly or wrongly, considered question 11 to be inappropriate does not indicate that the trial judge violated any constitutional duty

to give weight to specific mitigating factors. Petitioner cannot point to any portion of the sentencing hearing or other source in the record that gives the slightest indication that the trial judge refused to consider the weight of the evidence in sentencing Petitioner to death in accordance with the recommendation of the jury. Accordingly, Petitioner is not entitled to habeas relief on this argument.

The Court declines to address the remaining two arguments due to Petitioner's procedural default. These arguments were not raised on direct appeal. The Supreme Court of Kentucky specifically declined to address them. Instead, the Court concluded that consideration of the arguments was "not appropriate for an RCr 11.42 motion." (Dkt. No. 13, App. 223). Accordingly, the State's highest court appears to have relied on a procedural bar to preclude consideration of the merits of the remaining two arguments. Petitioner has not shown cause or prejudice sufficient to excuse the procedural default, nor has he established manifest injustice in the absence of consideration of these remaining arguments. Accordingly, the federal courts may not now review them.

### *VICTIM IMPACT STATEMENT*

■ In argument XI of his Memorandum, Petitioner maintains that he was denied due process and a rational sentencing when the trial court allowed into evidence a victim impact statement prepared by the victim's husband (Memo., 89–91). Petitioner argues that the information in the statement was immaterial to the proceeding and calculated "to inflame the sentencing jury and deny petitioner a fair, impartial and rational trial and capital sentencing. . . ." (*Id.,* 89–90). In support of this argument, Petitioner relies on *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987) as "partly overruled" by *Payne v.*

*Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).

This issue was first raised in Petitioner's motion to vacate his sentence pursuant to RCr 11.42. The trial court denied the motion without specifically addressing the issue. On appeal, the Supreme Court of Kentucky declined to address the merits of the issue. Instead, the State Supreme Court held that the issue "could have and should have been raised on direct appeal, so it is not appropriate for an RCr 11.42 motion." (Dkt. No. 13, App.225) (citing *Thacker v. Commonwealth,* 476 S.W.2d 838 (Ky.1972) (RCr 11.42 does not permit a defendant to retry issues which could and should have been raised in the original proceeding or were raised and considered on appeal)).

The quoted language confirms that the Kentucky Supreme Court determined that Petitioner had procedurally defaulted on this issue due to his failure to raise it on direct appeal. The Supreme Court relied on a well-established state law ground that issues that may be raised on direct appeal may not first be brought in a post-conviction motion to vacate. *Thacker,* 476 S.W.2d at 839. Petitioner has not shown cause or prejudice, nor a manifest injustice, sufficient to permit the federal courts to consider the issue on the merits in this proceeding.

Further, consideration of the merits would not have afforded Petitioner any relief. The victim impact statement at issue was not presented to the jury during Petitioner's trial. As Respondent points out, the jury had already returned its verdict at the time that the victim's husband prepared a brief, one-sentence statement that was presented to the trial court subsequent to the return of the verdict. This fact materially distinguishes the present case from both the *Booth* and *Payne* decisions, wherein the victim impact state-

ments in question were introduced into evidence during the penalty phase of the capital trial proceedings (or in the case of *Payne*, a relative of the victim was permitted to testify). *See Booth*, 482 U.S. at 503–09, 107 S.Ct. 2529; *Payne*, 501 U.S. at 814–16, 111 S.Ct. 2597. Accordingly, even were this issue properly before the federal courts, Petitioner would not be able to establish his entitlement to habeas corpus relief.

## INEFFECTIVE ASSISTANCE OF COUNSEL

██ Petitioner raises eleven arguments that involve ineffective assistance of counsel. Most of these arguments, eight of them, relate to claims of ineffective assistance during the guilt phase of Petitioner's state trial.[18] Petitioner, however, does raise three claims of ineffective assistance that relate directly to the penalty phase of his trial.[19] Two of these claims—that his attorney completely failed to investigate and prepare for the penalty phase and failed to obtain an independent expert report—merit extended discussion. Indeed, these two arguments are the most potent claims made by Petitioner in this proceeding—so potent that the Court firmly believes that Petitioner is entitled to habeas corpus relief, in the form of a new penalty phase.

### State Court Proceedings

Upon conviction, Petitioner timely exhausted his available remedies upon direct appeal. The Supreme Court of Kentucky affirmed his conviction and sentence in *Slaughter v. Commonwealth*, 744 S.W.2d 407 (Ky.1987). Petitioner, with assistance of new counsel, began a determined campaign to vacate the sentence by way of an RCr 11.42 motion filed on October 13, 1989 (TR II, 247–266). Among the many arguments raised in the motion was Petitioner's claim that his attorney, Mr. Radolovich, failed to prepare for the penalty phase of the capital trial and did not attempt to obtain an independent mental health expert after receiving Dr. Johnson's damaging report (*Id.*). The trial court conducted a lengthy evidentiary hearing over the course of three days, beginning on September 7, 1994.

The testimony of these witnesses has been summarized in the first portion of this recommendation. Certain testimony, however, bears brief review: in particular, the testimony of Petitioner's attorney, Mr. Radolovich. Radolovich entered the case after his law partner, Ed Harrington, withdrew prior to trial (VHR I, 9/7/94, 9:31:16). After Harrington withdrew, Radolovich continued pro bono to represent Petitioner without any other lawyer assisting him (*Id.*, 9:31:40).

Radolovich testified under oath during the post-conviction hearing that, as a former state prosecutor in New York and as a defense attorney in Kentucky, he had practiced a total of six capital cases (VHR I, 9/7/94, 9:33:00). In fact, as the affidavit of the Executive Assistant District Attorney for New York County would reveal, Radolovich had only worked in the office for less than a year, beginning on May 2, 1977, and did not try any capital cases during that time (TR VI, 816). Not only was Radolovich never the head of the Organized Crime Unit in New York, as he had testified, it was unlikely, according to the affidavit of the Executive Assistant District Attorney, that Radolovich had tried *any* homicide cases during the ten months that he worked in New York (*Id.*). Radolovich, contrary to his sworn testimony, apparently had *no* prior experience as

---

**18.** Arguments 37, 38, 39, 40, 41, 42, 43, 45.

**19.** Arguments 33, 34, 44.

a defense attorney in a capital murder prosecution.

Radolovich testified during the RCr 11.42 hearing that his trial preparation was entirely focused on the guilt phase of the trial (VHR I, 9/7/94, 9:33:40). In fact, 99% of his preparation was devoted to the first phase of Petitioner's trial (*Id.*, 9:34:30). In the words of an affidavit that he submitted in September of 1989: "My almost exclusive preparation and focus was directed to preparing the guilt-innocence phase of the trial." (Vol.I, App.A–919). It was Radolovich's plan to have Petitioner testify at the guilt phase of the trial (VHR 1, 9/7/94, 9:35:50).[20] Radolovich believed that if the defense was not successful during the guilt phase, the "penalty phase would be a blood bath for us." (*Id.*). Accordingly, Radolovich prepared Petitioner to testify only during the guilt phase and made no preparation for him to testify during the penalty phase. In Radolovich's words, "Our whole thrust was on the guilt phase." (*Id.*, 9:36:49).

Radolovich explained that the defense "really didn't get a chance to prepare [for the penalty phase] except, you know, the rudiments of the penalty phase. We just had a short period of time." (*Id.*). In fact, Radolovich apparently did not begin to prepare for the penalty phase until *after* the guilty verdicts had been returned on the first-degree robbery and murder charges. According to the transcript of the hearing:

MCDANIEL: This was something that happened after the guilty verdict was returned?

RADOLOVICH: Yes, sir, uh, both he and I were, uh, upset and, his Honor gave us as much time as we needed, but the, you know, I, we really, nothing in the way of time compared had he testified in, uh, guilt phase, and substantially that was, what we had prepared in guilt phase was what came out in penalty phase.

(VHR I, 9/7/94, 9:37:00).

Radolovich acknowledged that none of Petitioner's family testified during the penalty phase (VHR I, 9/7/94, 9:37:50). Radolovich apparently believed that Petitioner's parents were deceased. In fact, his mother was living in Alabama, and Petitioner had several relatives living locally in Louisville, Kentucky. The only contact that Radolovich had with any of Petitioner's family was a brief telephone conversation with an elderly aunt, who Radolovich did not believe would be helpful due to her age and minimal contact with Petitioner. Radolovich admitted that he did not even think to ask the aunt about the existence and location of other family members who might have testified for Petitioner during the penalty phase (*Id.*, 10:10:13). He acknowledged that it would have been helpful to have the testimony of anyone who could have vouched for Petitioner and show that his family still cared and stood by him (*Id.*, 10:11:30).

Radolovich acknowledged that Petitioner did testify on his own behalf during the penalty phase. This testimony, however, was against Radolovich's advice, given his view that if a defendant does not testify during the guilt phase, then the defendant should not testify at the penalty phase (VHR I, 9/7/94, 9:54:00). Radolovich acknowledged that during the penalty phase, Petitioner, who had not prepared to testify during the penalty phase, testified that he stole cars to support himself, that he witnessed the murder of a car thief, and that he stole every day for a living (*Id.*, 10:04:30–05:00).

Radolovich further testified that he called Dr. Johnson during the penalty phase because he "felt that I had no alter-

20. A transcript of Attorney Radolovich's testimony during the RCr 11.42 hearing may be found at the beginning of Appendix, Vol. II, accompanying the petition.

native to get in [Dr. Johnson's] ... information." (App., Vol. II, Testimony of Radolovich, 23–24). Radolovich agreed that Dr. Johnson testified that Petitioner had given him inconsistent information on Petitioner's family background (VHR I, 9/7/94, 10:05:40). Dr. Johnson testified that Petitioner had anti-social traits and supported himself by stealing cars (*Id.*, 10:06:00–06:15). Further, Radolovich acknowledged that Dr. Johnson testified in the penalty phase that if set free, Petitioner would continue his present lifestyle, and that Petitioner had a predisposition for violence (*Id.*, 10:07:30–07:50). Radolovich admitted that "a lot of what [Dr. Johnson] testified to was not what I would call helpful." (*Id.*, 10:07:50). Radolovich also acknowledged that Dr. Johnson diagnosed Petitioner with a borderline personality disorder with anti-social traits (*Id.*, 10:06:15). Finally, Radolovich acknowledged that Dr. Johnson testified that such individuals, those with borderline personality disorder, as a group, have a poor likelihood of rehabilitation (App., Vol.II, 22).

During the RCr 11.42 hearing, Petitioner also presented the testimony of various family members, including his mother, two brothers and other relatives who were located in Louisville at the time of the trial. Petitioner also presented the testimony of three psychologists, a social worker, and a family practitioner, along with an expert, attorney Betty Niemi, who testified on the standard for effective assistance in capital cases. The testimony of all of these witnesses was summarized at the outset of this Memorandum Opinion and Order and will not be repeated here.

On June 22, 1995, the trial court entered an Order that overruled Petitioner's RCr 11.42 motion (Dkt. No. 13, App., Vol. I, A1–7). The trial court characterized the ineffective-assistance-of-counsel issue as raising the question of whether, "had 'better' representation been made, would there

have been a different result, or, is it mere speculation?" (*Id.*, A–2). The trial court acknowledged the affidavit of Radolovich that most of his efforts had been directed to the guilt-innocence phase of the trial (*Id.*). The trial court set out the direct conflict between Radolovich's testimony concerning his experience in capital litigation and the affidavit of the Assistant District Attorney in New York (*Id.*, A3–4). The trial court advised in its Opinion that it had "wrestled" with the question of how the "apparent discrepancy" affected the merits of the present motion. The trial court concluded that, for the purpose of the motion, "any discrepancy in Mr. Radolovich's testimony must be put aside, and the concentration be focused on other issues." Further, the court concluded that the "testimony is in the record and will inevitably be reviewed by an appellate court." (*Id.*, A–4).

The trial court did not attempt to summarize the mitigating evidence presented during the RCr 11.42 hearing. However, the court did speak to the quality of that evidence. In the words of the court's Opinion:

> As noted, it was impressive. Indeed, in the years following, the court has never been presented at trial with such an accumulation of "mitigating evidence" during a penalty phase. With such evidence presented as the standard for "effective assistance" of counsel, Mr. Radolovich, serving pro bono, and most employed attorneys, would likely fail.

(Dkt. No. 13, App.A–5). The court then continued to note that "[f]or whatever reasons, the trial attorney, relying on the client, was not privy to the defendant's social history." (*Id.*).

The trial court followed this language by raising several questions rhetorically. The trial court asked whether, based on the allegedly sparse discovery, and without as-

sistance from his client, Radolovich was derelict in not discovering and following up on the mitigating evidence discovered by the Department of Public Advocacy (*Id.*). The trial court also rhetorically asked whether, despite Radolovich's "client serving" affidavit, he vigorously pursued a defense for the defendant in both phases of the trial. Both of these questions, which ran to the first prong of the *Strickland* test, were left unanswered by the trial court. In fact, the trial court did not cite *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) anywhere in its Opinion. Instead, the trial court concluded as follows:

> This case was tried in the early years after the death penalty returned. Since that time, perhaps standards for effective assistance of counsel have been raised. But, in the context of 1983, this court, also the trial judge, is not persuaded that Mr. Radolovich provided "ineffective assistance of counsel." Further, even raising the standard, the court is not persuaded that, in 1983, that the now mitigating evidence would have changed that jury's verdict; it may have, or not, but searching the corners of this judge's mind, there is the conclusion that the contention is based upon speculation.

> \* \* \* \* \* \*

> In conclusion, the court is not persuaded that the contentions of "ineffective assistance of counsel" warrant a further conclusion that the jury would have returned a different penalty verdict.

(Dkt. No. 13, App., A5–6).

Petitioner then took an appeal to the Supreme Court of Kentucky, which directly addressed the question of effective assistance of counsel during the penalty phase (Dkt. No. 13, App., A212–214). In its Opinion, the Kentucky Supreme Court set out the standard of *Strickland v.*

*Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (*Id.*, A212–213). The Supreme Court also identified the affirmative duty of counsel to investigate, citing *Austin v. Bell*, 126 F.3d 843, 848 (6th Cir.1997), *cert. denied*, 523 U.S. 1079, 118 S.Ct. 1526, 140 L.Ed.2d 677 (1998). The Court noted that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. Failure to investigate or present mitigating evidence at sentencing may constitute ineffective assistance of counsel." (*Id.*, A213) (citing *Austin*, 126 F.3d at 848). The Kentucky Supreme Court continued to hold, however, that Radolovich's performance, including his decision regarding whether to investigate the background of his client, was not deficient, because:

> Slaughter chose to withhold information from Radolovich, including the identity and location of his family members and other information pertinent to his sentencing hearing. Because Slaughter led Radolovich to believe that all but one of his relatives were dead, and conducting an investigation to find family members would be fruitless, it was reasonable under all the circumstances for Radolovich to decide not to investigate.

> Although there is generally a duty to investigate under *Strickland*, trial counsel is only required to conduct an investigation based on the information provided by the defendant. *See Thomas v. Gilmore*, 144 F.3d 513 (7th Cir.1998). As a result, Slaughter was not denied effective assistance of counsel in the penalty phase of his trial.

(*Id.*, A214).

The Supreme Court of Kentucky then addressed the ineffective-assistance-of-counsel arguments regarding mental health experts (Dkt. No. 13, App., A214–218). After again discussing the *Strick-*

*land* standard, the Supreme Court concluded that the report of Dr. Johnson was "mixed" and included information both helpful and hurtful to Petitioner's case. Accordingly, the Court reasoned: "Based on Dr. Johnson's report, Radolovich could have reasonably determined that further evaluations could not assist Slaughter, and as a matter of trial strategy, decided to forego those evaluations." (*Id.,* A216). The Court then continued to hold that the information contained in the psychological reports produced by Petitioner's mental health experts during the RCr 11.42 hearing was "equivocal at best." (*Id.,* A217). The Court held that:

> We are not persuaded that this evidence, if presented at the original sentencing hearing, would have swayed the jury to decide against the capital sentence.
>
> Because Radolovich's decision not to pursue further psychological examinations does not support an ineffective assistance claim, his choice regarding mental health experts was reasonable under the circumstances.
>
> Even if counsel's performance was not reasonable, Slaughter has not proven ineffective assistance of counsel, because he has not shown prejudice, the second prong of the *Strickland* test.
>
> \* \* \* \* \* \*
>
> The information would have presented some mitigating factors, but we are not convinced that they would have overcome the aggravating factors presented by the Commonwealth. Because Slaughter has not demonstrated prejudice, he has not shown ineffective assistance of counsel as set forth in *Strickland.*

(Dkt. No. 13, App., A217–218).

### The Strickland Standard

The function of the federal courts in the context of a habeas corpus proceeding is to determine whether the decision of the Kentucky Supreme Court in Petitioner's case was directly contrary to, or an objectively unreasonable application of, the standard for ineffective assistance of counsel announced in *Strickland* as applied subsequently in Supreme Court decisions, such as *Kimmelman v. Morrison,* 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) and *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court set forth the well-known two-prong test for determining ineffective assistance of counsel. The first factor requires a defendant to show that the performance of his or her attorney fell below an objective standard of reasonableness. *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. According to the Supreme Court, "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* Analysis of an attorney's reasonableness requires the court to take into account the skills the lawyer should possess, the guidelines of professional organizations such as the American Bar Association, and the specific circumstances of each case. *Id.; Campbell v. Coyle,* 260 F.3d 531 (6th Cir.2001) (available on WestLaw at 260 F.3d 531, 2001 WL 863560).

The courts, in examining the decisions of trial counsel, are to do so with tremendous deference and without the benefit of 20/20 hindsight. In the words of *Strickland,* "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689. A perfect performance is not required. Instead, the *Strickland* standard permits a wide range of profes-

sionally competent assistance, especially regarding those strategic choices informed by "reasonable investigations." *Id.*, at 690–91, 104 S.Ct. 2052. Even if the decisions of a defendant's trial counsel were mistaken, an ineffective assistance claim will not survive so long as the challenged decision was reasonable. *Id.; White v. McAninch*, 235 F.3d 988, 995 (6th Cir. 2000) (The *Strickland* decision cautions against second-guessing strategic decisions that did not prove successful).

■■■■ The second factor of the *Strickland* analysis requires the court to determine whether a defendant was materially prejudiced by the claimed errors of his or her trial counsel. According to *Strickland*: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. In the context of an ineffective-assistance-of-counsel claim in the penalty phase of a trial, the question is whether there is a "reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695, 104 S.Ct. 2052. *See also Glover v. United States*, 531 U.S. 198, 121 S.Ct. 696, 148 L.Ed.2d 604 (2001) (discussing the *Strickland* prejudice standard).

The United States Supreme Court subsequently applied the *Strickland* standard in *Kimmelman v. Morrison*, 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986), a decision rendered well before Petitioner's conviction became final. In *Kimmelman*, a New Jersey defendant was convicted of rape, following a trial in which his attorney failed to move to suppress damaging evidence in the form of a bedsheet that con-

tained incriminating bodily fluids. During post-conviction proceedings, the attorney explained that he was unaware of the existence of the bedsheet until the time of trial, long after the deadline for filing a motion to suppress had expired. *Id.* at 369, 106 S.Ct. 2574. The attorney had conducted no discovery to obtain information about evidence seized by the police due to his mistaken belief that the prosecution had an affirmative duty to provide the incriminating evidence to him. *Id.* The United States Supreme Court first noted that "counsel ... has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Id.* at 384, 106 S.Ct. 2574 (citing *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052).

The Court reiterated, again referring to *Strickland*, that counsel has a duty to make a reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary. *Kimmelman*, 477 U.S. at 384, 106 S.Ct. 2574. After stating the *Strickland* standard, the Court concluded that Kimmelman's lawyer had neither investigated, nor made a reasonable decision not to investigate, the case through discovery. *Id.* at 385, 106 S.Ct. 2574. The Court concluded that "[s]uch a complete lack of pretrial preparation puts at risk both the defendant's right to an 'ample opportunity to meet the case of the prosecution,' ... and the reliability of the adversarial testing process." *Id.* (citing *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052). The Supreme Court continued that:

In this case, however, we deal with a total failure to conduct pretrial discovery, and one as to which counsel offered only implausible explanations. Counsel's performance at trial, while generally creditable enough, suggests no better explanation for this apparent and pervasive failure to "make reasonable investi-

gations or to make a reasonable decision that makes particular investigations unnecessary."

*Kimmelman,* 477 U.S. at 386, 106 S.Ct. 2574 (citing *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052).

Recently, the United States Supreme Court returned to *Strickland* in a case that raised the question of ineffective assistance based on an attorney's failure to adequately prepare and investigate in relation to the penalty phase of a capital murder. *See Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). In *Williams,* a Virginia defendant was convicted of robbery and capital murder. The defendant was sentenced to death, following a sentencing hearing in which the jury found a probability of future dangerousness. During the state post-conviction proceedings, the same court found that the failure of the defendant's attorney to discover and present significant mitigating evidence during the penalty phase had violated his right to effective assistance of counsel under *Strickland. Id.* at 371, 120 S.Ct. 1495. The state supreme court, however, rejected this decision of the trial judge and concluded that the defendant had not suffered sufficient prejudice to warrant relief based on *Lockhart v. Fretwell,* 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

On certiorari, the United States Supreme Court applied the standard of the AEDPA and held that the defendant was denied his constitutionally guaranteed right of effective assistance of counsel when his trial lawyers failed to investigate and to present substantial mitigating evidence to the sentencing jury. *Williams,* 529 U.S. at 390–98, 120 S.Ct. 1495. The Supreme Court, in reaching this conclusion, noted that the defendant's attorneys had failed to seek out juvenile and social service records due to their mistaken belief that state law did not permit the intro-

duction of such records. *Id.* at 373, 120 S.Ct. 1495. Likewise, the same attorneys had failed to contact a potential character witness, not as a conscious choice, but simply due to their failure to return a telephone call. *Id.* The Court noted that it was undisputed that the defendant had a constitutionally protected right to provide the jury with the mitigating evidence that his trial attorneys had either failed to discover or failed to offer. *Id.* at 393, 120 S.Ct. 1495.

Among the evidence that trial counsel failed to present in mitigation was proof that: the defendant had a "nightmarish childhood" that included criminal neglect so severe that his parents were imprisoned; that he had been severely and repeatedly beaten by his father; that he had been committed to the custody of social services for two years; that he was borderline mentally retarded; that while previously imprisoned, he had received commendations for helping to crack a prison drug ring and for returning a guard's missing wallet. *Id.* at 395–96, 120 S.Ct. 1495.

The Supreme Court in *Williams* went on to find that the decision of the state supreme court was objectively unreasonable for several reasons. First, the state supreme court had mischaracterized the *Strickland* rule in relying on an inapplicable exception recognized in *Lockhart. Herrera,* 506 U.S. at 397, 113 S.Ct. 853. Second, the state supreme court was unreasonable in that it failed to evaluate the totality of the available mitigation evidence, both introduced at trial and the evidence developed during the habeas proceedings in re-weighing the evidence of mitigation versus aggravation. *Id.* at 397–98, 113 S.Ct. 853. Accordingly, the Supreme Court reversed the decision of the federal circuit court and remanded the

case so that the defendant ultimately could receive a new penalty phase trial.

Our own Circuit Court has considered the question of ineffective assistance of counsel in the context of a claim of failure to investigate and prepare for the penalty phase of a state capital murder prosecution. In *Carter v. Bell*, 218 F.3d 581, 596 (6th Cir.2000), the Sixth Circuit was faced with a Tennessee capital murder conviction in which trial counsel had failed to investigate mitigating evidence. *Id.* at 596. The Sixth Circuit concluded that it was clear that trial counsel's performance had been deficient under *Strickland*. *Id.* at 595. The Sixth Circuit acknowledged its previous recognition "that 'when a client faces the prospect of being put to death unless counsel obtains and presents something in mitigation, minimal standards require some investigation.'" *Id.* at 595. (citing *Mapes v. Coyle*, 171 F.3d 408, 426 (6th Cir.1999)) The Sixth Circuit then cited *Rickman v. Bell*, 131 F.3d 1150, 1157 (6th Cir.1997) for the relevant proposition that "the complete failure to investigate, let alone present, existing mitigating evidence is below an objective standard of reasonable representation, and may in fact be so severe as to permit us to infer prejudice." *Carter*, 218 F.3d at 595.

The Sixth Circuit in *Carter* continued to cite another of its cases, *Groseclose v. Bell*, 130 F.3d 1161, 1166 (6th Cir.1997), as a case in which trial counsel "almost entirely failed to investigate the case; he never, for example interviewed the crime incident witnesses or any family members." Counsel in *Groseclose* also failed to present any mitigating evidence during the sentencing stage of the proceedings, including the defendant's military, religious and volunteer records, or any experts who could testify about his sociological or psychological factors. *Id.* Under the circumstances, the Sixth Circuit in *Groseclose* found the attorney's representation to be objectively un-

reasonable. *Id.* at 595 (*Groseclose*, at 1170–71).

Finally, in the *Carter* decision, the Sixth Circuit discussed another of its decisions involving a failure of trial counsel to investigate and present mitigating evidence in the sentencing phase of a capital murder prosecution, *Austin v. Bell*, 126 F.3d 843, 848 (6th Cir.1997). In *Austin*, the court noted that trial counsel had made little attempt to prepare for the sentencing phase, even though the defendant's relatives, friends, death penalty experts and a minister were available and willing to testify on his behalf. *Austin*, 126 F.3d at 849. The court wrote in *Austin* that the failure to present any mitigating evidence "does not reflect a strategic decision but rather an abdication of advocacy." *Id.*

Based on the above cases, the Sixth Circuit determined in *Carter*:

Trial counsel here did Carter a disservice by failing to investigate mitigating evidence. While counsel advanced several reasons for adopting their strategy, their reasons do not excuse their deficiency. The sole source of mitigating factors cannot properly be that information which defendant may volunteer; counsel must make some effort at independent investigation in order to make a reasoned, informed decision as to their utility. We find that reluctance on Carter's part to present a mental health defense or to testify should not preclude counsel's investigation of these potential factors. Under the American Bar Association guidelines for appointed death penalty counsel, "[t]he investigation for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered." American Bar Association, Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases § 11.4.1.c (1989).

We agree, therefore, with the district court's conclusions that defense counsel made no investigation into Carter's family, social or psychological background and that the failure to do so constituted representation at a level below an objective standard of reasonableness.

*Carter,* 218 F.3d at 596–97.

Other decisions of the Sixth Circuit have applied *Strickland* to condemn an attorney's absolute failure to investigate and prepare in a criminal trial. In *Lewis v. Alexander,* 11 F.3d 1349 (6th Cir.1993), the Sixth Circuit held:

> This court has recognized that counsel's failure to investigate key evidence or to make a reasonable decision that a particular investigation is not necessary constitutes ineffective assistance, and thus precludes an argument that counsel's course of action was based on an legitimate strategic choice ... In such circumstances, it is not possible to discern a strategy in counsel's omissions, only negligence.

*Lewis,* 11 F.3d at 1352–53 (citing *Sims v. Livesay,* 970 F.2d 1575, 1580–81 (6th Cir. 1992)).

The Sixth Circuit also applied the *Strickland* standard to a claim of ineffective assistance based on a failure to investigate mitigating evidence in *Glenn v. Tate,* 71 F.3d 1204 (6th Cir.1995). In *Glenn,* the defendant was sentenced to death after a state trial, wherein his defense attorneys did not begin to prepare for the sentencing phase until after the jury had returned a verdict of guilty. As a consequence, they failed to investigate and present evidence of the defendant's history, character, background and organic brain damage. *Glenn,* 71 F.3d at 1207. Faced with these facts, the Sixth Circuit wrote:

> Although both of Glenn's court-appointed lawyers were experienced criminal defense attorneys, and although they

had some eight months to get ready for sentencing proceeding necessitated by a verdict that could hardly have come as a surprise to them, evidence presented to the state trial court at a post-sentence hearing showed that the lawyers made virtually no attempt to prepare for the sentencing phase of the trial until after the jury returned its verdict of guilty. It was obvious, or should have been, that the sentencing phase was likely to be "the stage of the proceedings where counsel can do his or her client the most good," *Kubat v. Thieret,* 867 F.2d 351, 369 (7th Cir.), *cert. denied,* 493 U.S. 874, 110 S.Ct. 206, 107 L.Ed.2d 159 (1989),— yet Glenn's counsel failed to make any significant preparations for the sentencing phase until the conclusion of the guilt phase. This inaction was objectively unreasonable. "To save the difficult and time-consuming task of assembling mitigation witnesses until after the jury's verdict in the guilt phase also ensures that witnesses will not be available." *Blanco v. Singletary,* 943 F.2d 1477, 1501–02 (11th Cir.1991), *cert. denied,* 504 U.S. 943, 112 S.Ct. 2282, 119 L.Ed.2d 207 (1992).

*Glenn,* 71 F.3d at 1207 (partial citations omitted).

While obviously the decisions of the Sixth Circuit are not clearly established precedent of the United States Supreme Court as required by the standard of review under the AEDPA, these decisions are included in this Memorandum Opinion as helpful benchmarks for the application of the *Strickland* standard. These decisions repeatedly demonstrate that complete inaction by counsel in relation to the penalty phase of a capital trial is almost always held to be a deficient performance under *Strickland.* When that deficient performance results in the failure of the jury to hear significant mitigating evidence, such that a reasonable probability

exists that the outcome of the penalty hearing may have been affected, the Sixth Circuit has not hesitated to grant habeas corpus relief based on ineffective assistance of counsel in violation of *Strickland.*

### The AEDPA Standard

Of course, the duty of the Court is now to determine whether the Supreme Court of Kentucky acted contrary to, or unreasonably applied, the *Strickland* standard in rejecting Petitioner's claim of ineffective assistance of counsel. The Supreme Court of Kentucky appears to have held that because Petitioner did not immediately reveal his true identity as Jeffrey Devine Leonard, and because he did not truthfully reveal the nature of his family situation to his trial attorney, his attorney had no duty to go beyond the information provided by his client in preparing for the mitigation phase of the trial. On this point, the Supreme Court held that: "Although there is a general duty to investigate under *Strickland,* trial counsel is only required to conduct an investigation based on the information provided by the defendant." (Dkt. No. 13, App.A214) (citing *Thomas v. Gilmore,* 144 F.3d 513 (7th Cir.1998)).

This holding is an unreasonable application of *Strickland.* The *Strickland* decision does not absolve a defense attorney of a duty to conduct a thorough and independent investigation before making such critical decisions as what evidence will or will not ·be presented during a capital prosecution. To the contrary, the *Strickland* decision specifically advises that a counsel has a duty to make reasonable investigations or to make a reasonable decision that makes a particular investigation unnecessary. *Strickland,* 466 U.S. at 668, 104 S.Ct. 2052. Further, a decision not to investigate must be directly assessed for reasonableness in view of all the circumstances. Accordingly, attorney Radolovich was not absolved of his duty to investigate Petitioner's background, personal history, criminal history, employment history or family history, based solely on the statements of his client. To the extent that the Supreme Court of Kentucky appears to hold otherwise, its decision is objectively unreasonable under the *Strickland* standard. Contrary to what the Supreme Court of Kentucky appears to hold, an attorney cannot ignore the duty to make a reasonable investigation merely because his or her client is uncooperative or misleads the attorney.

It must be remembered that this is a case in which trial counsel in a capital murder prosecution made absolutely no preparation and no investigation for the penalty phase of the trial. Indeed, counsel did not even begin to prepare for the penalty phase until after the guilty verdict had been returned. Yet, even the most rudimentary pretrial investigation would have revealed to an effective attorney that his client was not forthcoming, even about his own identity. For example, the pretrial discovery provided to defense counsel by the prosecution included the statement of Laura Edwards, which identified Petitioner's proper name, and further identified that Petitioner was from Alabama. Likewise, the report produced by Dr. Johnson indicated on its face that Petitioner had been giving conflicting stories about his background. The psychologist's notes further indicated that the name of Petitioner might be Jeffrey Leonard. Even during the trial, the prosecutor made reference to the name "Jeffrey Leonard." Yet, amazingly, attorney Radolovich made no effort to investigate any aspect of his client's background, even his true name.

On this point, the Court notes that Petitioner could not even correctly spell the name, Slaughter, which he misspelled phonetically as being "Slawter." This fact alone would cause the effective attorney to

wonder about the veracity of his client's background information.

More importantly, beyond being unaware of his client's true identity, attorney Radolovich made no effort to acquire any type of records concerning Petitioner. He did not seek to obtain any school records, medical records or other background information, such as, for example, police records from Houston, the city where Petitioner claimed that he lived as a car thief. Had Radolovich attempted to obtain such records, he would have immediately realized that his client's background information was inaccurate.

Indeed, the "effort" of Radolovich to prepare for the penalty phase was so lackadaisical that he did not even think to ask the sole family member he spoke with, one of Petitioner's aunts, whether she knew the whereabouts or existence of any other family members who might have come to Petitioner's assistance during the penalty phase. Radolovich candidly testified that it simply did not occur to him to ask her during their telephone conversation about any other family members who might be willing to have testified on Petitioner's behalf. Had he asked that simple question, he might have learned that Petitioner's mother was living, and that he had two brothers, all of whom were willing to testify on behalf of Petitioner during the penalty phase of the trial. Because Radolovich did not even inquire about the existence of other family members, he threw away his client's best opportunity to present powerful mitigation evidence that might very well have affected the outcome of the penalty phase proceedings.

■ During the penalty phase, Petitioner stood alone. He was the only individual who testified in any respect concerning his family history. Unfortunately, in keeping with his behavior and emotional problems, Petitioner continued to misstate his background, claiming, as noted, to have lived as a car thief in Houston and to have been a drug addict and purse snatcher. Had attorney Radolovich conducted a reasonable investigation, and contacted Petitioner's mother and brothers, the jury would have heard a dramatically different story about Petitioner.

Petitioner's mother, Mary Moon, would have directly confirmed the fact that she repeatedly beat Petitioner with any object available, including electric appliance extension cords, leaving scars on his back, arms and legs. The jury would have learned that Petitioner's biological father renounced him, and that he had almost no contact with him (VHR I, 9/7/94, 10:22:45–10:25:30). The jury also would have learned from Mary Moon that Petitioner helped to save his little brother from his drunken stepfather, that it was Petitioner who, due to his mother's absence, was exclusively responsible for caring for his two younger brothers for approximately fourteen hours a day (*Id.*, 10:37:25). The jury also might have learned that Petitioner suffered a serious head injury as a child which went untreated, leaving a visible depression in his skull (*Id.*, 10:38:45).

Mrs. Moon testified during the RCr 11.42 hearing that no one contacted her concerning Petitioner's arrest in Louisville, where her father, stepmother, aunts and uncles lived (*Id.*, 10:49:30). Mrs. Moon testified that she loved her son, did not want to see him die in the electric chair, and would have so testified at his trial if contacted (*Id.*).

The jury also did not hear the testimony of Petitioner's two brothers, Bobby and Vincent Moon. Bobby Moon confirmed that Petitioner took care of him and his brother, made sure they were fed and helped them with their homework (VHR I, 9/7/94, 11:07:20). When Vincent was seriously injured by a bullet that exploded in his eye, it was Petitioner who took the seriously

injured child and helped get him safely to the hospital. Bobby confirmed in his testimony that their mother would beat them with anything she could get her hands on, including belts, switches, extension cords and brooms (*Id.*, 11:09:40). Bobby, like his mother, testified that he loved his brother, and would have been at the trial to support him, had he been given the opportunity.

Vincent Moon also confirmed that Petitioner was primarily responsible for his care-giving due to his mother's absence. Vincent further confirmed the incident in which he lost his eye after a bullet exploded and Petitioner rushed him to the hospital. Vincent further testified that he and his brothers did not abuse drugs and alcohol during the time they were together (VHR I, 9/7/94, 11:27:00). He related that when his mother would confine them to their rooms without food, his brother would quietly bring them food, even though he risked being punished himself.

Petitioner's grandparents, Charlie and Clara Leonard, lived in Louisville. They testified during the RCr 11.42 hearing that they remembered visits by their grandsons during the summer. During these visits, they noticed that Petitioner experienced headaches. Had they been contacted, both of the grandparents would have testified in his behalf at the penalty phase of the capital murder trial (VHR I, 9/7/94, 13:03:00).

None of these family members was given the opportunity to testify on Petitioner's behalf solely due to the absolute failure of Petitioner's trial counsel to conduct any investigation, much less a reasonable one, in preparation for the penalty phase. Indeed, counsel acknowledged that he did not even begin to think about the penalty phase until after the jury had returned its guilty verdict. His sole focus was the guilt phase of trial.

The above-discussed cases make it clear that such conduct is completely unreasonable, and certainly more than adequate to support a finding of a deficient performance under *Strickland.* Yet, the Supreme Court of Kentucky wrote away the requirement of reasonable independent investigation based on its view that an attorney need only rely on the information provided by his client. On this point, it is ironic to note that attorney Radolovich did not even make a reasonable investigation based on the misinformation Petitioner provided him. The result is that the decision of the Kentucky Supreme Court is doubly unreasonable. Not only did it apply the wrong standard under *Strickland,* but Radolovich did not even meet the erroneous standard applied by the Kentucky Supreme Court, since he conducted no investigation whatsoever. As a result, the penalty phase proceeding was entirely unreliable.

Petitioner, a 20–year–old, African American male, with no prior violent felony history, was sentenced to death by a jury that not did not know his true background, family and social history, or even his true name. This absolute ignorance concerning Petitioner's true identity and family history falls squarely on the shoulders of his trial counsel, who did virtually nothing to prepare for the penalty phase of the trial. The result was that the penalty phase of the trial became a fundamentally unfair proceeding that lost any indicia of reliability, given the inactivity of counsel, who subsequently misstated his capital trial qualifications. As a result, more than a fair probability exists that the outcome of the penalty proceedings would have been different had Petitioner been represented by attorneys who chose to prepare for the penalty proceeding prior to the return of the guilty verdict. Any conclusion by the Kentucky Supreme Court to the contrary is an objectively unreasonable application of the *Strickland* standard that erases from *Strickland* the requirement of a rea-

sonable investigation. The subsequent decision of the Supreme Court in *Williams* underscores the unreasonableness of the decision of the Kentucky Supreme Court in this case.

The Court likewise concludes that the Supreme Court of Kentucky was unreasonable in its treatment of Petitioner's claim that his attorney rendered ineffective assistance in failing to secure the services of any mental health expert witnesses during the mitigation phase of the trial. On this point, the Supreme Court of Kentucky simply found, without elaboration, that the additional testimony presented by the mental health experts in the post-conviction proceeding would not have swayed the jury to decide against a capital sentence. The Supreme Court of Kentucky neither set forth the additional mitigating evidence presented by these mental health experts nor weighed that proof against the nature of the testimony that was presented by Dr. Johnson during the penalty phase. As the *Williams* decision teaches, this failure to review mitigation evidence that was not presented, and to weigh such evidence in the balance, in determining whether prejudice exists under the *Strickland* standard is itself an unreasonable application of *Strickland*.

Here, Petitioner's trial counsel did not make a conscious decision not to pursue an additional expert opinion on Petitioner's mental health. To the contrary, Petitioner's counsel apparently was unaware that he could request court funds to hire an expert who would work with the defense to evaluate his client's emotional and mental health status. An examination of Petitioner's motion for a competency determination suggests that Radolovich believed that the indigency of his client compelled him to obtain an evaluation through Dr. Johnson at KCPC (TR I, 27). Yet, Dr. Johnson clearly was not acting on Petitioner's behalf, but made a non-confidential evaluation that was intended to be used by the court and was shared with the prosecution. Further, it does not appear from the record that Petitioner's attorney ever explained to his client in any detail the purpose and limitations of Dr. Johnson's evaluation. Dr. Johnson was directed to determine Petitioner's competency, not to provide the defense with a confidential evaluation. Yet, Petitioner's attorney made no efforts to have any other mental health professional review Dr. Johnson's report, or to produce a separate report. This omission does *not* appear to be the part of any trial strategy whatsoever, but was simply the result of the trial counsel's sole focus on the guilt phase of trial.

A multitude of facts would have caused a reasonable attorney to be deeply concerned about the adequacy and accuracy of Dr. Johnson's report. Dr. Johnson, who had received his degree a mere two years prior to evaluating Petitioner, was not able to complete the full battery of tests. As his report notes, Dr. Johnson was not able to complete the Minnesota Multiphasic Personality Inventory (MMPI), a key screening test. Dr. Johnson's report also indicated on its face that Petitioner gave incomplete and inconsistent statements concerning his family history and background. Notwithstanding such inconsistencies, Dr. Johnson proceeded to rely on the Rorschach Ink Blot Test to arrive at a diagnosis of borderline personality disorder.

Two of the mental health experts who testified during the RCr 11.42 hearing, Drs. Drogin and Engum, both testified that the Rorschach Test, or Ink Blot Test, has been determined to be of questionable validity. Dr. Engum testified that the Ink Blot Test is not a valid substitute for the MMPI, which is an absolute necessity for a competent forensic evaluation (VHR I, 9/7/94, 13:53:00–54:40). According to Dr.

Engum, he has done research on the Rorschach Test, and it simply does not prove what it purports to prove (*Id.*, 13:54:45). While the Ink Blot Test may be satisfactory for use in psychotherapy, Dr. Engum testified that it is not appropriate for making life and death clinical evaluations (*Id.*, 13:55:40).

Dr. Engum also did not accept Dr. Johnson's conclusion that Petitioner had a borderline personality disorder (VHR I, 9/7/94, 14:01:15). According to Dr. Engum, Dr. Johnson did not perform any test that would have permitted him to reach that diagnosis (*Id.*, 14:03:50). Dr. Engum, however, did give Petitioner two tests that had specific scales to detect borderline personality. No significant indication of borderline personalty was revealed by either (*Id.*, 14:01:15).

Dr. Engum's diagnosis for Petitioner, after an extensive battery of testing, was cognitive disorder, not otherwise specified (VHR I, 9/7/94, 13:37:30). According to Dr. Engum, Petitioner displayed two major areas of cognitive deficit. First, he had attention deficit disorder; and second, he had difficulty in learning and acquiring information verbally (*Id.*, 13:35:00–35:38).

Significantly, Dr. Engum testified that he determined Petitioner to have potential for rehabilitation based on the results of the tests that indicated that if Petitioner can interact freely and develop trust, he will be able to overcome the vast majority of his problems (*Id.*, 14:04:50). Dr. Engum testified that, with appropriate psychotherapy, Petitioner could tear down the barriers he had established as the result of his difficult childhood, and thereby dissipate the feelings of anger, loneliness and rejection to become a happier, more content individual (*Id.*, 14:05:35). The doctor concluded that Petitioner had sufficient intellectual development to respond to psychotherapy. In fact, the doctor concluded that Petitioner's thought processes were

remarkably good, and that he "is an innately intelligent individual...." (*Id.*, 13:46:43).

Dr. Engum was not the only mental health expert who found serious flaws with Dr. Johnson's conclusions. Dr. Eric Drogin, a licensed clinical psychologist who had access to the raw data used by Dr. Johnson, reviewed Dr. Johnson's report. As noted, Dr. Drogin testified that the Rorschach Ink Blot Test should not be used in a forensic evaluation (VHR II, 9/8/94, 13:25:30).

Dr. Drogin also found that Dr. Johnson made errors in scoring a critical test, the Shipley Test. As a result, Dr. Drogin had no confidence in the IQ score obtained by Dr. Johnson in his report (*Id.*, 13:30:50). Given the discrepancy between the vocabulary and abstract scores on the Shipley Test, Dr. Johnson should have been aware that Petitioner had a definite reading problem that would have affected his ability to take the MMPI (*Id.*, 13:34:40). The fact that the Incomplete Sentence Test was given to Petitioner orally raised a question in Dr. Drogin's mind about whether the tester felt that Petitioner had a reading problem (*Id.*, 13:41:50).

Finally, Dr. Drogin noted that Petitioner's score on the Competency Screening Test was a borderline score of 20. This score should have raised questions as to whether Petitioner was actually competent to stand trial (*Id.*, 13:55:50). Yet, the borderline nature of the score was not reported to the trial court (*Id.*, 13:58:50).

Dr. Drogin concluded that to conduct a proper forensic evaluation, Dr. Johnson should have done neurological screening and assessed Petitioner's reading ability (*Id.*, 13:59:30). Based on the information he reviewed, Dr. Drogin could not have confidence in the diagnosis obtained by Dr. Johnson (*Id.*, 14:01).

Attorney Radolovich was not aware of any of these deficiencies in Dr. Johnson's report. Even though the report indicated on its face that Petitioner was inconsistent in providing background information, and was unable to complete the MMPI, Radolovich simply accepted the conclusions of Dr. Johnson and made no further efforts whatsoever to obtain any independent expert review of Dr. Johnson's report. This report was directed toward Petitioner's competency to stand trial, not to preparing for Petitioner's defense at trial. The report also was not confidential. Radolovich made no effort to prepare Dr. Johnson for testifying during the mitigation phase of trial, but merely elected to keep the doctor on stand-by.

During the mitigation phase of the trial, Petitioner's own attorney brought out through the testimony of Dr. Johnson that his client led a nomadic, lawless lifestyle, and due to his supposed borderline personality disorder would be an unlikely candidate to be successfully rehabilitated, but rather would continue in such a lifestyle and potentially commit violent acts if released. As the testimony of Drs. Engum and Drogin has shown, these conclusions were extremely questionable, a fact that a reasonably prepared defense counsel would have known. Because Radolovich simply chose not to prepare for the penalty phase, apparently was not aware that he could have the court pay for a defense mental health expert, and ignored obvious indications on the face of the report that its conclusions were based on incomplete background information and testing, he eliminated any possibility that his client would have favorable testimony such as that of Drs. Engum and Drogin.

The result of such ineffective assistance is that the jury never saw Petitioner for whom he really was, not James Slaughter, a fictitious entity, but Jeffrey Leonard, a physically abused, neglected child, who was abandoned by his father and forced to care for his brothers; a child who, while innately intelligent, suffered from a significant learning disability that went undiagnosed throughout his childhood. The jury never learned that Jeffrey Leonard was an individual who, with proper treatment, was a good candidate for rehabilitation, who had loving family members who would stand by him and support him.

Instead, they saw "James Earl Slaughter," in many senses, the man who never was, standing alone and defiant. Slaughter was a man testified recklessly; a man who apparently was so unloved and so uncared for that not a single individual, relative or friend would vouch for him, though his life hung in the balance. There is one reason, and one reason only, that the jury faced this dismal picture—a complete failure of his trial attorney to meaningfully prepare or investigate for the penalty phase of the trial. Under such circumstances, a reasonable probability certainly existed that the result of the penalty phase would have been different had Jeffrey Leonard been represented by an attorney who treated this critical portion of the trial as something more than an afterthought.

Yet, the Supreme Court of Kentucky brushed aside all of the additional mitigating evidence, evidence so powerful that the trial judge stated in his Opinion that he had never seen the likes of such an accumulation of mitigating evidence before. The Kentucky Supreme Court did so without even identifying the additional mitigating evidence presented during the postconviction hearing. The Court merely concluded, without elaboration, that the additional mitigating evidence would not have altered the outcome (Dkt. No. 13, App.A217–218). The full extent of the analysis of the Kentucky Supreme Court is found in a single brief passage in its

Opinion stating [t]he information [discovered by subsequent investigation and psychological examinations] presented some mitigating factors, but we are not convinced that they would have overcome the aggravating factors presented by the Commonwealth. Because Slaughter had not demonstrated prejudice, he has not shown ineffective assistance of counsel as set forth in *Strickland.* (*Id.,* A218).

This conclusion is certainly an unreasonable application of *Strickland.* It is unreasonable because it fails to provide any analysis of the additional mitigating evidence presented or even to identify such evidence. If this standard were to be applied and held reasonable in the application of the *Strickland* test, then Opinions of the state courts, such as that now under review, would be absolutely immune from meaningful review under *Strickland.* The state courts merely would have to proclaim, without elaboration, that they had examined the evidence and remained unconvinced that the undiscovered mitigating evidence would have overcome the evidence of aggravating factors. No identification of the additional mitigating evidence would be required nor would the courts have to weigh carefully against the aggravating evidence.

The *Strickland* standard for determining prejudice demands something more than an absolving declaration devoid of analysis. Because the Supreme Court of Kentucky unreasonably applied the *Strickland* standard when it determined that Petitioner received effective assistance of counsel in the mitigation phase, where

counsel was grossly deficient, and the state post-conviction hearing revealed extensive mitigating evidence that most probably would have affected the outcome, Petitioner is entitled to habeas corpus relief to the extent of having a new penalty phase trial, a trial at which he is actually represented by an attorney who conscientiously and carefully prepares and attempts to show the jury that Jeffrey Leonard, not the nonexistent James Slaughter, is not deserving of death. What the outcome of that proceeding will be, of course, is impossible to determine, but the Court can say with complete confidence that Petitioner has demonstrated, quite clearly, that a reasonable probability exists that the outcome of his penalty trial would be different based on the mitigating evidence, both expert and lay, that was overlooked by his prior attorney.[21]

Accordingly,

**IT IS ORDERED** that the respondent's motion for summary judgment is **DENIED.**

**IT IS FURTHER ORDERED** that the petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 is **GRANTED IN PART,** insofar as it seeks a new penalty phase trial, but is otherwise **DENIED.**

**IT IS FURTHER ORDERED** that as the petitioner has made a substantial showing of the denial of a constitutional right, 28 U.S.C. § 2253(c)(1), a certificate of appealability is **GRANTED.**

**IT IS FURTHER ORDERED** that the motion by the petitioner for leave to file a

---

21. Petitioner has raised a number of other ineffective assistance arguments. These arguments run to issues that relate to the guilt phase of his trial. He claims that his counsel was ineffective for failing to: (1) request a competency hearing; (2) obtain co-counsel to assist him; (3) conduct an inadequate voir dire; (4) object to evidence of other crimes; and (5) request an instruction on criminal facilitation. The Court has already discussed each of the underlying constitutional issues and has found them to be meritless given the standard of the AEDPA. As a result, a discussion of these additional guilt trial claims of ineffective assistance is not necessary, as counsel's performance was not deficient in any respect other than that set forth above.

memorandum in excess of forty pages is **GRANTED,** which memorandum has been duly considered.

**IT IS FURTHER ORDERED** that the motion by the respondent for leave to file a memorandum in excess of forty pages is **GRANTED,** which memorandum has been duly considered.

**IT IS FURTHER ORDERED** that all remaining motions are **DENIED AS MOOT.**